**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

**FILED IN CAMERA AND UNDER SEAL
Pursuant to 31 U.S.C. § 3730(b)(2)**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA ex )
rel. JOLIE JOHNSON and DEBBIE )
HELMLY )
    and )
STATE OF GEORGIA ex rel. JOLIE )
JOHNSON and DEBBIE HELMLY, )
  )
    Plaintiff-Relators, )
  ) Civil Action No. _____
  ) Jury Trial Demanded
v. )
  )
BETHANY HOSPICE OF COASTAL ) FILED UNDER SEAL
GEORGIA, LLC, BETHANY )
HOSPICE, LLC, BETHANY )
BENEVOLENCE FUND, INC., AVA )
BEST, THOMAS MILLER, M.D., )
JUSTIN HARRELL, M.D., DAVID )
ARNETT, M.D., STAN SINCLAIR, )
M.D., RICHARD E. WHEELER, M.D., )
BERKLEY M. "MAC" MACKEY, ST. )
JOSEPH'S – CANDLER HEALTH )
SYSTEM, INC., JOENIE ALMEIDA, )
M.D., BRIAN ANDERSON., M.D., )
MEMORIAL HEALTH, INC., )
MEMORIAL HEALTH UNIVERSITY )
MEDICAL CENTER, INC., )
PROVIDENT HEALTH SERVICES, )
INC., MPPG, INC., MEMORIAL )
HEALTH UNIVERSITY )
PHYSICIANS, LLC, COMMUNITY )
HOSPICE HOLDINGS, LLC, )
SOUTHERN COMMUNITY )
HOSPICE CARE, INC., SOUTHERN )
COMMUNITY HOSPICE, INC., )
VICKI RYLES, ROYCE RYLES, )
JASON COLBERT, JAMES L. RAY, )
M.D., PATRICK BYRNE, M.D., )
MISTY POOLE, M.D., HOSPICE )
SAVANNAH, INC., THE STEWARD )
CENTER FOR PALLIATIVE CARE, )

**CV416 - 290**

INC., HOSPICE SAVANNAH      )
FOUNDATION, INC., MONICA    )
ANDERSON, BRUCE BARRAGAN,   )
CHAD CARNELL, KELLY EROLA,  )
M.D., LAURA FARLESS, M.D.,  )
MARTIN GREENBERG, M.D.,     )
DEBRA ANTHONY LARSON,       )
APPLING HEALTHCARE SYSTEM,  )
INC., COMFORT CARE HOSPICE, )
LLC, RAY LEADBETTER, ANGIE  )
POTTS,  ERROL GRAHAM, M.D., )
SOUTHCOAST HEALTH SYSTEM,   )
SOUTHCOAST MEDICAL          )
ASSOCIATES, LLC, SOUTHCOAST )
MEDICAL GROUP, LLC,         )
THEODORE GEFFEN, M.D.,      )
THOMAS MORIARITY, M.D.,     )
PRUITTHEATH, INC., PRUITT   )
HEALTH HOSPICE, INC., NEIL  )
PRUITT, JR.                 )
                            )
             **Defendants.**    )
_____  )
                            )

## COMPLAINT

The United States of America and the State of Georgia, by and through Relators Jolie Johnson and Debbie Helmly, bring this action under 31 U.S.C. §§ 3729-3732 ("False Claims Act") and O.C.G.A. § 49-4-168.1, *et seq*. ("Georgia False Medicaid Claims Act") to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and Relators, and the State False Medicaid Claims Act on behalf of the State of Georgia and Relators, and would show the following:

## I.    INTRODUCTION

1.    There is a large hospice problem in Southern Georgia.   Primarily, hospice companies have discovered that they can manipulate the system through kickbacks and admitting

2

patients who do not qualify.  They have disrupted the entire point of the hospice program in Southern Georgia.  This needs to stop.  This lawsuit is intended to change the trend of hospice companies profiting on some of the most vulnerable in the system.  These defendants have engaged in Medicare fraud through upcoding, double billing, admitting ineligible patients, kickbacks and a whole host of other improper activities.

2.     As a result of this conduct, Defendants are liable under the False Claims Act, 31 U.S.C. § 3729, *et seq.* and the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq*.

## II.     JURISDICTION AND VENUE

3.     This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*. and Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq*.

4.     This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

5.     This Court has subject-matter jurisdiction over this action pursuant to U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

6.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a) and O.C.G.A. § 49-4-168.6.

## III.    THE PARTIES

7.     Defendant Bethany Hospice of Coastal Georgia, LLC and Bethany Hospice, LLC are providers of hospice care.  Bethany has four locations in Georgia with offices in Claxton, Douglas, Valdosta, and Quitman.  The Douglas office is located at 201 Westside Drive, Douglas, Georgia, 31533.  The Quitman office is located at 1901 West Screven Street, P.O. Box 5027, Quitman, Georgia, 31643.  The Valdosta office is located at 2700 North Oak Street, Building B,

Valdosta, Georgia, 31602. Defendant Bethany Benevolence Fund, Inc. is located at 2700 N. Oak Street, Building B., Valdosta, Georgia 31602. Defendant Ava Best is the President of Bethany; Defendant Thomas Miller, M.D. is the Bethany Medical Director at the Claxton location; Defendant Justin Harrell, M.D. is the Bethany Medical Director at the Douglas location and also an employee of Coffee Regional Hospital; Defendant Stan Sinclair, M.D. and Defendant David Arnett, M.D. are the Bethany Medical Directors of Coffee Regional Hospital; Defendant Richard E. Wheeler, M.D. is the Bethany Medical Director at the Valdosta location and Defendant Berkley M. "Mac" Mackey, III is an investor and listed on the Secretary of State as the Chief Financial Officer (collectively referred to as "Bethany").

        8.      Defendant St. Joseph's/Candler Health System, Inc. are two hospitals providing inpatient, outpatient and emergency care and consists of a 330-bed acute care. The St. Joseph's Savannah location is located at 11705 Mercy Boulevard, Savannah, Georgia 31419. The Candler Hospital is a 384-bed facility and located in Savannah's midtown. Defendant Joenie Almedia, M.D. is an internal medicine physician employed by St. Joseph's/Candler located at 527 Eisenhower Drive, Savannah, Georgia. Dr. Almeida is also the Medical Director at Spanish Oaks Retreat/Hospice and Tara Nursing Home; and Defendant Brian Anderson, M.D. is a physician who currently lives in South Carolina but works for St. Joseph's/Candler (collectively referred to as "St. Joe's/Candler").

        9.      Defendant Memorial Health, Inc. ("the Holding Company") is a non-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404. The Holding Company was created to own and operate a comprehensive health care system consisting of outpatient and inpatient medical facilities, physician practices, residency teaching programs, medical transportation and

4

other related and ancillary components. The Holding Company owns and operates Defendant Memorial Health University Medical Center, Inc. ("Memorial") and is a non-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 700 Waters Avenue, Savannah, Georgia 31404. Memorial operates a 530-bed medical center serving multiple counties in southeastern Georgia and southern South Carolina. Defendant Provident Health Services, Inc. ("Provident") is a for-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404. Provident is a holding company for many of the ancillary service providers operating in connection with the Hospital including ambulance transport, medical office buildings, and physicians employed by Defendant MPPG, Inc. Memorial is the sole member of Provident. MPPG, Inc. is a for-profit corporation organized under the laws of the State of Georgia and maintains a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404. MHUP conducts business under the trade name Memorial Health University Physicians. MPPG is the holder of the physician contracts for those physicians working at the Hospital and is the legal entity that employs the physicians. Defendant Memorial Health University Physicians, LLC maintains a principal address of 4700 Waters Avenue Savannah, Georgia 31404. Defendants Hospice Savannah, Inc., The Steward Center for Palliative Care, Inc., and Hospice Savannah Foundation Inc. are providers of hospice care and palliative care with the principal office located at 1674 Chatham Parkway, Savannah, Georgia, 31405. This location is the main office for the homecare and administrative staff. Hospice Savannah serves five southeastern Georgia counties: Bryan, Chatham, Effingham, Liberty, and Long. The Hospice House, which is part of Hospice Savannah, is a 28-bed inpatient facility for patients with medical issues that cannot be handled at home and is located at 1352 Eisenhower Drive, Savannah, Georgia, 31406. The Demere Center for Living

5

is located at 6000 Business Center Drive, Savannah, Georgia, 31405 and is the home to the Hospice Savannah Foundation, Inc., Full Circle (a Center for Education & Grief Support), The Steward Center for Palliative Care, and the Edel Caregiver Institute. Defendant Kelly Erola, M.D. is on the staff at Memorial and is Medical Director at Hospice Savannah and is in charge of the palliative care program at Hospice Savannah "The Stewart Center." Defendant Monica Anderson is the Chief Clinical Officer; Defendant Bruce Barragan is the Chair Hospice Savannah Board of Directors; Defendant Chad Carnell is the Chief Operating Officer; Defendant Laura Farless, M.D. is the Palliative Care Physician; Defendant Martin Greenberg, M.D. is the Chair of The Steward Center for Palliative Care, Inc. Board of Directors; and Defendant Debra Anthony Larson is the President, CEO and COO of Hospice Savannah, Inc. (collectively referred to herein as "Memorial").

10.     Defendants Appling HealthCare System, Inc. ("Appling") is a licensed, non-profit acute care medical facility. Appling is licensed for 39 acute care hospital beds, 15 geriatric psych beds, 101 SNF bed, and has 4 rural health clinics. Appling has between 201-500 current employees and is located at 163 E. Tollison Street, Baxley, Georgia 31515. Defendant Appling is governed by the Baxley-Appling County Hospital Board Authority. Defendants Comfort Care Hospice ("CCH") are providers of hospice care through CCH's partnership with Appling and are able to provide services located inside the Appling HealthCare System. Defendant CCH is located at 88 Heritage Street, Baxley, Georgia 31513. Defendant Ray Leadbetter is the interim CEO of Appling HealthCare System as of March 2016. Defendant Angie Potts, RN is a joint owner of CCH. Ms. Potts opened this hospice house in the Appling County Hospital, which is also known as Appling HealthCare System. Defendant Errol Graham, M.D. is a physician for Comfort Care (collectively referred to herein as "Comfort Care").

6

11.     Defendants Southern Community Hospice Care, Inc., Community Hospice Holdings, LLC and Southern Community Hospice, Inc. are providers of hospice care. Community Hospice opened in 1999 and has two locations in Georgia which consist of eight total beds. Community Hospice has their principal office located at 904 Mt. Vernon Road, Vidalia, Georgia 30474. Defendant Vicki Ryles is the Co-founder and President of Community Hospice. Ms. Ryles is also a Registered Nurse. Defendant Royce Ryles is the Co-founder and Chief Financial Officer of Community Hospice. Defendant Jason Colbert, CHPCA is the Chief Executive Office of Community Hospice. Defendant James L. Ray, M.D. is the Chief Medical Director of Community Hospice and Defendant Misty Poole, M.D. is the Assistant Medical Director and Seasons of Life Medical Advisor. Defendant Patrick Byrne, M.D. is also the Assistant Medical Director of Community Hospice (collectively referred to as "Community Hospice").

12.     Defendant SouthCoast Health System is the parent company of SouthCoast Medical Group, LLC with Administrative offices located at 330 Benefield Drive, Savannah, Georgia 31406. SouthCoast Health has 120 physicians and medical professionals in 18 locations in Savannah, Richmond Hill, Pooler, Rincon, Baxley, Bluffton, Hilton Head and Hinesville. SouthCoast Health offers comprehensive medical services including: Family Medicine, Internal Medicine, Obstetrics & Gynecology, Pediatrics, Allergy and Immunology, Cardiology, Eye Care, Imaging, Infectious Disease, Nephrology, Neurology, Physical Therapy, Podiatry, Pulmonology, Sleep Medicine, Surgery, Clinical Trial Research Studies, Diabetic Self-Management Training Sessions, Dietetic Counseling, High Risk Breast Cancer Clinic, Laboratory Services, Massage Therapy, Optical Shop, Pharmacy, and Weekend Care. Defendant Theodore Geffen, M.D. is the Head of SouthCoast Medical; Defendant Thomas Moriarity, M.D. is second in charge at SouthCoast Medical (collectively referred to herein as "SouthCoast Medical").

7

13.     Defendant Pruitt Health, Inc. services communities in Georgia, North Carolina, and Florida.  Pruitt Health – Savannah is located at 12825 White Bluff Road, Savannah, Georgia 31419.  There are 120 Medicare/Medicaid beds at this facility.  Defendant Pruitt Health Hospice – Savannah is located at 9100 White Bluff Road, Suite 305, Savannah, Georgia 31419.  Defendant Neil Pruitt, Jr. is the Chairman and CEO (collectively referred to herein as "Pruitt Health").

14.     Relator Jolie Johnson began working for Bethany in December 2014 as a marketer and was terminated July 2015.

15.     Relator Debbie Helmly began working for Bethany in December 2014 as an Administrator and was terminated July 2015.

## IV.     STATUES AND REGULATIONS

### A.     Medicare and Medicaid Programs

16.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, et seq., establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

17.     The Medicare program consists of several parts.  Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care. 42 U.S.C. § 1395c-1395i-2 (1992).  Medicare Part B is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products including the treatments at issue in this complaint.  42 U.S.C. § 1395(k), 1395(i), 1395(s).  Reimbursement for Medicare claims is made by the United States through CMS.  CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u).  In this capacity, the

carriers act on behalf of CMS.  42 C.F.R. § 421.5(b) (1994).

18.     In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states expressly state that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid.  42 C.F.R. § 455, et seq.

19.     Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (1) bill Medicare for only those covered services which are medically necessary; (2) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (3) not engage in any act or omission that constitutes or results in over-utilization of services; (4) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (5) comply with state and federal statutes, policies and regulations applicable to Medicare; and (6) not engage in any illegal activities related to the furnishing of services to recipients.

20.     Title XIX of the Social Security Act, 42 U.S.C. § 1396, et seq., establishes Medicaid, a federally assisted grant program for the States.  Medicaid enables the States to provide medical assistance and related services to needy individuals.  CMS administers Medicaid on the federal level.  Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures. Medicaid authorizes grants to states for medical assistance to children and blind, aged, and disabled individuals whose income and resources are not sufficient to meet the costs of necessary

9

medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; 42 U.S.C. § 1396-1396v. The Medicaid Program is jointly funded by the federal government and participating states.

21.    At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program. Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

22.    At all times relevant to this Complaint, Defendants were participating as a Medicare/Medicaid provider.

23.    At all times relevant to this Complaint, Medicare/Medicaid constituted and continues to constitute a significant source of revenue for Defendants.

24.    Defendants submitted or caused to be submitted false claims for payment to Medicare/Medicaid for services and supplies.

**B.    Medicare and Medicaid Hospice Coverage**

25.    Defendants are a mostly for-profit hospice providers. Defendants significantly fund their operations and employees through receipt of Medicare/Medicaid dollars on behalf of individuals who are supposed to be eligible to receive Medicare/Medicaid hospice benefits. One of the purposes of the Medicare and Medicaid hospice requirements is to ensure that the limited

funds available are properly spent on patients who are dying and need end of life care.

26.     In order to be eligible to elect hospice care under Medicare, an individual must be (a) entitled to Part A of Medicare; and (b) certified as terminally ill in accordance with 42 C.F.R. § 418.22; 42 U.S.C. § 1395f(7)(A); 42 C.F.R. § 418.20.   According to 42 C.F.R. § 418.3, "terminally ill" means that a person "has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course."  As discussed further below, there also must be specific medical information supporting the certification of terminal illness.

27.     While elderly patients may qualify for a variety of other medical services paid by Medicare/Medicaid, for-profit hospice companies, like Defendants, are entitled to receive Medicare/Medicaid dollars only for Medicare/Medicaid recipients who are "terminally ill."

28.     When businesses such as Defendants admit a Medicare/Medicaid recipient to hospice care, that individual no longer receives, or is entitled to receive, services that would help to cure his or her illness.  Instead the individual receives what is called palliative care, or care that is aimed at relieving pain, symptoms, or stress of terminal illness, which includes a comprehensive set of medical, social, psychological, emotional, and spiritual services.  For this reason, electing hospice care is often a critical medical decision for a patient who has been informed that his or her death is imminent.  It is clear that Congress authorized funding from limited Medicare/Medicaid funds for this specialized benefit during the last several months of an individual's life.  To be covered, hospice services must be reasonable and necessary for the palliation and management of a patient's terminal illness as well as related conditions.

29.     The statutory basis for the Medicare hospice benefit is found in the Social Security Act: Sections 1812(a)(4) and (d) (scope of benefits and benefit periods); 1813(a)(4) (coinsurance); 1814(a)(7) and 1814(i) (requirement for written certifications; payment for hospice care); 1861(dd)

11

(services covered and conditions for hospice programs); and 1862(a)(1)(C), (6), and (9) (limits on hospice coverage).  The implementing regulations are found primarily at 42 C.F.R. Part 418 (the "Regulations").

30.     The Regulations require that eligible individuals who wish to elect hospice care file an election statement with a particular hospice.  42 C.F.R. § 418.24.  The hospice then files a notice of election with Medicare to begin the per diem payments.  After two initial periods of 90 days, an individual may continue to receive hospice care for an unlimited number of 60-day periods, as long as he or she continues to be re-certified as terminally ill.  Social Security Act § 1812(d)(1); 42 C.F.R. § 418.21; Medicare Benefit Policy Manual, Ch. 9 §§ 10, 20.1.

31.     For the initial 90-day period, the hospice provider must obtain a certification of terminal illness for the patient from both (a) the Medical Director of the hospice or a physician-member of the hospice interdisciplinary group, and (b) the individual's attending physician, if the individual has an attending physician.  For subsequent eligibility periods after the initial 90 day period, a re-certification must be completed by either the Medical Director or another physician at the hospice.  42 U.S.C. § 1395f (7)(A); 42 C.F.R. § 418.22.  The doctors must prepare this written certification before the hospice submits any claim for payment.  Social Security Act § 1812(a)(7); 42 C.F.R. § 418.21.  This certification, along with other clinical information and documentation that supports the patient's prognosis, must be filed in the patient's medical record with the hospice. 42 C.F.R. § 418.74.

32.     The written certification requires (a) a statement that the individual's medical prognosis is that his or her life expectancy is six months or less if the terminal illness runs its normal course; (b) specific clinical findings and other documentation supporting a life expectancy of six months or less; and (c) the signature(s) of the physician(s).  42 C.F.R. § 418.74.; Medicare

Benefit Policy Manual, Chapter 9, § 20.1.

33.     It is also required that a plan of care be established and periodically reviewed by the attending physician, the medical director, and the interdisciplinary group of the hospice program as set forth in § 418.56.  That plan of care must be established before hospice care is provided. The services provided must be consistent with the plan of care.

34.     Medicare's regulations governing hospices require the hospice medical record to include "clinical information and other documentation that support the medical prognosis" and "the physician must include a brief narrative explanation of the clinical findings that supports a life expectancy of 6 months or less as part of the certification and recertification forms." 42 C.F.R. § 418.22(b)(2) and (3).

35.     It is a condition of participation that hospices must maintain a clinical record for each hospice patient that contains "correct clinical information." All entries in the clinical record must be "legible, clear, complete, and appropriately authenticated and dated..." 42 C.F.R. § 418.104.

## C.     <u>Obligations of the Hospice Provider</u>

36.     All Medicare and Medicaid providers must enroll in the respective programs as providers, and are expected to deal honestly with the Government and with patients.

37.     In addition, all healthcare providers, like Defendants and its related entities, are obligated to comply with applicable statutes, regulations, and guidelines in order to be reimbursed by Medicare and Medicaid.  When participating in Medicare and Medicaid, a provider has a duty to be knowledgeable of the statutes, regulations, and guidelines for coverage of services, and, in the case of hospice care, to know that Medicare and Medicaid only reimburse for services that are reasonable and necessary for the palliation or management of terminal illness.  42 U.S.C. §

1395y(a)(1)(C).  They also have to properly train and inform their employees regarding the requirements for Medicare and Medicaid coverage of hospice services.

38.     Medicare regulations for hospice providers are set forth at 42 C.F.R. § 418.

39.     Since January 1, 2011, a physician or nurse practitioner must have a face-to-face encounter with every hospice patient "to gather clinical findings to determine continued eligibility for hospice care" before recertifying a patient for more than 180 days of hospice services and prior to each subsequent recertification. 42 C.F.R. § 418.22(a)(4).  "The physician or nurse practitioner who performs the face-to-face encounter with the patient . . . must attest in writing that he or she had a face-to-face encounter with the patient, including the date of that visit."  42 C.F.R. § 418.22(b)(4).  "The attestation of the nurse practitioner or a non-certifying hospice physician shall state that the clinical findings of that visit were provided to the certifying physician for use in determining continued eligibility for hospice care." 42 C.F.R. § 418.22(b)(4).  In addition to the Medicare regulations, these important requirements are also contained in the Medicare Benefit Policy Manual, Chapter 9, § 20.1, along with additional descriptions and guidance for hospice providers.

40.     Recognizing the gravity of a patient's decision to forgo curative care for a terminal illness, Medicare instructs that "[a] hospice needs to be certain that the physician's clinical judgment can be supported by clinical information and other documentation that provide a basis for the certification of six months or less if the illness runs its normal course.  A signed certification, absent a medically sound basis that supports the clinical judgment, is not sufficient for application of the hospice benefit under Medicare." 70 Fed. Reg. 70534-35.

41.     The clinical record for each hospice patient must contain "correct clinical information." 42 C.F.R. § 418.104.  The hospice provider also must maintain clinical records that

are "legible, clear, complete, and appropriately authenticated and dated"; these records must include clinical notes such as nursing notes. 42 C.F.R. § 418.104; 42 C.F.R. § 418.310.

42.     Among the regulatory requirements for hospice providers are the requirement that each hospice patient be treated by an interdisciplinary team.  As specified by 42 C.F.R. § 418.56, the interdisciplinary group should consist of, at a minimum, a physician, a registered nurse, a social worker, and a pastor or other counselor.  The interdisciplinary group is responsible for coordination of each patient's care, to ensure continuous assessment of each patient's and family's needs, and the implementation of the interdisciplinary plan of care.

43.     In treating a hospice patient, the registered nurse assumes a particularly critical role, in that he or she is responsible for providing coordination of care, ensuring continuous assessment of each patient's needs, and ensuring implementation of the plan of care.  42 C.F.R. § 418.56(a); 42 C.F.R. § 418.100(a)(2).  A registered nurse who provides direct "skilled care" must be present on each and every shift.  Neither a licensed practical nurse nor certified nursing assistant is qualified to meet the requirements of 42 C.F.R. § 418.100(a)(2).

44.     Each member of the interdisciplinary team must treat the patient according to an individualized plan of care, which is developed at the time of initiation of services and is updated no less than every 15 days.  42 C.F.R. § 418.56(b)-(d).  The hospice provider must also develop and maintain a system of communication and integration among the interdisciplinary team, to ensure that the plan of care is being followed, and to provide for the sharing of information among the team members and with non-hospice healthcare providers.  42 C.F.R. § 418.56(e).

45.     The Medicare hospice benefit covers a broad set of services for eligible beneficiaries, including physician services, nursing care, physical therapy, social services, homemaker services, medical supplies, short-term inpatient care, and bereavement counseling for

the family.  Social Security Act § 1861(dd)(1)-(2).  Hospice providers must make whatever services are necessary for the particular patient, including nursing services, available on a 24 hour basis.  Social Security Act § 1861(dd)(1)-(2); 42 C.F.R. § 418.50.  Eligible beneficiaries who choose to elect hospice care agree to forego all curative treatment for their terminal condition.  Social Security Act § 1812(d)(2)(A); 42 C.F.R. § 418.24(d).

46.     Written plans of care must be established and maintained for each enrolled patient.  C.F.R. § 418.58, 68.  These plans must be established by the attending physician or the Medical Director in cooperation with an interdisciplinary team within the hospice.  C.F.R. § 418.58, 68.  The plans must be reviewed periodically by the team, including when determining whether to recertify a patient as terminally ill, and that review must be documented.  C.F.R. § 418.58, 68.  The Medicare Regulations specifically note what documentation the hospice must keep for each individual.  42 C.F.R. § 418.74.

47.     The hospice provider also must "maintain an effective, ongoing, hospice-wide data-driven quality assessment and performance improvement program".  42 C.F.R. § 418.58.

48.     There are four levels of hospice care: (1) routine home care; (2) continuous care; (3) inpatient respite care; and (4) general inpatient ("acute") care.  Level 1 is commonly called "routine" care, and hospices may provide this level of care not only in private residences, but also in nursing homes and stand-alone hospice facilities.  Level 4 general inpatient care is sometimes called "acute" care.  It must be provided in a Medicare-certified hospice facility, hospital, or skilled nursing facility (42 C.F.R. § 418.98) with a registered nurse on-site to provide direct patient care 24-hours a day.  42 C.F.R. § 418.100(a)(2).

49.     Nursing services "must be made routinely available on a 24-hour basis 7 days a week."  42 C.F.R. § 418.100.  Nursing services must ensure that the patient's needs, as identified

in the plan of care, are met.  42 C.F.R. § 418.64.

      50.     To qualify for "general inpatient" or "acute" care, a patient must be in a free-standing hospice, a hospital, or a skilled care nursing home "for pain control or acute or chronic symptom management which cannot be managed in other settings."  42 C.F.R. § 418.302(b)(4). This level is intended to be short-term.  42 C.F.R. § 418.98.

      51.     As a condition of participation, hospices may provide care at the general inpatient level only for "short term" periods and only when medically indicated.  The specific circumstances allowed by the regulations are "pain control" and "symptom management." 42 C.F.R. § 418.98 (a).  A hospice is only allowed to bill the more expensive general inpatient level for brief periods when a patient is in an acute stage, needs stabilization, or is in transition.  If the hospice patient does not qualify for the general inpatient level of care, then the patient receives routine care, and the patient or his/her family is responsible for the room and board whether at home, or in a nursing home.

      52.     CMS provides the following guidance with regard to "Short Term Inpatient Care":

> General inpatient care may be required for procedures necessary for pain control or *acute* or chronic symptom Management that cannot feasibly be provided in other settings. *Skilled nursing care* may be needed by a patient  whose home support has broken down if this breakdown makes it no longer feasible to furnish needed care in the home setting ... [A] *brief* period of general inpatient care may be needed in some cases when a patient elects the hospice benefit at the end of a covered hospital stay. If a patient in this circumstance continues to need pain control or symptom management which cannot be feasibly provided in other settings *while the patient prepares to receive hospice home care*, general in patient care is appropriate. Other examples of appropriate general inpatient care include a patient in need of medication adjustment, observation; or other stabilizing treatment, such as psycho-social monitoring, or a patient whose family is unwilling to permit needed care to be furnished in the home.

CMS Medicare Benefit Policy Manual, Chapter 9, § 40.1.5 (emphases added).

53.     Medicare requires that at least eight hours of primarily nursing care are needed to manage an acute medical crisis.  Furthermore, "[w]hen a hospice determines that a beneficiary meets the requirements for [crisis care], appropriate documentation must be available to support the requirement that the services provided were reasonable and necessary and were in compliance with an established plan of care in order to meet a particular crisis situation.  Medicare Benefit Policy Manual, Chapter 9, § 40.2.1.

54.     The hospice is responsible for determining the correct level of care for a patient through the patient's plan of care and the involvement of an interdisciplinary team.  It is incumbent upon the medical director to oversee this process to ensure that the level of care is appropriate.

**D.     The Medicare and Medicaid Hospice Payment Process**

55.     Hospices are paid a per diem rate based on the number of days and level of care provided during the election period.  Medicare Benefit Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302.  The payment rates are based on which level of care the hospice provider furnishes to a patient on a particular day.  42 C.F.R. § 418.302; Medicare Benefit Policy Manual, Ch. 9, § 40. The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers.  CMS, in turn, contracts with Medicare Administrative Contractors ("Medicare claims processors," also known as "MACs"), to review, approve, and pay Medicare bills, called "claims," received from health care providers like Defendants.  In this capacity, the Medicare claims processors act on behalf of CMS.

56.     Payments are typically made by Medicare directly to health care providers like Defendants rather than to the patient.  The Medicare beneficiary usually assigns his or her right to Medicare payment to the provider.  The Medicare provider either submits its bill directly to Medicare for payment, or it contracts with an independent billing company to submit a bill to the

18

Medicare claims processor, on the provider's behalf.

57.     Because it is not feasible for the Medicare program, or its contractors, to review the patient files for the millions of claims for payments it receives from hospice providers, the Medicare program relies upon the hospice providers to comply with the Medicare requirements and trusts the providers to submit truthful and accurate claims. Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form called a "CMS-1450 form."

58.     On the CMS-1450 form, the hospice provider must state, among other things, the identity of the patient, the hospice's provider number, the patient's principal diagnosis, the date of the patient's certification or re-certification as "terminally ill," the location where hospice services were provided, and the level of hospice care provided (i.e., routine home care, crisis care, respite care, or general inpatient care).

59.     On the CMS-1450 form, the provider also certifies that the claim "is correct and complete," that "[p]hysician's certifications and re-certifications, if required by contract or Federal regulations, are on file," and that "[r]ecords adequately disclosing services will be maintained and necessary information will be furnished to government agencies as required by applicable law."

60.     All Medicare providers must have, in each of their patients' files, the medical documentation to establish that the Medicare items or services for which they have sought Medicare reimbursement are reasonable and medically necessary.

61.     The physician certifications and other documents that support the claim that hospice providers make to Medicare are submitted to Medicare only if the claim for hospice services is selected for medical review, which does not happen routinely. Additionally, it is the hospice provider, like Defendants, and not the patient's primary care or treating physician, who is required to submit to Medicare the underlying documentation that supports the eligibility determination and

the claim.

62.     In order to bill Medicare, a provider (such as Defendants) often submits a claim form known as a CMS Form 1500 to the appropriate fiscal intermediary (FI) or MAC. Each time it submits a claim for payment by Medicare, therefore, a provider (such as Defendants) certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations.

63.     To be eligible for Medicaid reimbursement, providers must enroll in the Medicaid program. They must declare under penalty of perjury that they are "responsible for the presentation of true, accurate and complete information on all invoices/claims submitted [to the fiscal agent]."

64.     It is not feasible for the Medicaid program, or its agents, to review each claim or patient file that supports a claim. It does not employ doctors to review the certifications of eligibility or the medical records to ensure the hospice is complying with the requirements before paying claims. Instead, the Medicaid program requires and trusts hospice providers to comply with the Medicaid requirements, and requires the providers to submit truthful and accurate claims.

65.     The hospice providers are required to submit certifications and other documents to support claims to Medicaid.

1.     Payment amounts are determined within each of the following categories:

(1) Routine home care day. A routine home care day is a day on which an individual who has elected to receive hospice care is at home and is not receiving continuous care as defined in paragraph (b)(2) of this section.

(2) Continuous home care day. A continuous home care day is a day on which an individual who has elected to receive hospice care is not in an inpatient facility and receives hospice care consisting predominantly of nursing care on a continuous basis at home. Home health aide (also known as a hospice aide) or homemaker services or both may also be provided on a continuous basis. Continuous home care is only furnished during brief periods of crisis as described in § 418.204(a) and only as necessary to maintain the terminally ill patient at home.

20

(3) Inpatient respite care day.  An inpatient respite care day is a day on which the individual who has elected hospice care receives care in an approved facility on a short-term basis for respite [this is respite for their regular caretakers].

(4) General inpatient care day.  A general inpatient care day is a day on which an individual who has elected hospice care receives general inpatient care in an inpatient facility for pain control or acute or chronic symptom management which cannot be managed in other settings.

42  C.F.R. § 418.302(b).

66.     To bill Medicare for crisis care, a hospice must provide care that is: (1) designed to palliate the patient's acute medical symptoms, (2) provided to the patient for at least eight hours in a 24-hour period, counted from midnight to midnight, and (3) predominantly nursing care, meaning care provided by a registered nurse (RN), licensed practical nurse (LPN), or nurse practitioner (NP).  42 C.F.R. §§ 418.302, 418.204.  If the care lasts less than eight hours in a 24-hour period, the hospice may only bill Medicare for routine home care for that day of hospice services.  Similarly, if the care provided does not consist of predominantly nursing care, the hospice may not bill Medicare for crisis care and must instead bill for routine home care.  42 C.F.R. §§ 418.302, 418.204.

67.     Medicare also reimburses hospices for evaluation and management (E&M) services rendered by physicians in the hospice setting.  Claims for these services are submitted using CPT codes.  E&M services are billed to Medicare using CPT codes 99334, 99335, 99336, and 99337 for established patients and 99324, 99325, 99326, 99327, and 99328 for new patients.

68.     Medicare pays the highest reimbursement for CPT codes 99336 and 99337 (Level 3 and Level 4 for established patients) and 99327 and 99328 (Level 4 and Level 5 for new patients). Billing at Levels 3, 4 and 5 codes requires that the physician has provided a more complete patient history, a more comprehensive examination, and medical decision involving a higher level of

21

complexity, than the services provided at Levels 1 or 2.

69.     The per diem rate for hospice services is deemed to include all administrative, clinical and medical duties performed by the hospice's Medical Director, such as supervisory duties, quality assurance duties, assessments of patients' eligibility for hospice, participation in the establishment, review and updating of plans of care, supervising care and services, and establishing governing policies.  42 CFR § 418.304(a); Medicare Claims Processing Manual, Ch. 11 § 40.1.1.

**E.     General Rules for Billing Physician Services**

70.     Under Medicare rules, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS").  In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them. Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate (conversion factor).

71.     RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS").  HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid and other federal and state-funded health care programs pay for services rendered to patients by physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render classes or types of medical care.  To ensure uniform descriptions of medical care rendered and consistent compensation for similar work, Government-funded health care programs tie levels of reimbursement to these standardized codes.

72.     The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (called Level I codes) and are published and updated annually by the American Medical Association.  Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and

22

Management," "Anesthesiology," "Surgery," "Radiology," or general "Medicine") and the medical services and procedures commonly performed by physicians working in that field.

73.     Physicians typically submit claims to Medicare and Medicaid for professional services on Form CMS-1500.  The claim form sets forth the diagnostic code describing the patient's presenting condition and the procedural codes.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient...."

74.     Medicare will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395(a)(l)(A).

75.     The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary.   For physician services, "medical necessity of a service is the overarching criterion" for determining which CPT code is appropriate. See Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A).

76.     Although CPT codes are used by Medicare to determine the appropriate levels of reimbursement for specific medical procedures and services, those codes are not intended to substitute for adequate documentation in a patient's medical record of all medical services rendered. In part to establish that care was appropriately rendered and medically necessary, patient medical records must also document the reason for the patient encounter and relevant history, physician examination findings and prior diagnostic test results; assessment, clinical impression or diagnosis; plan for care; time and date; and legible identity of the provider.   The patient's progress, response to and changes in treatment, and revision of diagnosis should also be documented.  If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred, and past and present diagnoses should be accessible.  The documentation

must support the CPT codes reported on the health insurance forms.  See CMS's 2010 Evaluation and Management Services Guide, at 4.

77.    Although documentation is important, the "volume of documentation should not be the primary influence upon which a specific level of service is billed."   Medicare Claims Processing Manual, Chapter 12 § 30.6.1 (A).  Instead, the level of service should be determined based on the nature and severity of the patient's problem(s) and the required course of treatment, as determined through exercise of the physician's honest medical judgment, unclouded by personal financial interest.

F.    **The Federal Anti-Kickback Statute**

78.    The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even handful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

79.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute ascribes liability to both sides of an impermissible kickback relationship.

80.    Essentially, if just one purpose of the payment was to induce future referrals, the

Medicare statute has been violated.  This is true even if the doctor performs some medical service for the money.  It is not even required that it be the primary purpose—just one purpose of the payment.  In other words, a defendant can have 99 lawful reasons to enter a relationship, but if one other reason is to expect referrals, it is illegal.  It is irrelevant if the funds would have been spent anyway or that Medicare funds were not used to make the illegal payment.

81.     Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act.  42 U.S.C. § 1320a-7b(g). It is not just the claims tied to the referring physician, but all claims that in any way relate to the referred patient. This would include medicine, scans and x-rays, and a host of other related charges.

82.     Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicare and Medicaid programs.

83.     Either pursuant to provider agreements, claim forms, or other appropriate manner, physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

84.     Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).  Any party convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(l).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agencies to exclude that provider from the State health program), and may consider imposing administrative

sanctions of $50,000 per kickback violation.  42 U.S.C. § l320a-7(b).

85.     The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(2), 124 Stat. 119, 759 (March 23, 2010), clarified that "a person need not have actual knowledge of" or "specific intent to commit a violation" of the Anti-Kickback Statute.

## V.     FACTUAL ALLEGATIONS

### A. BETHANY HOSPICE

86.     Ava Best is the President and CEO of Bethany Hospice.  Ava Best, Mac Mackey, and Richard Wheeler are also officers of Bethany Benevolence Fund, Inc. which was founded in February 2009.  Ms. Best is listed as the Administrator for Bethany with the State of Georgia.  In December 2014, Ms. Best and Relator Helmly agreed that Relator Helmly would get a 2.5% ownership for working with the company.  Ms. Best listed Relator Helmly as the Administrator for Bethany Hospice of Coastal Georgia.

87.     Ms. Best purchased the number used for Bethany Hospice of Coastal Georgia from Alex Patterson who owned Presbyterian Hospice and she used this number for her hospice office in Quitman, Georgia.  Then, once she decided to open the office in Claxton, she transferred the number over to Bethany Hospice of Coastal Georgia.

88.     Once a number is purchased, the purchaser is required to do a CHOW (Change of Ownership).  It is unclear whether or when Ms. Best did a CHOW for Bethany Hospice of Coastal Georgia, which she opened on January 1, 2015, because it appears that she was running as Presbyterian Hospice for some time.

89.     Ms. Best did not realize that when employees would pull up any of the billing that was needed before signing up a new patient, it would still show up as the Presbyterian Hospice. This hospice never had permission to work in Claxton, Georgia.  This continued for at least two

months after Bethany was up and running in Claxton. When Relators would run someone's Medicare or Medicaid number through the system, it would show if they had ever been on hospice before and if so, with which company. Every time Relators did this, it would show up as The Presbyterian Hospice in Valdosta. Relators contacted Ms. Best about this, but she just told them not to worry about it.

90.     Relator Helmly started a branch of Bethany Hospice called Bethany Hospice of Coastal Georgia which is located in Claxton, Georgia. This branch was only created because Relator Helmly was identified with the State of Georgia as its Administrator. After Relator Helmly was terminated, the location went off the rails with regard to management and following the regulations.

91.     Ms. Best used what she called an "Interim Clinical Director". Supposedly, that person drove 6 hours a day from Valdosta, Georgia. Of course, the Interim Clinical Director did not actually come in all 5 days. Even when the Interim Director from Valdosta came to the site, she would arrive between 10:00-10:30 a.m. and leave by 1:00 or 2:00 p.m.

92.     Ms. Best also put the Clinical Director of the Douglas location, Jeneen Cliett, as the Administrator for the Claxton site (which is 1.5 hours away). After Ms. Cliett "became" the Administrator of Claxton, she never visited the site. She would "call in." Both of these actions are illegal. There must be an Administrator on site all day every day.

93.     Ms. Best also made Bridget Thornton the Clinical Director of the office, even though she was the only RN working there, and she does not meet the qualifications to be a Clinical Director. There are also two LPNs that are being used in place of RNs.

94.     Also contrary to the regulations, Ms. Best does not have a Social Worker with a master's degree in social work seeing patients. This is a prerequisite to billing for the visit. Relator

Johnson was told about this by the very person seeing the patients that does not have her masters.

95.     Historically, Ms. Best has discharged patients if they are going into the hospital (also against regulations). An example, is patient P in Savannah, Georgia. Relator Johnson was told this in person by the nurse that had to meet patient P at the hospital to have him sign revocation papers.

96.     Some of the patients that went directly into the hospital and were also picked up that very same day include IC, JP, HK, and ST. Patient AQ also went to the doctor for aggressive treatment and Bethany did not pay for this even though he was a full Medicaid patient.

97.     Ms. Best also discharges patients once they are out of their Medicare payments. If they are on Medicaid, she will keep them because they do not have a monetary limit.

98.     There are also issues of neglect and failure to perform the services required by hospice. A patient by the name of SB ended up dying due to negligence on Bethany's part of not treating a urinary tract infection. TT is a patient who had passed away two days before any nurse went out to check on him. The neighbors actually found him as they had not seen him out. It was said he had been dead for days, but because the nurse said he would not answer the phone, she did not go by and check on him.

99.     Bethany has also engaged in multiple HIPAA violations such as using patients names in emails, sending by text to personal cell phones, or speaking about patients on Facebook.

100.     However, the largest problem with Bethany is that Ms. Best determined to grown and maintain her business through kickbacks.

101.     Ms. Best came from Odyssey Hospice, which got most of its referrals by giving their Medical Directors kickbacks. When Odyssey sold its office in Valdosta, Ms. Best purchased it. Ms. Best was well aware that the way Odyssey operated was illegal. She often told Relator

Johnson that she had found a way to do it so she would not get caught.  She said she had "found a way around" the Anti-Kickback law.

102.    Ms. Best mentioned several times that her Medical Directors were "part owners" in Bethany Hospice.  Of course, they also sat on hospital boards and had private practices which could refer patients regularly.  Relator Johnson reminded Ms. Best that SouthCoast Medical in Savannah had joined in an agreement with Odyssey Hospice and when Odyssey was bought out, the new company deemed this to be illegal and the agreement was dissolved.  Ms. Best said she had "found a way around this issue."

103.    To emphasize Ms. Best's knowledge and intent, Relators provide the example of Dr. Daily.  Dr. Daily had been trying to become an investor in Bethany for quite some time.  Mac Mackey asked Relators what they knew about him since he was from Savannah but has another office in Douglas.  Relators told Mr. Mackey that they would never get referrals from Dr. Daily because he is a "sleep guy".  Ms. Best and Mr. Mackey then said to "forget it.  If he cannot refer, [they] don't need him."  "Investment" was never "investment," it was Bethany's disguised kickback scheme—and they all knew it.

104.    There are a lot of Medical Directors or Associate Medical Directors for Bethany, all of which are investors and get money back in their pockets.  When the referrals are pulled for Bethany Hospice, you will see that 95% of the referrals come from their own investors, who sit on the medical board.  The Douglas location has the most Medical Directors that are linked with the hospital which is why they get the most referrals at this location.  Dr. Justin Harrell, Dr. David Arnett and Dr. Stan Sinclair are all Medical Directors who also work at Coffee Regional Hospital.  The Valdosta location has Dr. Richard E. Wheeler as the Medical Director.  The Quitman location also has a Medical Director and numerous Associate Medical Directors.  Most hospices will list

29

their Medical Directors, but at Bethany, they know that they have too many and are keeping it a very low profile because of all the money they make off of it.

105.    The Medical Director at Acres Nursing Home in Douglas is also a Medical Director for Bethany Hospice in Douglas. Bethany Hospice wants its Medical Directors to be Medical Directors at Nursing Homes because then they know they will always get all the referrals, just as they do with Coffee Regional Hospital.

106.    Dr. Thomas Miller is the Medical Director at the Claxton location, and is the only doctor that Ms. Best employs that has refused to take her investment offer. Dr. Miller was referred by Relators.

107.    After Relators referred Dr. Miller, Mr. Mackey, Dr. Wheeler, who is the main Medical Director, Ms. Best, and Relator Helmly went to see Dr. Miller during his lunch break. He said he wanted a monthly salary. In response, Ms. Best explained to him how she gives an interest into the company to all her Medical Directors and that provides them with "a large amount of money." Ms. Best explained that all of the other Medical Directors are "investors." Dr. Miller directly told Ms. Best that he did not think it was ethical for him to have ownership in a business for which he was also the Medical Director. He told her that he felt that would be a conflict of interest. Dr. Miller also indicated that it was clearly illegal. This was in the first week of February, 2015.

108.    In March 2015, Relator Johnson was present when Ms. Best asked Dr. Miller again about partial ownership in Bethany and he asked Ms. Best how Medical Directors could be investors. Ms. Best replied, "I have found a way that makes it legal."

109.    The Medical Directors in Douglas, Georgia, which is Coffee County are also Directors that sit on the Coffee County Hospital Board. They refer all patients to Bethany and

therefore receive the largest bonuses.  In August 2015, Ms. Best also sent all the Medical Directors to a Hospice meeting, paying airfare, hotel, and food for both them and their wives.  Relator Helmly was present in late May or early June when Ms. Best offered this trip to Dr. Miller, the Medical Director for Claxton Hospice of Coastal Georgia.  He declined because it did not appear to be legal.

110.    Ms. Best also pays different amounts in "bonuses" to her Medical Directors throughout the year depending on how well the sites are doing, which means how the referrals increase the census.  Dr. Miller refused all bonuses and vacations with his wife at Bethany's expense and stated right in front of Ms. Best, Mr. Mackey, and Relator Helmly that he did not think any of this was legal.

111.    Ms. Best has a Clinical Director that also get a percentage of the company as well as the girl that does the QAPI, Monica Jones RN.  Ava has another site Whitman, Georgia, that is not far from Valdosta that also has a Clinical Director that gets a percentage of what her site does as well as her Medical Directors and Investors. Ms. Best continues the kickback/investor incentives with her Clinical/Executive Directors.  For example, Jeneen Client was the Clinical Director for Douglas, Georgia.  She was considered to have a larger percentage of the company than other "investors" because of how many patients her office had.  Ms. Best pays out monies to her Clinical/Executive Directors periodically depending on how the site performed that year (based on the number of patients put under service), because they too are "investors."  These non-set amounts of "pay out" are improper.

112.    Relator Helmly was the Administrator at Bethany.  She had never been written up or reprimanded or received any other discipline.  She was unceremoniously terminated for engaging in protected activities under the False Claims Act.  She even asked Ms. Best and Mr.

Mackey if she could be demoted rather than fired, but they refused and terminated her employment. Ms. Best said things to Relator Helmly that made it clear that this was related to suspected whistleblower activities. She did not want whistleblowers associated with her business. Relator Helmly was not allowed to clean out her own desk. In fact, Relator was seeing patients who needed immediate attention (including medication) and Ms. Best told her to abandon those activities and return directly to the office.

113.    Relator Johnson suffered a similar fate for the same reason.

## B. ST. JOSEPH'S/CANDLER

114.    St. Joseph's/Candler gives doctors bonuses based on the profit they bring in. They incentivize and encourage doctors to upcode, double bill, and miscode—which they do. While most of the information and evidence is centered on Dr. Almeida, other doctors and doctor's practices that are owned or controlled by St. Joseph's/Candler follow the same pattern. St. Joseph's/Candler reviews codes and charges for its doctors and medical practices.

115.    Relators have met with current and former doctors affiliated with St. Joseph's/Candler as recently as a few months ago. The clear message is that doctors are pressured to upcode (particularly the level of their visits) in order to receive a higher bonus at the end of the year. There is little to no oversight on this process and the system is set to maximize profit rather than properly bill Medicare, Medicaid, and other Government programs. At least one physician has quit over this overbilling culture, which focuses only on "the bottom line, not the patients." Other doctors have left for the same or similar reasons. St. Joseph's/Candler is or should be aware of all the improper billing, but does nothing about it. The one person in the system who is responsible for oversight is also the office manager for several locations and is incapable of detecting or rectifying the universal upcoding.

116.    Dr. Bill Kolhoff was a Hospitalists for St. Joseph's/Candler in 2011-2013 and informed Relator Helmly and Relator Johnson on several occasions that his year-end bonus was based on running increased test on Medicare/Medicaid patients.   Dr. Kolhoff said they, the Hospitalists, were highly encouraged to run unnecessary tests to increase revenue for the hospital.

117.    Dr. Joenie Almeida upcodes as well as bills all his nursing home and hospice patients' charges through St Joseph's/Candler to increase his yearly income therefore directly impacting his year-end bonus amount.  This type of upcoding, primarily with Medicare patients, is as egregious as Medicare fraud can reach because it is to simply increase Dr. Almeida's monetary payout/bonus at the end of the year.

118.    When Dr. Almeida took over as Medical Director of Spanish Oaks Hospice, he was also the Medical Director for numerous nursing homes.  His private practice is owned by St. Joseph's/Candler, but his office is located on Eisenhower Road (or Drive) in Savannah.  Since Dr. Almeida has taken over as the Medical Director of Spanish Oaks, he has started running bills for the hospice patients he is in charge of through St. Joseph's.   In addition, Dr. Almedia is receiving kickbacks for referrals to Spanish Oaks as a part of the St. Joseph's/Candler system.

119.    A quick review of Dr. Almeida's information at St. Joseph's/Candler shows that he is trending at over $400,000 in revenue for St. Joseph's/Candler, which is what determines his bonus.  A cross-reference of his schedule and his billing rates shows that Dr. Almeida is upcoding his levels of visits as they could not be done on the schedule allowed.  He also submits level bills before even seeing the patients—showing the inherent (and intentional) upcoding in the system.  For example, on August 31, 2015, Dr. Almeida billed for two patients in the morning before he ever saw them in the afternoon, therefore he had to determine what codes to put down before actually seeing them.  The patient names are W and C.

120.    Other doctors, such as Dr. Kestin, Dr. Rendon, and Dr. Anderson, are following the same formula as shown by a comparison of the schedule and the billing.  Dr. Almeida and others also bill in various capacities, such as Medical Director and physician (nursing home, hospice, practice, and hospital).  One record obtained shows that Dr. Almeida was paid for the same service by Medicare, Spanish Oaks, and St. Joseph's/Candler.

121.    There are also issues with kickbacks and Stark referrals.  For example, Novo Nordisk, a pharmaceutical company, used to come in to St. Joseph's/Candler once a month to conduct a free diabetes day for those with diabetes.  One of the employees reported this to upper management and it was stopped immediately because "the diabetic patients need to go to the Candler Diabetic center for education," because this "was taking revenue out of the pocket of the hospital."  All physicians that work for St. Joseph's/Candler only send their patients to either Candler or St. Joseph, which includes all test, mammograms and other imaging.

122.    Dr. Almeida also insists that all of his patients go to Spanish Oaks Hospice.  For example, one patient that needed hospice wanted Hospice Savannah, but Dr. Almeida insisted they go with Spanish Oaks.  He refused to give the patient pain medication and caused them to suffer unless they went with Spanish Oaks.

### C. MEMORIAL HEALTH

123.    Memorial Health is a community hospital in Savannah, Georgia.  This hospital is an indigent hospital nonprofit and is supported by enormous government grants.  Memorial is a teaching hospital with medical students for both Internal Medicine and Family Practice.  The residents from the Memorial family practice can range from first year residents to fourth year residents preparing for graduation.  All residents do a one day rotation through Hospice Savannah and some four year residents will actually work in the hospice to earn extra money.

124.    Memorial employees many hospitalists that will oversee the patient care while in the hospital. Dr. Erola is on the staff at Memorial and is Medical Director at Hospice Savannah and is in charge of the palliative care program at Hospice Savannah "The Stewart Center."

125.    A hospice cannot be directly or indirectly involved with a palliative care program, even under safe harbor. The belief is that you are preparing these patients for your hospice care which is what the Stewart Center is doing for Hospice Savannah. Both programs are funded by the hospice's nonprofit foundation.

126.    Because the residents do rotations at Hospice Savannah they will make direct referrals to Hospice Savannah which is a kickback. Relator Johnson was informed in person by Miriam Cribb, the coordinator for the residents that they almost always will refer to Hospice Savannah because of the relationship.

127.    The discharge planners have a list of approved vendors for hospice and this will allow for the families and the patient to interview and select the hospice of their choice. However, the practice is that all the doctors are told to just refer to Hospice Savannah. Memorial employees have been instructed that they cannot oversubscribe to GIP or to any particular hospice, but they willingly refer to Hospice Savannah for the remunerations.

128.    Dr. Kelly Erola is a board certified Hospice and Palliative Medicine Physician. She is employed by Memorial Health and is also the Chief Medical Officer for Hospice Savannah and the Palliative Medicine Physician for The Steward Center for Palliative Care in Savannah, Georgia. Dr. Erola is also the Co-Chair of the Georgia Pain Initiative; Chair of the Palliative Care Working Group of Georgia's Cancer Control Consortium; a member of the Ethics Committee and Cancer Committee at Memorial Health University Medical Center and St. Joseph's/Candler Health Systems and Clinical Assistant Professor for Mercer University School of Medicine and Regents

University (Medical College of Georgia) where she teaches hospice and palliative medicine.  She is also a member of the Board of Health for Chatham County; the past President of the Georgia Medical Society; and Chair of the Department of Family Medicine, Memorial Health University Medical Center.

129.    Dr. Kelly Erola also works with hospital residents at Memorial Health and hires them to work at Hospice Savannah.  All palliative patents are sent or referred to Hospice Savannah once they are finished with palliative care.  Dr. Erola is also the Palliative Care Director at St. Joseph's/Candler.  Relator Helmly knows of more than one physician who has tried to refer patients from St. Joseph's/Candler, and it rolls over to Hospice Savannah.

130.    Dr. Erola is called in if a patient is not ready for hospice but will allow for palliative care under The Stewart Center.  The Stewart Center is the brain child of Hospice Savannah (and operated by Hospice Savannah) and then once the patient does qualify for hospice be put directly under Hospice Savannah care not allowing once again patient choice.

131.    The Lewis Anderson Cancer Center allows for Hospice Savannah to have breakfast in the office every month to educate families on hospice.  No other hospices are allowed to do breakfast.  Hospice Savannah also has an eight foot sign advertising the breakfast and information and hospice standing by the door in the waiting room of the cancer center.

132.    In addition, Hospice Savannah has had to discharge between 60-75 patients per year for not qualifying for hospice after being placed under service.  This is a clear indication that the patients should not have been admitted in the first place.

133.    As an overall rule, Memorial has an employee check all the billing to maximize billing (not based on procedures, but on billing tricks).  They also watch every referral from every affiliated entity to make sure they are going to "right place."  This includes referrals implicated by

36

the Stark laws such as MRIs or x-rays.

### D. COMFORT CARE

134.    Comfort Care Hospice ("CCH") makes it appear that the hospital either owns or supports this particular hospice as the owner, Angie Potts, rebuilt a wing Appling County Hospital only for patients of CCH.

135.    Stephanie Thompson does PRN work for Ms. Potts, the owner of Comfort Care Hospice.  Ms. Thompson informed Relator Helmly on April 14, 2016 that the Appling County Hospital where Angie Potts rebuilt a wing for patients of CCH only, is going to close the wing because there has not been any income for the hospital.  Ms. Thompson informed Relator Helmly that no other hospice was allowed to put patients in the wing that was redone by CCH.

136.    Dr. Cezar is both the Medical Director and part owner of CCH.  He also works as a Hospitalists at Appling Healthcare System.  Dr. Cezar receives income paid by the hospital, but also then receives a salary from CCH for being the Medical Director and part owner of CCH.  Dr. Cezar is receiving kickbacks from every angle.  Almost all the patients of CCH come directly from Dr. Cezar.

137.    Stephanie Thompson, a Social Worker, told Relator Johnson that CCH does not have a Volunteer Coordinator, which is required as recently as January 2016. . CCH also does not have a social worker, instead has one that comes from DFACS but does not see patients at all, but bills CMS for this service.  CCH just went to computerized medical information sometime this year.  CCH does not have a dietitian.  When Ms. Thompson reviewed Dr. Cezars' paperwork she found it to all be blank.

### E. COMMUNITY HOSPICE

138.    Community Hospice pays for referrals.   For example, Mr. Colbert, for Community

Hospice, pays the discharge planners at Meadows Regional Hospital in Vidalia, Georgia with money, expansive gifts, and gift card.

139.    Relator Johnson formerly worked for another local hospice and had a family that wanted to transfer their father from Community Hospice to her place of employment. Relator Johnson went to meet with the son JS of the potential patient, CS. When Relator Johnson met with the son, during the discussing of admitting his father, the son told Relator Johnson about the many issues with Community Hospice. Among other things, the son informed Relator Johnson that Mr. Colbert wanted to know the name of the person from Glenwood nursing home in Mount Vernon, Georgia that referred his father to Community Hospice so that Mr. Colbert could send her some money for the referral.

140.    Community Hospice has three Medical Directors for a patient load of about 35. Community Hospice is used as an over flow for the hospital Meadows Regional when the hospital is full. Relator Johnson was told that Community Hospice billed for this service either as respite or continuous care even if the patients do not meet regulations for hospice.

141.    Mr. Colbert, the Administrator, has his own transport company for hospice patients and any other patients in the community. Relator Johnson has seen one of the buses at the hospital for pick up. Relator Johnson was told that the buses are used for non-emergent transport and bills Medicare or Medicaid for these service. Relator Johnson was told of one family that felt mislead and upset by this so called free service (Seasons of Life) funded by Community Hospice which is a nonprofit organization. Community Hospice is direct violation of anti-kickback laws by providing their Seasons of Life Program to their patients. The Seasons of Life Program is funded by Community Hospice.

## F.  SOUTHCOAST MEDICAL

142.    SouthCoast is said to be one of the worst for making sure the billings are all upcoded.  They have someone that watches every referral that is sent out and if one of their group doctors sent a referral outside of the group, which is the largest privately owned physician group around, the controller will send them a warning and threaten to remove them from the group.

143.    All referrals are internal and in direct violation of anti-kickback and Stark laws. This includes MRIs and x-rays.

## G.  PRUITT HEALTH

144.    Pruitt Health ("PH") will not allow any other hospice other than their own, Pruitt Health Hospice – Savannah ("PHH"), to use any new outside hospice contracts.

145.    PH is a locally owned health care organization, which owns their own nursing home facilities.  Pruitt has their own rehabilitation/nursing home in Savannah and many other nursing homes in surrounding counties, a DME Company (durable medical device), assisted livings, their own pharmacy, and hospice (United Hospice) in many counties in Georgia.

146.    PH demands that their patients in their nursing homes use United Hospice, which is owed by Pruitt Health.  Relator Johnson was told in person about this during years 2012-2015 by many marketers, family members, and Mac Mackey from Bethany Hospice.

147.    Dr. Gay practices family medicine for Optim in Millen, Georgia is also a Medical Director for Pruitt nursing home in Millen.  Dr. Gay told Relator Johnson in person during a lunch in 2013 that he was very mad with Pruitt, because without his consent, they would do auto substitutions of medications he had written for his patients to generics of Pruitt's own formulary list which where a cheaper cost to Pruitt.

## VI.   DEFENDANTS KNOWINGLY SUBMITTED OR CAUSED TO BE SUBITTED FALSE AND FRAUDULENT CLAIMS

148.   All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" or with reckless disregard, as those terms are defined in the False Claims Act, 31 U.S.C. § 3729 and related case law.

### FIRST CAUSE OF ACTION

**(False or Fraudulent Claims)**
(False Claims Act 31 U.S.C. § 3729(a)(1)(A))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1))

149.   Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

150.   As set forth above, Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government and the State of Georgia numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1).

151.   Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

152.   The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

153.   The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

154.   Relators are also entitled to their attorney's fees and litigation expenses.

## SECOND CAUSE OF ACTION
### (False Statements)
(False Claims Act 31 U.S.C. § 3729(a)(1)(B))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(2))

155.    Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

156.    As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(2).

157.    Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

158.    The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

159.    The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

160.    Relators are also entitled to their attorney's fees and litigation expenses.

## THIRD CAUSE OF ACTION
### (Failure to Repay)
(False Claims Act-31 U.S.C. § 3729(a)(1)(G))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.189(a)(7))

161.    Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

162.    As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the United States Government

41

and the State of Georgia and knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the United States Government and the State of Georgia, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(7).

163.    Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

164.    The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

165.    The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

166.    Relators are also entitled to their attorney's fees and litigation expenses.

**FIFTH CAUSE OF ACTION**
**(Retaliation Against Relators)**
(False Claims Act-31 U.S.C. § 3730(h))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.4)

167.    Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

168.    Defendants Bethany violated Relators' rights pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4 by retaliating against them for lawful acts done by them in furtherance of efforts to stop one or more violations alleged in this action and other protected activities.

169.    As a result of Defendants' actions, Relators have suffered damages in an amount to be shown at trial.

170.    Relators are entitled to double their damages under the law as well as all attorney's fees and litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators Jolie Johnson and Debbie Helmly pray for judgment:

a. awarding the United States and the State of Georgia treble damages sustained by them for each of the false claims;

b. awarding the United States and the State of Georgia the largest civil penalty allowed by law for each of the false claims;

c. awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

d. awarding Relators two times back pay, interest, and special damages resulting from retaliation;

e. awarding Relators their litigation costs and reasonable attorney's fees; and

f. granting such other relief as the Court may deem just and proper.

Respectfully submitted,

Mike Bothwell
Ga Bar No. 069920
Mike@WhistleblowerLaw.com
Attorney for Relators

**BOTHWELL**
LAW GROUP
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442