**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** ) | |
| **JOLIE JOHNSON and ESTATE OF** ) | |
| **DEBBIE HELMLY** ) | |
|    **and** ) | |
| **STATE OF GEORGIA ex rel. JOLIE** ) | |
| **JOHNSON and ESTATE OF DEBBIE** ) | |
| **HELMLY,** ) | |
| ) | |
|    **Relators,** ) | |
| ) | |
|      **v.** ) | **Civil Action No. 4:16-CV-290** |
| ) | |
| **BETHANY HOSPICE AND PALLIATIVE** ) | |
| **CARE OF COASTAL GEORGIA, LLC** ) | |
| **(f/k/a BETHANY HOSPICE OF COASTAL** ) | |
| **GEORGIA, LLC), BETHANY HOPSICE** ) | |
| **AND PALLIATIVE CARE, LLC  (f/k/a** ) | |
| **BETHANY HOSPICE, LLC), BETHANY** ) | |
| **BENEVOLENCE FUND, INC., AVA** ) | |
| **BEST, JUSTIN HARRELL, M.D., DAVID** ) | |
| **ARNETT, M.D., STAN SINCLAIR, M.D.,** ) | |
| **RICHARD E. WHEELER, M.D., and** ) | |
| **BERKLEY M. "MAC" MACKEY** ) | |
| ) | |
|    **Defendants.** ) | |

_____

## FIRST AMENDED COMPLAINT

The United States of America and the State of Georgia, by and through Relators Jolie

Johnson and the Estate of Debbie Helmly, bring this action under 31 U.S.C. §§ 3729-3732 ("False

Claims Act") and O.C.G.A. § 49-4-168.1, *et seq*.  ("Georgia False Medicaid Claims Act") to

recover all damages, penalties, and other remedies established by the False Claims Act on behalf

of the United States and Relators, and the State False Medicaid Claims Act on behalf of the State

of Georgia and Relators, and would show the following:

## I.    JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*. and Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq*.

2.      This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

3.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a) and O.C.G.A. § 49-4-168.6.

## II.   THE PARTIES

5.      Defendant Bethany Hospice and Palliative Care of Coastal Georgia, LLC (f/k/a Bethany Hospice of Coastal Georgia, LLC) and Bethany Hospice and Palliative Care, LLC (f/k/a Bethany Hospice, LLC) are providers of hospice care.  Bethany has four locations in Georgia with offices in Claxton, Douglas, Thomasville, and Valdosta.  The Claxton office is located at 109 South Duval Street, Claxton, Georgia, 30417.  The Douglas office is located at 1400 Peterson Avenue North, Suite 12, Douglas, Georgia, 31533.  The Thomasville office is located at 2012 East Pinetree Boulevard, Suite A, Thomasville, Georgia, 31792.  The Valdosta office is located at 2700 North Oak Street, Building B, Valdosta, Georgia, 31602.  Defendant Bethany Benevolence Fund, Inc. is located at 2700 N. Oak Street, Building B, Valdosta, Georgia, 31602.  Defendant Ava Best is the President of Bethany.  Defendant Justin Harrell, M.D., Defendant David Arnett, M.D., and Defendant Stan Sinclair are Bethany Medical Directors at the Douglas location and also employees of Coffee Regional Medical Center. Defendant Richard E. Wheeler, M.D. is the Bethany Medical

Director at the Valdosta location, and Defendant Berkley M. "Mac" Mackey, III is an investor and listed on the Secretary of State as the Chief Financial Officer (collectively referred to as "Bethany"). Bethany Company Defendants and Bethany owner and operator Defendants ignore corporate formalities, intermingle assets, and have a unity of interest that causes the defendants to act as alter egos rather than separate entities.

6.      Relator Jolie Johnson began working for Bethany in December 2014 as a marketer and was terminated July 2015.

7.      Relator Debbie Helmly began working for Bethany in December 2014 as an Administrator and was terminated July 2015. Relator Helmly passed away on March 27, 2018. Her estate has substituted as a party to this litigation.

III.     **FACTUAL ALLEGATIONS**

8.      Ava Best is the President and CEO of Bethany. Ava Best, Mac Mackey, and Dr. Richard Wheeler are also officers of Bethany Benevolence Fund, Inc. which was founded in February 2009. Ms. Best is listed as the Administrator for Bethany with the State of Georgia. Bethany is a for-profit hospice provider. Bethany exclusively funds its operations and employees through receipt of Medicare/Medicaid dollars.

9.      From 2011 through October 2014, Relator Helmly ran the Claxton office of Spanish Oaks hospice and Relator Johnson worked for that office. After that time, Relators were looking for a hospice that would care for patients rather than focus on money. Around that time, Ms. Best and Mr. Mackey were looking to open a Bethany location in the Claxton area.

10.     Around October/November 2014, Ms. Best and Relator Helmly agreed that Relator Helmly would become the Administrator of the Bethany Claxton office and get a 2.5% ownership for working with the company. Ms. Best also hired Relator Johnson as a marketer. Relator Helmly

had a prescheduled operation that would take her through December and would start to open the Claxton location after that.  Mr. Mackey put Relators under the insurance of his company starting December 1, 2014 and everyone worked to open the Claxton office in January 2015.

11.     Because of dissatisfaction with their time at Spanish Oaks and the way their employment was terminated, Relators Helmly and Johnson sought legal assistance.  Ms. Best insisted that Relators approach her for permission to take time off.  In January 2015, Relators asked for one day off, and Ms. Best peppered them with questions on why they needed a day off. Eventually, Ms. Best asked if it had to do with their prior employer, and they said yes.  This was the first time Relators had encountered Ms. Best's paranoia and interrogative style of management. However, it was not out of character for Ms. Best as she was an unrealistically demanding boss who required immediate attention to whatever was on her mind at the time.

12.     The second time they needed a day off to meet with an attorney, Ms. Best peppered them with questions.  Relators did not know enough at that time to respond.  The day after they met with this attorney, Ms. Best became relentless with her questions and continued to pepper Ms. Helmly with questions through the end of January.  Over this time, Relator Helmly told Ms. Best that they were meeting with an attorney in Atlanta, and this matter had to do with their prior employment and long-term hospice patients.

13.     In late 2014, Ms. Best purchased the number used for Bethany Hospice and Palliative Care of Coastal Georgia, LLC (f/k/a Bethany Hospice of Coastal Georgia, LLC) from Alex Patterson who owned Presbyterian Hospice.  Initially, she used this number for her hospice office in Quitman, Georgia.  Then, once Ms. Best decided to open the office in Claxton, she transferred the number over to Bethany Hospice and Palliative Care of Coastal Georgia, LLC (f/k/a Bethany Hospice of Coastal Georgia, LLC).

4

14. Once a number is purchased, the purchaser is required to do a CHOW (Change of Ownership). It is unclear whether or when Ms. Best did a CHOW for Bethany Hospice and Palliative Care of Coastal Georgia, LLC (f/k/a Bethany Hospice of Coastal Georgia, LLC), which she opened on January 1, 2015, because it appears that she was operating as Presbyterian Hospice for some time.

15. Part of Relator Helmly's responsibilities was overseeing all the billing at Bethany. Ms. Best did not realize that when Relator Helmly or employees under her supervision would pull up any of the billing that was needed before signing up a new patient, it would still show up as the Presbyterian Hospice in Quitman. This hospice never had permission to work in Claxton, Georgia. The Presbyterian issue continued for at least two months after Bethany was up and running in Claxton. Relators contacted Ms. Best about this, but she just told them not to worry about it.

16. In February of 2015, Relators left for a day to work with their attorney in Atlanta. Relators had received information from a former co-worker concerning their case and kept it in a locked drawer in Relator Helmly's office. They also kept correspondence with their attorney, Mike Bothwell, in that locked drawer. While Relator Helmly was out of her office, Ava Best had an employee search her office including the locked drawers in her desk. From this search, Ms. Best learned about their whistleblower attorney, Mike Bothwell, and much of the basis of their lawsuit. However, Ms. Best did not confront Ms. Helmly about this information until the end of March 2015. At the end of March, Ava Best told Relator Helmly that she did not want "whistleblowers affiliated with her business." She mentioned the whistleblower attorney Mike Bothwell, even though Relators had not told her that was the name of the attorney. Ms. Best insisted that Ms. Helmly not be a part of the whistleblower lawsuit because Ms. Best "did not want a whistleblower as her Administrator." Relator Helmly worked out a compromise with Ms. Best

and promised that her name would not be on any pleadings, but Relator Johnson would be a whistleblower against their former employer.

17.     Ms. Best never reprimanded either Relator for work-related issues or performance issues.  Relators were never approached about any negative aspect of their work and were never written up or disciplined in any way.  In fact, the time between the opening and May 2015 was characterized by high praise from both Ava Best and Mac Mackey.  Some of the praise from Mac Mackey was his delight that Relators had opened an office where Bethany was an unknown entity and had made it so profitable so quickly.  Mr. Mackey would text Relator Helmly saying how much he liked the numbers he was seeing (and similar comments).

18.      However, as much as Ava Best and Mac Mackey were thrilled with Relators' performance, there were battles bubbling up with how Ava Best and Mac Mackey grew the rest of Bethany by providing remuneration to referral sources and potential referral sources in exchange for or in gratitude for referrals.  Relators felt these were kickbacks, they violated the Anti-Kickback Statute (AKS), and were illegal.  In fact, the impetus for this FCA lawsuit is that Ms. Best and Mr. Mackey determined to grow and maintain their business through kickbacks.

19.     Prior to forming Bethany Hospice, Ms. Best worked for Odyssey Hospice.  In fact, Bethany rose out of the ashes of Odyssey when a national hospice owner was asked by Odyssey to buy some of the Georgia hospice locations Odyssey was seeking to divest from, he bought the Valdosta office, and renamed it Bethany Hospice.  He brought Ava Best on to work for Bethany until she insisted that Mac Mackey come on and they bought the original investor out.

20.     Ms. Best was well aware that the way Odyssey operated was illegal.  She acknowledged that it got referrals by giving their Medical Directors kickbacks.  She was aware that Odyssey was under local HHS-OIG scrutiny for providing illicit kickbacks to Medical

Directors and that Odyssey was hit with a $25 million settlement by DOJ for FCA violations. Ava Best had also previously worked for another company near Brunswick that was raided by DOJ. She told Relators they came into her office with guns and demanded billing records and charts. She said that the DOJ convicted the owner of that company for Medicare or Medicaid fraud. Ms. Best felt she knew how these things went having been a party to a DOJ Medicare fraud investigation.

21.     However, her experience with these companies caused Ms. Best and Mr. Mackey to face a dilemma. They knew that paying for referrals was the most effective way to get referrals, but they also knew that the Government did not like remuneration for referrals. Therefore, Ms. Best and Mr. Mackey decided to pay kickbacks to referring physicians, but to hide or mask the payments as compensation to Medical Directors and part owners of Bethany.

22.     Ms. Best revealed the terms of the kickbacks when negotiating ownership with Relator Helmly prior to December 2014. At the outset of the negotiation for employment, Ms. Best told Relators that she would follow the same protocol to add compensation for Relator Helmly that she used to pay referring doctors for their referrals. The offer concerned a below market investment for a percentage of the company and huge returns when referrals came pouring in. Focused on census and referrals, as she was, Ms. Best indicated that she would determine the amount of return based on the number of patients put under service. Ms. Best informed Relator Helmly that her formulas for compensation always related to the number of referrals or the census because that is what Ms. Best wanted to incentivize. Ms. Best paid all the Medical Directors who owned shares in Bethany according to this same formula, and the payments varied depending on the volume of referrals. Relators thought this discussion was odd, but Relators did not address this issue at the time, because it would require more investigation.

23.     Early on, after Relators had opened the new office in Claxton from scratch and had started to see success (for which Ms. Best and Mr. Mackey complimented them), an issue came up with regard to needing a Medical Director for the office. Relators referred Ava Best and Mac Mackey the name of Dr. Thomas Miller, a family physician, as the potential Medical Director.

24.     After Relators referred Dr. Miller, in the first week of February 2015, Mr. Mackey, Dr. Wheeler, Ms. Best, and Relator Helmly went to see Dr. Miller during his lunch break. Because Relators had a strong working relationship with Dr. Miller, Ms. Best and Mr. Mackey requested Relator Helmley's presence during Dr. Miller's salary negotiations. During the negotiations, Ms. Best informed Dr. Miller that she gives an interest into the company to all her Medical Directors, and this interest provides them with "a large amount of money." After hearing her whole pitch on how Medical Directors could get "a large amount of money" for a high census and a lot of referrals, Dr. Miller informed Ms. Best that this arrangement constituted an illicit kickback. When Ms. Best explained that all of the other Medical Directors are "investors," Dr. Miller directly told Ms. Best that he did not think it was ethical for him to have ownership in a business for which he was also the Medical Director. He told her that he felt that would be a conflict of interest. Dr. Miller also indicated that what Ava Best was doing was clearly illegal. Relator Helmly watched the entire exchange and agreed with Dr. Miller that Bethany was giving illegal kickbacks to doctors for referrals.

25.     Bethany had compensation arrangements with numerous Medical Directors that gave rise to kickbacks. Apart from Dr. Miller, these arrangements contained the following forms of payment: (1) a monthly salary; (2) an annual dividend; and (3) monthly bonuses. The doctors would receive payments as inducement for and appreciation for referrals of patients, which constitute kickbacks. The payment of the salary is not done after a fair market value (FMV)

analysis and is made to doctors for referrals rather than for the obligation of an appropriate amount of actual work for the hospice. The schedule or interval of work (if any) is not written and not followed. The complete compensation is not consistent with FMV or an arms-length transaction in large part because it takes the volume or value of referrals into account. Bethany has more "Medical Directors" than is commercially reasonable for their census because they are actually paying for referrals. For a period, while most hospices list their Medical Directors, Bethany did not. Bethany knows they have too many Medical Directors and that they need to keep a low profile to avoid detection and ensure continued revenue streams.

26.     Ms. Best uses the Electronic Medical Record ("EMR") to track referrals from the various doctors so she can determine how much she is paying each referral. She and Mac Mackey routinely review the ROI for their kickbacks. Physicians who refer the most patients receive the largest payments.

27.     Bethany cloaks some payments to Bethany's Medical Directors as investment interests. Instead of providing these individuals with payments directly, Ms. Best first has them purchase an ownership stake in Bethany without obtaining a proper valuation and without assessing a commercially viable buy-in. Once partial owners in Bethany, Ms. Best issues annual dividends to these individuals. These amounts fluctuate according to how many patients are put under service at the Director's site and are not proportional to the amount invested. The terms of the investment are related to the expected volume of referrals or the amount of business that could be generated by the investor. The "investors" are required to make referrals to Bethany and only those who are in a position to make referrals are considered or offered an investment opportunity. This is a sham transaction to hide the payment for referrals.

28.     The Daly situation makes it clear that this was a kickback scheme and never

intended as a legitimate investment.  Dr. Daly is a sleep medicine specialist based in Savannah, Georgia (with another office in Douglas).  His practice focuses on performing sleep studies on patients to diagnose them with disorders such as obstructive sleep apnea.  Early on in their tenure, Relators found out that Dr. Daly had been continuously approaching Ms. Best and Mr. Mackey about becoming an investor in Bethany Hospice.  Mr. Mackey discussed this with Relators because Relator Johnson knew Dr. Daly from work with a prior employer.  When Relators told Mr. Mackey that Dr. Daly could not provide Bethany with referrals because of his niche practice, Mr. Mackey said "Forget it.  We do not and will not need him if he does not refer patients to Bethany."  These remarks highlighted the fact that Bethany Hospice's primary objective in obtaining investors was to lock up referral streams rather than investment streams that could benefit their patient population.  Ms. Best wanted to look like she complied with the law, while intending to make payments based on the volume of referrals from these doctors.

29.    There are a lot of Medical Directors or Associate Medical Directors for Bethany, all of which are "investors" and get extra money from Bethany.  The vast majority of revenue for Bethany comes from "investor" referrals.  In certain periods, 95%-100% of Bethany's referrals come from "investors" and "Medical Directors."   The Douglas location has the most Medical Directors and they are linked with the hospital, which is why Bethany gets the most referrals at this location.  In fact, these "investors" sit on the Coffee County Hospital Board.  Dr. Justin Harrell, Dr. David Arnett, and Dr. Stan Sinclair are all Medical Directors who also work at Coffee Regional Medical Center.  They refer all patients to Bethany and therefore receive the largest bonuses.

30.    The Medical Director at Acres Nursing Home in Douglas is also a Medical Director for Bethany Hospice in Douglas.  Bethany Hospice wants its Medical Directors to be Medical Directors at Nursing Homes because then they know they will always get all the referrals, just as

they do with Coffee Regional Medical Center.

31.     Dr. Wheeler serves as the Medical Director for Bethany's Valdosta site.  He has a controlling interest in Bethany Hospice and receives annual dividends based on how many patients his site puts under census.  The Quitman location also has had a Medical Director and numerous Associate Medical Directors.  Bethany pays different amounts in "bonuses" to its Medical Directors throughout the year depending on how much the referrals increase the census.

32.     Dr. Miller was the only holdout—having warned Bethany that all these incentives and "ownership" were unethical and illegal.  In March 2015, Relator Johnson was present when Ms. Best asked Dr. Miller again about partial ownership in Bethany, and he asked Ms. Best how Medical Directors could be investors.  Ms. Best replied, "I have found a way that makes it legal." Dr. Miller continued to remain unpersuaded and again told Ms. Best that he felt this created an unethical conflict of interest and was illegal.

33.     Even after Dr. Miller pointed out the illegal nature of these payouts, Bethany continued to compensate all other Medical Directors through investment interests.  Bethany's decision to proceed with these compensation arrangements—even after a clinician with whom they vested Medical Director privileges deemed them illegal—demonstrates their continued willingness to provide kickbacks.  Ms. Best thought she had outmaneuvered the statute and the agency responsible for its enforcement.

34.     After the conversation between Ava Best and Dr. Miller, the conversation continued between Ms. Best and Relator Johnson.  Ms. Best said that she had found a way to do it so she would not get caught.  Ms. Best mentioned several times that her Medical Directors were "part owners" in Bethany Hospice.  Relator Johnson had been investigating this matter and found that Odyssey had a similar scheme to pay directors through their retirement rather than directly.

She knew that Ms. Best would know that because she worked there.  She reminded Ms. Best that SouthCoast Medical in Savannah had an agreement with Odyssey Hospice like the Bethany agreement, but when Odyssey was bought out, the new company deemed the agreement to be "illegal" and dissolved the agreement.  Ms. Best said she had "found a way around this issue."  She indicated that she could create a sham agreement that would mask the payment to doctors for referrals.  She said that by making potential referral sources Medical Directors and Medical Directors "part owners" she would not get caught.  These remarks not only illuminate the scheme employed, but also demonstrate Ms. Best's clear intent to funnel kickbacks through a sham device. This conversation made it clear to Relators that they had to continue to investigate and continue conversations like this to persuade Ava Best and Mack Mackey to stop their illegal behavior.

35.     However, Ms. Best was already paranoid and concerned about the existence of "whistleblowers" in her employ.  Unbeknownst to Relators, she had previously raided Ms. Helmly's personal, locked office areas to make sure Realtors were not blowing the whistle on Bethany.  When Relators pointed out that the kickbacks were illegal and that Ms. Best should know that from her Odyssey experience, things turned with Ava Best, Bethany, and Relators.  Ms. Best figured out that Relators were opposed to Bethany's "payment scheme," thought it was illegal, and were trying to convince her to stop it.  However, because her raid of the office did not turn up any prepared "reporting of this to the Government" and showed that the meeting with the attorney were focused on Spanish Oaks (and the fact that Relator's were doing such a good job making Bethany money), it took a few more events to secure in Ava Best's mind that she would need to act to stop Relators from blowing the whistle on Bethany and its kickback schemes.

36.     One of these incidents involved a series of additional kickback offers to referring physicians to take their wives on a paid vacation and having food, hotels, and expenses and such

paid by Bethany.  The offers to doctors went out around late May or early June 2015 for a trip in August 2015.  The only doctor to refuse the bonuses, ownership, trips and expenses was Dr. Miller—the doctor where Realtors worked, and the one who had a prior relationship with them. He had told Ms. Best, Mr. Mackey, and Relators that he did not think any of this was legal. Undaunted, Bethany sent the top referring doctors and their wives on a trip, paying airfare, hotel, and food for both them and their wives.

37.    In this same timeframe, in May, Relators went on vacation to Florida.  During that trip, Relator Helmly called Ava Best and broached the issue of putting Relator Helmly's name on the lawsuit to be filed against her prior employer.  Ms. Best said she was not going to ask her to not put her name on something she could get money out of.  However, after Relators came back from Florida, Ava Best's attitude changed.  The apex of Ms. Best's determination that Relators were a threat, that they might be filing something to come after Bethany, and they needed to be dealt with was when Relators had to take time off in June to meet with the Government.  When Ms. Best again peppered Relators with questions about this time off, they responded that they could not tell her about it.  After that, Ms. Best and all employees "loyal" to her started a harassment campaign against Relators trying to get them to quit so she would be "protected" from a retaliation claim.  The harassment just got worse when Ms. Best realized that Relators were not easily going to quit.  Ms. Best and those "loyal" employees started making things up about Relators to try to justify the retaliatory discrimination and possible termination.

38.    However, during all this time, neither Relator was ever written up for anything, nor officially disciplined in any way—just harassed.  Bethany did not follow its policy manual.  Shortly after the visit with the Government that Relators could not discuss, Ava Best and Mac Mackey demoted Relator Helmly to field nurse without explanation or reason.  A few weeks later, Ava

13

Best tortured Relator Helmly by threatening to tell her prior boss "everything" including telling him about the lawsuit Ms. Best assumed had been filed and which of his then current employees had helped Relators with their lawsuit.  This was the same week Relator Helmly found out that Ava Best and Ms. Best's "loyal" employees had been going through Relator Helmly's personal information in her locked room and her locked desk on a regular basis.  Whenever Relator Helmly was gone, she locked her door and only she and Ava Best had a key to her office.  Yet, on a regular basis someone who had a key had been in Relator's office and gone through her personal things.

39.     Relators were stressed and mortified by this latest threat.  Then, on July 28, 2018, Ms. Best called Relator Helmly and told her to come into the office.  Relator Helmly called Relator Johnson to tell her she was worried about possible retaliation at the proposed meeting -- especially in light of Ava Best's most recent threats.  Relator Johnson was concerned Ava Best was going to do something to retaliate for their standing up to her for her illegal activities.  To protect against possible whistleblower retaliation, Relator Johnson texted Relator Helmly at around noon on July 28, 2018 to tell her to have their whistleblower attorney on the line during the conversation (or to at least to record the conversation).  However, Relator Johnson accidently sent the text to the Bethany group text, which included Ava Best herself.  Within minutes of finding out that Relators were trying to protect themselves against whistleblower discrimination by including their whistleblower attorney (about whom Ms. Best learned by ransacking Relator Helmly's desk), Ava Best had called both of them and told them they could resign or be fired that very day, but either way she was firing them that day.

40.     Ms. Best and other Bethany managers told Bethany employees that Relator Helmly resigned because of her health.  They also told others that Ms. Helmly resigned to pursue her education.  Ms. Best never told anyone (including Ms. Helmly) that she was being fired for any

lack of productivity or for any improper behavior.  Ms. Best never told Relator Johnston that she was being fired for any improper behavior.  Ms. Best also never indicated that to anyone else at Bethany.  Relator Johnson had three referrals for Bethany in her hand at the time Ms. Best fired her.  In fact, she had averaged about 14 patients a month for the several months prior to July 28th. That did not matter to Ava Best, she wanted their investigation illegal activities to stop, she wanted their questioning her illegal policies to stop, she did not want a whistleblower as her Administrator or at her company, and she was concerned that Relators had or might blow the whistle on Bethany. Ms. Best has told various people various different stories about why Relators suddenly disappeared from Bethany after building the office from scratch.  However, other employees who actually engaged in the very behavior Ms. Best later complained of were never disciplined.

41.     Additional discrimination for protected activity included not allowing Relators to clean out their offices.  Ms. Best went through their things and gave them back what she wanted to give back to them.  In addition, knowing that Relators had used information from then current employees of their former employer in their reporting to the Government, Ms. Best forbid anyone working for Bethany from having any contact with Relators for any reason.  Bethany also blackballed Relators and did what it could to prevent them from obtaining subsequent employment in the area and the industry.  Ms. Best, the head of Bethany's HR department, and others would give bad references and badmouth Relators to potential employers.

42.     In an effort to undermine any potential whistleblower case against Bethany, Ava Best and Monica Jones tried to ferret out any employees who might help Relators or provide them with information.  They would call employees in to talk to them and accuse the employees of "talking to Debbie" or "talking to Jolie" and then tell them they needed to "resign."  If they did not chose to "resign," Bethany management would cut their hours and harass them until they quit.

Ms. Best fired at least one Bethany employee for the false accusation that she had had contact with Relators.  Then, in a final act of discrimination, to show Relators Ava Best would carry out her threats and to make Relators think twice about pursuing anything further against Bethany, Bethany provided information to Relators' former boss about who was helping them report that company to the Government for FCA violations.  That person was immediately fired by their former boss— sending the signal that Ms. Best would retaliate against anyone involved in reporting FCA violations to the Government and warning Relators not to do it to Bethany.

43.     The termination of Relators' employment was not well planned because Bethany management wanted to get Relators away from Bethany before they could gather more evidence to give to the Government.  At the outset, the Claxton branch of Bethany was only created because Relator Helmly was able to be identified with the State of Georgia as its Administrator.  After Relator Helmly was terminated, the location went off the rails with regard to management (and following the regulations).  Ms. Best used what she called an "Interim Clinical Director."  Of course, the Interim Clinical Director from Valdosta did not actually come in to the office every day.  Even when the "Interim Director" came to the site, she would only arrive between 10:00-10:30 a.m. and then leave by 1:00 or 2:00 p.m.

44.     Ms. Best later put the Clinical Director of the Douglas location, Jeneen Cliett, as also the Administrator for the Claxton site (which is 1.5 hours away).  After Ms. Cliett "became" the Administrator of Claxton, she never visited the site.  She would "call in."  Both of these actions are illegal.  There must be an Administrator on site all day every day.

45.      Ms. Best also made Bridget Thornton the Clinical Director of the office, even though she was the only RN working there and she does not meet the qualifications to be a Clinical Director.  There are also two LPNs that were then being used in place of RNs, so there was a chain

16

reaction of regulatory violations simply because Ms. Best was unprepared to fire her Administrator for protected activity.

46.     While they were there, kickbacks were not the only thing Relators were investigating.  Ms. Best did not have a Social Worker with a master's degree in social work seeing patients.  This is a prerequisite to billing for the visit.  Relator Johnson was told about this by the very person seeing the patients who did not have her masters.

47.     In addition, Ms. Best would discharged patients if they were going into the hospital (also against regulations).  An example is patient P in Savannah, Georgia.  Relator Johnson was told this in person by the nurse that had to meet patient P at the hospital to have him sign revocation papers.  Some of the patients that went directly into the hospital and were also picked up that very same day include IC, JP, HK, and ST.  Patient AQ also went to the doctor for aggressive treatment, and Bethany did not pay for this even though he was a full Medicaid patient.  Ms. Best also discharged patients once they ran out of their Medicare payments.  If they are on Medicaid, she will keep them because they do not have a monetary limit.

48.     There are also issues of neglect and failure to perform the services required by hospice.  A patient by the name of SB ended up dying unnecessarily due to negligence on Bethany's part of not treating a urinary tract infection.  TT is a patient who had passed away two days before any nurse went out to check on him.  The neighbors actually found him as they had not seen him out.  It was said he had been dead for days, but because the nurse said he would not answer the phone, she did not go by and check on him.

49.     During their investigation of Medicare and Medicaid fraud at Bethany, Relators gained intimate knowledge of Bethany's billing protocols and operations.  This familiarity apprised them to the types of patients Bethany endeavored to put under service, who the primary

referral sources for each entity were, and the specific entities that reimbursed Bethany for hospice services.  One of the key protocols at Bethany was to immediately check all potential patients for Medicare coverage.  Ava Best insisted that Bethany patients have either Medicare or Medicaid coverage. This is one of the ways Relators found out about the issues concerning Presbyterian Hospice.

50.     As a marketer, part of Relator Johnson's job duties entailed visiting patients in their homes and collecting their social security numbers to see if these patients had any Medicare eligibility left.  In doing so, Relator Johnson interacted with administration at every branch.  Billing personnel would take the information from the marketers and run it through the system to assure coverage before a patient could be admitted.  This protocol was heavily emphasized in Relator Johnson's mandatory marketer training.  Her trainer was Robert Clements in Douglas, Georgia.

51.     During this training, Mr. Clements and Relator Johnson also visited the offices of the Medical Directors for Bethany in Douglas, which is where she picked up a great deal of information about the kickback/referral process.  During these meetings, Mr. Clements would ask the Medical Directors if they had any patients that needed to be referred to Bethany and whether these patients were covered by Medicare and Medicaid.  Drs. Arnett, Sinclair, and Harrell would provide Mr. Clements with names of patients eligible for Medicare and Medicaid coverage.

52.     Afterwards, Mr. Clements and Relator Johnson would visit those patients referred by the Medical Directors in the patients' homes.  Mr. Clements explained to Relator Johnson that she needed to collect each patients' social security number.  This allowed Ms. Best to see whether a patient had previously been under hospice, how long they had been under hospice, and their certification period.  Mr. Clements told Relator Johnson that Bethany collects this information to determine if patients are eligible for Medicare and Medicaid coverage.  He further explained that

18

Bethany's unwritten policy was to acquire more Medicare patients because "Medicare paid more." Relator also found out about the percentage of the census that came from illicit referrals (which was as high as 95%-100%) and that all the patients were billed to the Government until their benefits ran out.

53.     Relator Johnson had access to the census reports documenting each site's patients and which payor paid for the patients' care.  These reports revealed that federal health care programs covered the hospice expenses for a substantial majority of patients (100% or nearly 100%).  Relator Johnson also had the opportunity to meet with billers at the Valdosta office.  These individuals informed her that they too entered patient's social security information into the billing system to make sure the patient was eligible for Medicare coverage before putting the patient under service.  From all of her contacts with billers, Relator Johnson was able to find out about the billing and collection from Medicare of the illicit referrals and the submission of bills for other inappropriate patients.

54.     As the Administrator at Bethany's Claxton site, Relator Helmly had access to all of the billing information and census reports for her site.  She also attended meetings with Ms. Best where management discussed site productivity and census numbers for all Bethany's sites. Through these sources, Relator Helmly learned that a substantial majority of patients put under service received coverage from Medicare and Medicaid.  She shared this knowledge with Relator Johnson.

55.     All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" meaning with reckless disregard, as that is defined in the False Claims Act, 31 U.S.C. § 3729 and related case law.

## FIRST CAUSE OF ACTION

### (False or Fraudulent Claims)
(False Claims Act 31 U.S.C. § 3729(a)(1)(A))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1))

56.     Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

57.     As set forth above, Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government and the State of Georgia numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1).

58.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

59.     The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

60.     The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

61.     Relators are also entitled to their attorney's fees and litigation expenses.

## SECOND CAUSE OF ACTION
### (False Statements)
(False Claims Act 31 U.S.C. § 3729(a)(1)(B))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(2))

62.     Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

63.     As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement

material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(2).

64.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

65.     The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

66.     The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

67.     Relators are also entitled to their attorney's fees and litigation expenses.

### THIRD CAUSE OF ACTION
#### (Failure to Repay)
(False Claims Act-31 U.S.C. § 3729(a)(1)(G))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.189(a)(7))

68.     Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

69.     As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the United States Government and the State of Georgia and  knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit property or money to the United States Government and the State of Georgia, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(G) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(7).

70.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

71.     The United States and the State of Georgia are entitled to treble damages based

upon the amount of damage sustained by them in an amount that will be proven at trial.

72.     The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

73.     Relators are also entitled to their attorney's fees and litigation expenses.

**FOURTH CAUSE OF ACTION**
**(Retaliation Against Relators)**
(False Claims Act-31 U.S.C. § 3730(h))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.4)

74.     Relators hereby incorporate and re-allege all other paragraphs as if fully set forth herein.

75.     Defendants Bethany violated Relators' rights pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4 by retaliating against them for lawful acts done by them in furtherance of efforts to stop one or more violations alleged in this action and other protected activities.

76.     As a result of Defendants' actions, Relators have suffered damages in an amount to be shown at trial.

77.     Relators are entitled to two times back pay, interest, (Relator Johnson) reinstatement, and make whole damages as well as all attorney's fees and litigation expenses.

**PRAYER FOR RELIEF**

**WHEREFORE**, Relators Jolie Johnson and Estate of Debbie Helmly pray for judgment:

a.     awarding the United States and the State of Georgia damages sustained by them for each of the false claims;

b.     awarding the United States and the State of Georgia treble damages sustained by them for each of the false claims;

c.     awarding the United States and the State of Georgia the largest civil penalty allowed by law for each of the false claims;

22

d.      awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

e.      awarding Relators two times back pay, interest, (Relator Johnson) reinstatement, and make whole damages resulting from retaliation;

f.      awarding Relators their litigation costs and reasonable attorney's fees; and

g.      granting such other relief as the Court may deem just and proper.

Respectfully submitted,

_____

Mike Bothwell
Ga Bar No. 069920
Mike@WhistleblowerLaw.com
Attorney for Relators

BOTHWELL
LAW GROUP
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442