**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA ex rel.** ) | |
| **JOLIE JOHNSON et al.,** ) | |
| ) | |
| **Relators,** ) | |
| ) | |
| **v.** ) | **Civil Action No.** |
| ) | **4:16-cv-290-WTM-JEG** |
| **BETHANY HOSPICE AND PALLIATIVE** ) | |
| **CARE OF COASTAL GEORGIA, LLC.** ) | |
| **et al.,** ) | |
| ) | |
| **Defendants.** ) | |

## SECOND AMENDED COMPLAINT

The United States of America and the State of Georgia, by and through Relators Jolie

Johnson and the Estate of Debbie Helmly, bring this action under 31 U.S.C. §§ 3729-3732 ("False

Claims Act") and O.C.G.A. § 49-4-168.1, *et seq.*  ("Georgia False Medicaid Claims Act") to

recover all damages, penalties, and other remedies established by the False Claims Act on behalf

of the United States and Relators, and the State False Medicaid Claims Act on behalf of the State

of Georgia and Relators, and would show the following:

### I.   JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq.* and Georgia

False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq.*

2.     This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. §

3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and

portions of the violations of the False Claims Act described herein were carried out in this district.

3.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§

1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

4.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a) and O.C.G.A. § 49-4-168.6.

## II.     THE PARTIES

5.     Defendant Bethany Hospice and Palliative Care of Coastal Georgia, LLC (f/k/a Bethany Hospice of Coastal Georgia, LLC) ("Bethany Coastal") is a for profit provider of hospice care.  Bethany Coastal has one office in Claxton, Georgia, which is located at 109 South Duval Street, Claxton, Georgia.  Bethany Coastal exclusively (or nearly exclusively) funds its operations through receipt of Medicare/Medicaid dollars.  Bethany Coastal has retaliated against Relators in violation of the law.

6.     Bethany Hospice and Palliative Care, LLC (f/k/a Bethany Hospice, LLC) ("Bethany Hospice") is a for profit provider of hospice care.  Bethany Hospice has four locations in Georgia with offices in Douglas, Thomasville, Waycross, and Valdosta.  At various times, Bethany Hospice and Palliative Care, LLC also maintained an office in Quitman, Georgia.  The Douglas office is located at 1400 Peterson Avenue North, Suite 12, Douglas, Georgia.  The Thomasville office is located at 2012 East Pinetree Boulevard, Suite A, Thomasville, Georgia.  The Waycross office is located at 411 Lister Street, Waycross, Georgia.  The Valdosta office is located at 2700 North Oak Street, Building B, Valdosta, Georgia.  Bethany Hospice exclusively (or nearly exclusively) funds its operations through receipt of Medicare/Medicaid dollars.  Bethany Hospice is responsible for submitting and causing false claims to be submitted to the Government for the per diem reimbursement for patients whose referrals were tainted by kickbacks.  It is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.

7.     Defendant Ava Best is an owner and the president and CEO of both Bethany Hospice and Bethany Coastal.  Ava Best is responsible for submitting and causing false claims to be submitted to the Government for the per diem reimbursement for patients whose referrals were tainted by kickbacks.  She is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.  She is also responsible as an owner, officer, and/or director of Bethany Hospice, which submitted false claims to the Government that were tainted by kickbacks.  Ms. Best primarily provided the kickbacks or directed companies or employees to provide them.

8.     Defendant Berkley M. "Mac" Mackey, III is an owner and officer in Bethany Hospice and Bethany Coastal.  Mac Mackey is responsible for submitting and causing false claims to be submitted to the Government for the per diem reimbursement for patients whose referrals were tainted by kickbacks.  He is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.  He is also responsible as an owner, officer, and/or director of Bethany Hospice, which submitted false claims to the Government that were tainted by kickbacks.  Mr. Mackey primarily provided the kickbacks or directed companies or employees to provide them.

9.     Defendant David Arnett, M.D. is an owner of Bethany Hospice and Bethany Coastal, a former medical director at the Douglas location, the chief medical officer of Bethany Hospice, an officer of Bethany Coastal, and a current or former board member of Coffee Regional Medical Center who has also worked at the hospital.  Dr. Arnett also owns the hospitalist practice that provides doctors to Coffee Regional Medical Center.  He and Bethany Hospice had financial ties to Dr. Marshall Tanner.  Dr. Arnett bought out Dr. Tanner's ownership in Bethany Hospice.  Dr. Arnett is responsible for submitting and causing false claims to be submitted to the

Government, which were tainted by kickbacks.  He is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.  He is also responsible as an owner, officer, and/or director of Bethany Hospice, which submitted false claims to the Government that were tainted by kickbacks.  Dr. Arnett primarily received the kickbacks.

10.    Defendant Stan Sinclair, M.D. is a medical director at the Bethany Hospice Valdosta location, an owner of Bethany Hospice, currently or formerly on the board of Coffee Regional Medical Center and works at Coffee Regional Medical Center.  Dr. Sinclair also owns the hospitalist practice that provides doctors to Coffee Regional Medical Center.  Dr. Sinclair is responsible for submitting and causing false claims to be submitted to the Government, which were tainted by kickbacks.  He is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.  He is also responsible as an owner, officer, and/or director of Bethany Hospice, which submitted false claims to the Government that were tainted by kickbacks.  Dr. Sinclair primarily received the kickbacks.

11.    Defendant Richard E. Wheeler, M.D. is an owner and officer of Bethany Hospice and is a medical director at the Valdosta location.  Dr. Wheeler is responsible for submitting and causing false claims to be submitted to the Government, which were tainted by kickbacks.  He is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.  He is also responsible as an owner, officer, and/or director of Bethany Hospice, which submitted false claims to the Government that were tainted by kickbacks.  Dr. Wheeler primarily received the kickbacks.

12.    Defendant Justin Harrell, M.D. is an owner and a current medical director at the

Bethany Hospice Douglas location.  He is also a current or former member of the board of Coffee Regional Medical Center and works there.  Dr. Harrell also owns the hospitalist practice that provides doctors to Coffee Regional Medical Center.  Dr. Harrell is responsible for submitting and causing false claims to be submitted to the Government, which were tainted by kickbacks.  He is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.  He is also responsible as an owner, officer, and/or director of Bethany Hospice, which submitted false claims to the Government that were tainted by kickbacks.  Dr. Harrell primarily received the kickbacks.

13.    Relator Jolie Johnson began working for Bethany Coastal in December 2014 as a marketer and was terminated July 2015.

14.    Relator Debbie Helmly began working for Bethany Coastal in December 2014 as an administrator and was terminated July 2015.  Relator Helmly passed away on March 27, 2018.  Her estate has substituted as a party to this litigation.

## III.    FACTUAL ALLEGATIONS

15.    Hospices are paid a per diem rate based on the number of days and level of care provided for a hospice patient.  Medicare Benefit Policy Manual, Chapter 9, § 40; 42 C.F.R. § 418.302.  The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers.  Payments are typically made by Medicare directly to health care providers like Bethany Hospice and Bethany Coastal rather than to the patient.  The Medicare provider submits its bill directly to Medicare for payment.

16.    In particular because any hospice patient automatically generates daily payments from the Government, absolutely no remuneration of any kind (kickbacks) can be exchanged for referrals of hospice patients.  "The prohibition against kickbacks is a core requirement whose

violation eviscerates the value of the service the Government has bargained for: an unbiased determination by a medical provider that a certain medical procedure, device, or drug is 'reasonable and necessary' for the treatment of a patient." Statement of Interest of the United States of America in Response to Defendants' Motion to Dismiss, *U.S. ex rel. Wood v. Allergan, Inc.*, Civil Action No. 10-CV-5645, at 4 (Oct. 19, 2016).

17.     The Medicare and Medicaid Fraud and Abuse Statute 42 U.S.C. § 1320a-7b(b) or Anti-Kickback Statute ("AKS") was enacted under the Social Security Act in 1977. The AKS arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care. The AKS also specifies that "a claim that items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7 (2013). This includes any claim submitted for a patient who was referred by someone receiving a kickback. The statute ascribes liability equally to both sides of an impermissible kickback relationship.

18.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. § 1320a-7b(b). Essentially, if just one purpose of the payment was to reward referrals or to induce future referrals, the AKS has been violated. This is true even if the doctor performs some medical service for the money. It is not even required that it be the primary purpose—just one purpose of

the payment.  In other words, a defendant can have 99 lawful reasons to enter a relationship, but if one other reason is to expect referrals or reward referrals, it is illegal.  It is irrelevant if the funds would have been spent anyway or that Medicare funds were not used to make the illegal payment.

19.     Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form known as CMS Form 1500 to the appropriate fiscal intermediary or Medicare claims processor.  Each time it submits a claim for payment by Medicare, a provider certifies that the claim is true, correct, and complete, and complies with all Medicare laws and regulations.

20.     Bethany Hospice, Bethany Coastal, and the individual physician Defendants each certified compliance with the AKS statute prior to submitting claims to federal health care programs for reimbursement.  For instance, Drs. Harrell, Sinclair, Arnett, and Wheeler each certified compliance with the AKS upon executing CMS Form 855I and enrolling as a Medicare provider.  Bethany Hospice and Bethany Coastal made identical certifications upon executing CMS Form 855A.  Each of the billing forms echoed these certifications that no one had violated the AKS in conjunction with the submission of the bills.  These certifications (and the billing certifications) were false and the defendants knew they were false.

21.     Relators came to Bethany Coastal from another hospice—Spanish Oaks.  From 2011 through October 2014, Relator Helmly ran the Claxton office of Spanish Oaks hospice and Relator Johnson worked for that office.  By October 2014, Relators were looking for a different hospice to work for.  Around that time, Ms. Best and Mr. Mackey were looking to open a Bethany Hospice location in the Claxton area.

22.     Around October/November 2014, Ms. Best and Relator Helmly agreed that Relator Helmly would become the administrator of what would become Bethany Coastal and get a 2.5%

ownership.  During these negotiations, Ms. Best explained to Relator Helmly that since opening Bethany Hospice in 2007, she had offered each of her medical directors and administrators an ownership stake in Bethany Hospice and Bethany Coastal.  Once they were owners, Ms. Best explained that Bethany Hospice or Bethany Coastal would issue annual dividends to each owner/investor based on how many patients were put under service at the owner/investor's site as reflected in the site's annual census report.  Ms. Best further explained that if the owner/investor's site made the company enough money through patient enrollment, then the owner/investor stood to receive substantially more in annual dividends.  According to Ms. Best, meeting revenue benchmarks also enabled part-owners to acquire additional ownership shares in subsequent years. Ms. Best also hired Relator Johnson as a marketer.

23.     Relator Helmly had a prescheduled operation that would occupy her through December 2014, so she and Ms. Best agreed she would start to open Bethany Coastal after that. Mr. Mackey put both Relators under the insurance of his company starting December 1, 2014 and paid initial salaries to Relators for work at Bethany Coastal.  Everyone worked to open Bethany Coastal in January 2015.

24.     Because of dissatisfaction with their time at Spanish Oaks and the way their employment was terminated, Relators Helmly and Johnson sought legal assistance to deal with Spanish Oaks.  Because Ms. Best insisted that Relators approach her for permission to take any time off, in January 2015, Relators asked for one day off.  Before she gave her permission, Ms. Best peppered them with questions on why they needed a day off.  For Relators, it was a very uncomfortable topic to discuss.  Eventually, Ms. Best figured that it had something to do with their former employment and said yes.  This was the first time Relators had encountered Ms. Best's paranoia and interrogative style of management.  However, it was not out of character for Ms. Best

as she was an extremely demanding boss who required immediate attention to whatever was on her mind at the time.  A good example of her overbearing paranoia came a few years later when an employee was interrogated by Ms. Best about the fact that he had opened his door 7 times on a particular day and asked whether he was seeing patients each of those seven times.  Ms. Best had a practice of engaging in surveillance of the office and attached tracking devices on all the cars (which included tracking the number of times the door opened).

25.     The first attorney they interviewed did not do the type of work they needed and referred them to another attorney.  The second time they needed a day off to meet with an attorney, Ms. Best again peppered them with questions.  Relators did not know enough about their putative meeting at that time to provide any details.  However, the day after they met with this attorney, Ms. Best became relentless with her questions and continued to pepper Ms. Helmly with questions through the end of January.  Over this time, Relator Helmly shared with Ms. Best that they were meeting with an attorney in Atlanta and that this matter had to do with their prior employment and long-term hospice patients.

26.     The Medicare identification number used for Bethany Coastal was one Ms. Best purchased from Alex Patterson who owned Presbyterian Hospice.  Initially, she used this number for the Bethany Hospice office in Quitman, Georgia.  Then, once Ms. Best decided to open the office in Claxton, she transferred the number over to Bethany Coastal.  Once a number is purchased, the purchaser is required to do a CHOW (Change of Ownership).  It is unclear whether or when Ms. Best did a CHOW for Bethany Coastal, which she opened on January 1, 2015, because it appears that she was operating as Presbyterian Hospice for some time after that.

27.     Part of Relator Helmly's responsibilities was overseeing all the billing at Bethany Coastal.  When Relator Helmly or employees under her supervision would pull up any of the

billing that was needed before signing up a new patient, it would still show up as the Presbyterian Hospice in Quitman.  Bethany Coastal never had permission to work in Claxton, Georgia.  The Presbyterian number issue continued for at least two months after Bethany Coastal was up and running.  Relators contacted Ms. Best about this, but she just told them not to worry about it.

28.     In February of 2015, Relators left work for a day to meet with their attorney in Atlanta.  Relators had received information concerning their case from a former co-worker and kept it in a locked drawer in Relator Helmly's office.  They also kept correspondence with their attorney, Mike Bothwell, in that locked drawer.  While Relator Helmly was out of her office, Ava Best had an employee search Relator Helmly's office including the locked drawers in her desk.  From this search, Ms. Best learned about their whistleblower attorney, Mike Bothwell, and much of the basis of their lawsuit.  However, Ms. Best did not confront Ms. Helmly about this information until the end of March 2015.  At the end of March, Ava Best told Relator Helmly that she did not want "whistleblowers affiliated with [her] business."  She mentioned the whistleblower attorney, Mike Bothwell, by name even though Relators had not told her that was the name of the attorney.  Ms. Best insisted that Ms. Helmly not be a part of the whistleblower lawsuit because Ms. Best "did not want a whistleblower as [her] administrator."  Relator Helmly relented and promised Ms. Best that her name would not be on any pleadings, but told her Relator Johnson would still be a whistleblower against their former employer.

29.     Ms. Best never reprimanded either Relator for work-related issues or performance issues.  Relators were never approached about any negative aspect of their work and were never written up or disciplined in any way.  In fact, the time between the January 2015 opening and May 2015 was characterized by high praise from both Ava Best and Mac Mackey.  Some of the praise from Mac Mackey was his delight that Relators had opened an office where Bethany Hospice was

an unknown entity and had made it so profitable so quickly.  Mr. Mackey would text Relator Helmly saying how much he liked the numbers he was seeing (and similar comments).

30.     However, as much as Ava Best and Mac Mackey were thrilled with Relators' performance, there were battles bubbling up with how Ava Best and Mac Mackey grew the rest of Bethany Hospice by providing remuneration to referral sources and potential referral sources in exchange for or as a reward for referrals.  Ms. Best first provided insight into her practice of providing referral sources remuneration when she explained to Relator Helmly during salary negotiations that she issued her medical directors and administrators annual dividends that fluctuated according to how many patients (including Medicare and Medicaid beneficiaries) were put under service at the owner/investor's site and how much money the site made for the company that year.  This conversation, coupled with subsequent ones focused on owner/investor compensation and referral practices, led Relators to conclude that these were kickbacks, they violated the AKS, and were illegal.  In fact, the impetus for this FCA lawsuit is that Ms. Best and Mr. Mackey determined to grow and maintain their business through kickbacks.

31.     Prior to forming Bethany Hospice, Ms. Best worked for Odyssey Hospice.  In fact, Bethany Hospice rose out of the local ashes of Odyssey.  Odyssey asked a national hospice owner to buy some of the Georgia hospice locations Odyssey was seeking to divest from.  He bought the Valdosta office, and renamed it Bethany.  He brought Ava Best on (from Odyssey Valdosta) to work for Bethany Hospice, but disagreements with Ava Best and Mac Mackey over business practices prompted the original buyer to have them buy him out.

32.     From her prior tenure, Ms. Best was well aware that the way Odyssey was operated was illegal.  At one point, she acknowledged to Relators that she knew Odyssey got referrals by giving medical directors kickbacks.  She was aware that Odyssey was under local HHS-OIG

scrutiny for providing illicit kickbacks to medical directors, and that Odyssey was hit with a $25 million settlement by DOJ for FCA violations. Ava Best had also previously worked for another company near Brunswick that was raided by DOJ. She told Relators they came into her office with guns and demanded billing records and charts. She said that the DOJ convicted the owner of that company for Medicare or Medicaid fraud. Ms. Best felt she knew how these things went, having been a party to a DOJ Medicare fraud investigation.

33.     However, Ms. Best's experience with these companies provided her with conflicting conclusions. On the one hand, Ms. Best and Mr. Mackey knew that paying for referrals was the most effective way to get referrals, but, on the other hand, they knew that the Government did not like remuneration for referrals. Ms. Best and Mr. Mackey tried to have the best of both worlds: paying the kickbacks to referring physicians, but hiding or masking them as compensation to medical directors and part owners of Bethany. They were sure they would never get caught.

34.     Ms. Best revealed the terms of the kickbacks when negotiating ownership with Relator Helmly prior to December 2014. At the outset of the negotiation for employment, Ms. Best told Relator Helmly that she would follow the same protocol to add compensation for Relator Helmly that she used to pay referring doctors for their referrals. The offer concerned a below market investment for a percentage of the company and huge returns when referrals came pouring in. Focused on census and referrals as she was, Ms. Best indicated that she would determine the amount of return based on the number of patients put under service. Ms. Best informed Relator Helmly that her formulas for compensation always related to the number of referrals or the census because that is what Ms. Best wanted to incentivize. Ms. Best paid all the medical directors who owned shares in Bethany according to this same formula, and the payments varied depending on the volume of referrals. Relators thought this discussion was odd, but Relators did not address this

issue at the time because it required more investigation.

35.     Early on, after Relators had opened Bethany Coastal from scratch and had started to see success (for which Ms. Best and Mr. Mackey complimented them), an issue came up with regard to needing a medical director for the Claxton office.  Relators referred Ava Best and Mac Mackey the name of Dr. Thomas Miller, a family physician, as the potential medical director.

36.     When informed that Ava Best would give an interest into the company to all her medical directors, and this interest would provide them with "a large amount of money" for maintaining a high census and a lot of referrals, Dr. Miller informed the Bethany people that this arrangement was unethical and he would not participate.  Dr. Miller said that he did not think it was ethical for him to have ownership in a business for which he was also the medical director. He said he felt that would be a conflict of interest.  Relator Helmly was influenced by Dr. Miller's reaction and concluded that Bethany was giving illegal kickbacks to doctors for referrals.

37.     Even after Dr. Miller pointed out the unethical nature of these payouts, Bethany Hospice continued to distribute investment income to referring physicians.  Bethany Hospice's decision to proceed with these financial arrangements—even after a clinician with whom they vested medical director privileges voiced his concerns—demonstrates their continued intent to provide kickbacks.

38.     Bethany Hospice had compensation arrangements with numerous medical directors and doctors that gave rise to kickbacks.  These arrangements contained the following forms of payment:  a monthly salary, an annual dividend, and/or monthly bonuses.  The doctors would receive payments as inducement for or reward for referrals of patients, which constitute kickbacks. Even the payment of the salary was not done after a fair market value ("FMV") analysis and was made to doctors for referrals rather than for the obligation of an appropriate amount of actual work

for the hospice. The schedule or interval of work is not written and not followed. The compensation is not consistent with FMV or an arms-length transaction and takes the volume or value of referrals into account. Bethany has more "medical directors" than is commercially reasonable for their census, in part because they are paying for referrals. For a period, while most hospices listed their medical directors, Bethany Hospice did not. It knew it had too many medical directors and that it needed to keep a low profile to avoid detection and ensure continued revenue streams.

39.     Ms. Best uses Bethany Hospice and Bethany Coastal's Electronic Medical Record ("EMR") system, Consolo, to track referrals from the various doctors so she can determine how much she is paying for each referral. Ms. Best requires staff to record every new admission, the date, and the physician who referred the patient on a white board. This information is also added to the Consolo program. In Douglas, Tonya Bush, the admissions coordinator, inputs the referral source for each admission into Consolo. Once entered, Ms. Best generates weekly and monthly reports detailing how many referrals each physician has made. Jeneen Cliett and Monica Jones showed Relator Helmly how to run these reports and informed her that Ms. Best uses these reports to determine how much to pay referral sources. Ms. Best and Mr. Mackey routinely review the ROI for their kickbacks. Physicians who refer the most patients receive the largest payments.

40.     Bethany Hospice cloaks some payments to its medical directors as investment interests. Instead of providing these individuals with payments directly, Ms. Best first has them purchase an ownership stake in Bethany Hospice without obtaining a proper valuation and without assessing a commercially viable buy-in. Once they are partial owners in Bethany Hospice, Ms. Best issues annual dividends to these individuals. These amounts fluctuate according to how many patients are put under service at the owner/investor's site and are not proportional to the amount

invested.  The terms of the investment are related to the expected volume of referrals or the amount of business that could be generated by the owner/investor.  The "owner/investors" are required to make referrals to Bethany Hospice and only those who are in a position to make referrals are considered or offered an investment opportunity.  This is a sham device to hide the payment for referrals.

41.     The Dr. Daly situation makes it clear that this was a kickback scheme and was never intended as a legitimate investment.  Dr. Daly is a sleep medicine specialist based in Savannah, Georgia (with another office in Douglas).  His practice focuses on performing sleep studies on patients to diagnose them with disorders such as obstructive sleep apnea.  Early on in their tenure, Relators found out that Dr. Daly had been continuously approaching Ms. Best and Mr. Mackey about becoming an investor in Bethany Hospice or Bethany Coastal because Mr. Mackey asked Relators about him as a potential investor.  Mr. Mackey discussed this with Relators because Relator Johnson knew Dr. Daly from when she worked at Hospice Advantage.  Dr. Daly had been the medical director during Relator Johnson's tenure with Hospice Advantage.  When Relators informed Mr. Mackey that Dr. Daly never referred patients to Medical Advantage because of his niche practice, Mr. Mackey said "Forget it.  We do not need him if he does not and will not refer patients to Bethany [Hospice]."  These remarks highlighted the fact that Bethany Hospice and Bethany Coastal's primary objective in obtaining investors was to lock up referral streams rather than investment streams.  Mr. Mackey and Ms. Best wanted to look like they complied with the law, while intending to make payments based on the volume of referrals from these doctors.

42.     There are a number of medical directors for Bethany Hospice or other doctors who are "owner/investors" and get extra money from Bethany Hospice.  Drs. Wheeler and Sinclair serve as medical directors for Bethany Hospice's Valdosta site.  They receive annual dividends

based on how many patients their site puts under census.  The vast majority of revenue for Bethany Hospice comes from "owner/investor" referrals.  In certain periods, around 95% of Bethany Hospice's referrals came from doctors with a financial interest in Bethany.

43.     The Douglas location has a large concentration of these doctors, and they are linked with the county hospital.  "Bethany doctors" include Drs. Arnett, Sinclair, Harrell, and Harper. They work or have worked at Coffee Regional Medical Center.  In fact, these doctors sit on or have sat on the Coffee County Hospital Board.   Each of these "Bethany doctors" refers every single patient they control to Bethany Hospice.  Other than outlier occasions, such as the family demanding another hospice, every single patient is referred to Bethany.  "Bethany doctors" (Arnett, Sinclair, Harrelson, and Harper) also bought out the company that provides hospitalists to Coffee Regional Medical Center and direct referrals from them as well.  After they bought out the hospitalist company, Bethany Hospice became Coffee Regional Medical Center's number one referral of hospice patients (with around 90% of its referrals).  This statistic is even more profound when the referrals to home health agencies that refer to Bethany Hospice are taken into account. It is as if payments to these doctors alone has the power to direct 80-90% of the county's hospice patients to Bethany Hospice (and it does).

44.     Bethany Hospice's kickbacks have worked as intended. Dr. Harper, for instance, only referred two patients to Bethany Hospice prior to receiving kickbacks from Bethany Hospice.  However, once his affiliation with Bethany Hospice began all of Dr. Harper's referrals for hospice care that he could send to Bethany were sent to Bethany Hospice.  In fact, while nearly none of their referrals went to Bethany Hospice before their financial arrangements, afterwards, nearly all of the "Bethany doctor's" referrals for hospice services have gone to Bethany Hospice. Coffee County is a perfect example of the effectiveness of these kickbacks.    Using referral

information housed in the Consolo program and comparing it to the total deaths in the county, it is clear that Bethany has almost all the hospice business in the county.  In 2015, for example, 381 people died in Coffee County, and of those, 327 were patients of Bethany Hospice.  Even assuming that all the deaths that year were preceded by hospice care, Bethany would have had at least 86% of all hospice patients that year.  Making a reasonable adjustment to account for non-hospice deaths would push that percentage to almost 100%.  Whether it is 86% or 99%, no one could argue the effectiveness of Bethany's kickbacks or the loyalty it has bought from the "Bethany doctors."

45.     In March 2015, Relator Johnson actually engaged Ms. Best in a conversation about doctor ownership in Bethany Hospice.  Before the conversation, Relator Johnson had been looking into this matter and found that Odyssey had a similar scheme to pay directors through their retirement rather than directly.  Relators knew that Ms. Best would know that because she worked there.  She reminded Ms. Best that SouthCoast Medical in Savannah had an agreement with Odyssey Hospice like the Bethany Hospice agreement, but when Odyssey was bought out, the new company deemed the agreement to be "illegal" and dissolved the agreement.  Ms. Best said she had "found a way around this issue."  Ms. Best said that she had found a way to do it so she would not get caught.  She indicated that she could create a (sham) agreement that would mask the payment to doctors for referrals.  She said that by making potential referral sources medical directors and medical directors "part owners" she would not get caught.  Ms. Best mentioned several times that her medical directors were "part owners" in Bethany Hospice.  These remarks not only illuminate the scheme employed, but also demonstrate Ms. Best's clear intent to funnel kickbacks through a sham device.  This conversation made it clear to Relators that they had to continue to investigate and continue conversations like this to persuade Ava Best and Mack Mackey to stop their illegal behavior.

46.     Continued investigations revealed that physicians receiving kickbacks from Bethany Hospice cut regulatory corners when referring patients to Bethany, ostensibly to maximize their bonuses and annual dividends.  For instance, Relators learned through a contact with Atkinson Visiting Nurses Services, Inc. that a fellow employee in charge of receiving all physician orders for home health and hospice care had discovered that physicians with a financial interest in Bethany Hospice, including Drs. Arnett and Sinclair, referred patients to Bethany Hospice without informing the patient of alternate facilities that could provide hospice care.  While all other physician orders would denote that the physician had discussed treatment and facility options with the patient, orders from providers linked to Bethany Hospice lacked this information. Their orders, by contrast, would merely state "refer to hospice" with the understanding that the patient would be sent to Bethany Hospice.

47.     Ms. Best was already paranoid and concerned about the existence of "whistleblowers" in her employ.  Unbeknownst to Relators, she had previously raided Ms. Helmly's personal, locked office areas to make sure Relators were not blowing the whistle on Bethany Hospice and Bethany Coastal.  The results of the raid showed that the whistleblowing was confined to Spanish Oaks, but Ms. Best remained uneasy.

48.     A few more related incidents played into Ms. Best's paranoia about Relators blowing the whistle on Bethany.  One of these incidents involved a series of additional kickback offers to referring physicians to take their wives on a paid vacation and having food, hotels, and expenses and such paid by Bethany Hospice and Bethany Coastal.  The offers to doctors went out in May 2015 for a trip in August 2015.  Bethany Hospice and Bethany Coastal sent the top referring doctors and their wives on a trip, and paid airfare, hotel, and food for both the doctors and their wives.  Relators tried to persuade Ms. Best that this was inappropriate, but she didn't listen.

However, it increased Ms. Best's paranoia about Relators blowing the whistle on her kickback schemes.

49.     Unbeknownst to Relators, they played right into Ms. Best's whistleblower paranoia.  In the same timeframe as the discussions about doctor trips, in May, Relators went on vacation to Florida.  During that trip, Relator Helmly called Ava Best and, for the first time since their January agreement, broached the issue of putting Relator Helmly's name on the lawsuit to be filed against Spanish Oaks.  Ms. Best agreed saying that she was not going to ask Relator Helmly to forego the money she could possibly get from the case.  However, after Relators came back from Florida, Ava Best's attitude toward them markedly changed.

50.     Apparently, the last whistleblower straw came when Relators had to take time off in June to meet with the Government.  Ms. Best again peppered Relators with questions about this time off.  However, this time was different and they responded that they could not tell her about it.  At this time, contrary to prior discussions, a case had been filed and a federal judge had entered a seal order gagging Relators from discussing the case.

51.     After the June meeting with the DOJ that Relators could not discuss, Ms. Best and all employees "loyal" to her started a harassment campaign against Relators trying to get them to quit so she would be "protected" from a retaliation claim.  When Ms. Best realized that Relators were not so easily going to quit, the harassment got worse.  Ms. Best and those "loyal" employees started fabricating things about Relators to "justify" the retaliatory discrimination and possible future termination if the harassment didn't work.  Even though Ms. Best tried to create a pretext for termination, she failed to create a contemporary record.  Neither Relator was ever written up for anything nor officially disciplined in any way—just harassed.  In creating this fake pretext, Bethany Coastal did not even follow its own policy manual.

-19-

52.     Part of the escalation of harassment and discrimination resulted in an unmerited demotion.  Shortly after the visit with the Government that Relators could not discuss, Ava Best and Mac Mackey demoted Relator Helmly to field nurse without explanation or reason.  A few weeks later, Ava Best escalated things again by threatening to tell Relator Helmly's old boss (at Spanish Oaks) "everything," including telling him about the lawsuit Ms. Best assumed had been filed.  She also threatened to out the Spanish Oaks employee who had helped Relators with their lawsuit.  This was the same week Relator Helmly finally found out that Ava Best and Ms. Best's "loyal" employees had been going through Relator Helmly's personal information in her locked room and her locked desk on a regular basis.  Whenever Relator Helmly was gone, she locked her door and only she and Ava Best had a key to her office.  Yet, on a regular basis, someone who had a key had been in Relator's office and gone through her personal things.

53.     Relators were stressed and mortified by this conduct and these threats.  Then, on July 28, 2015, Ms. Best called Relator Helmly and told her to come into the office.  Relator Helmly called Relator Johnson to tell her she was worried about possible retaliation at the proposed meeting—especially in light of Ava Best's most recent threats.  Relator Johnson was very concerned Ava Best was going to do something to retaliate for their standing up to her for her illegal activities.  To protect against possible whistleblower retaliation, Relator Johnson texted Relator Helmly at around noon on July 28, 2015 to tell her to have their whistleblower attorney on the line during the conversation (or to at least to record the conversation).  However, Relator Johnson accidently sent the text to the Bethany Coastal group text, which included Ava Best herself.  Within minutes of finding out that Relators were trying to protect themselves against whistleblower discrimination by including their whistleblower attorney (about whom Ms. Best learned by ransacking Relator Helmly's desk), Ava Best had called both of them and told them

they could claim to resign to save face or they could be fired, but, either way, she was firing them that day.

54.     Ms. Best and other Bethany Hospice and Bethany Coastal managers told Bethany Coastal employees that Relator Helmly resigned because of her health.  They also told others that Relator Helmly resigned to pursue her education.  Ms. Best never told anyone (including Relator Helmly) that she was being fired for any lack of productivity or for any improper behavior.  Ms. Best never told Relator Johnson that she was being fired for lack of productivity or any improper behavior.  Ms. Best also never indicated that to anyone else at Bethany.  Ironically, Relator Johnson had three referrals for Bethany in her hand at the time Ms. Best fired her.  In fact, she had averaged about 14 patients a month for the several months prior to July 28th.  That did not matter to Ava Best, as she wanted their investigation of illegal activities to stop, she wanted their questioning of her illegal policies to stop, she did not want a whistleblower as her administrator or at her companies, and she was concerned that Relators had or might blow the whistle on Bethany Hospice and Bethany Coastal.  Over time, Ms. Best has tried to fabricate excuses and pretexts for Relators sudden disappearance from Bethany Coastal after they started and built the entire office from scratch.   However, Bethany Coastal's history undermines this revisionist history as other employees who actually engaged in the type of behavior Ms. Best later ascribed to Relators were never disciplined.

55.     The harassment and discrimination continued after the termination.  Additional discrimination for protected activity included not allowing Relators to clean out their offices.  Ms. Best went through their things and gave them back what she wanted to give back to them.  In addition, knowing that Relators had used information from then current employees of their former employer in their reporting to the Government, Ms. Best forbade anyone working for Bethany

Hospice and Bethany Coastal from having any contact with Relators for any reason. Bethany Coastal also blackballed Relators and did what it could to prevent them from obtaining subsequent employment in the area and the industry. Ms. Best, the head of Bethany Coastal's HR department, and others, would give bad references and badmouth Relators to potential employers.

56. After the termination, in an effort to undermine any potential whistleblower case against Bethany Hospice and Bethany Coastal, Ava Best and Monica Jones tried to ferret out any employees who might help Relators or provide them with information. They would call employees in to talk to them and accuse the employees of "talking to Debbie" or "talking to Jolie" and then tell them they needed to "resign." If they did not chose to "resign," Bethany Coastal management would cut their hours and harass them until they quit. Ms. Best fired at least one Bethany Coastal employee for the false accusation that she had had contact with Relators.

57. Then, in a final act of harassment and discrimination and to scare Relators from talking to the Government about Bethany, Ms. Best actually provided information to Relators' former boss at Spanish Oaks about who was helping them report that company to the Government for FCA violations. That person was immediately fired from Spanish Oaks—sending the message that Ms. Best would retaliate against anyone involved in reporting FCA violations to the Government and warning Relators not to do it to Bethany Hospice or Bethany Coastal.

58. Undermining the façade and the plethora of made up excuses, the termination of Relators' employment was not well planned because Bethany Coastal management wanted to get Relators away from Bethany Hospice and Bethany Coastal before they could gather evidence of false claims to give to the Government. After Relator Helmly, Bethany Coastal's administrator on file with the state was terminated, the Claxton office went off the rails.

59. Ms. Best started with what she called an "interim clinical director," who was an

employee of Bethany Hospice Valdosta office.  Of course, the interim clinical director from Bethany Hospice Valdosta did not actually come in to the Claxton office every day.  Even when the "interim director" did come to the site, she would arrive between 10:00-10:30 a.m. and then leave by 1:00 or 2:00 p.m.  Ms. Best later made the clinical director of the Bethany Hospice Douglas location, Jeneen Cliett, the administrator for Bethany Coastal (which is 1.5 hours away).  After Ms. Cliett "became" the administrator of Bethany Coastal, she remained the director of the Douglas location and she never visited Claxton.  She would "call in."  Both of these actions are illegal.  There must be an administrator on site all day every day.

60.     Ms. Best also made Bridget Thornton the clinical director of Bethany Coastal, even though she was the only RN working there and she did not meet the qualifications to be a clinical director.  There are also two LPNs that were then being used in place of RNs, so there was a chain reaction of regulatory violations simply because Ms. Best was unprepared to fire her administrator for protected activity.

61.     While Relators were at Bethany Coastal, kickbacks were not the only thing they were investigating.  Ms. Best did not have a social worker with a master's degree in social work seeing patients.  This is a prerequisite to billing for the visit.  Relator Johnson was told about this by the very person seeing the patients who did not have her masters.

62.     In addition, Ms. Best would discharge patients if they were going into the hospital (also against regulations).  An example is patient P in Savannah, Georgia.  Relator Johnson was told this in person by the nurse that had to meet patient P at the hospital to have him sign revocation papers.  Some of the patients that went directly into the hospital and were also picked up that very same day include IC, JP, HK, and ST.  Patient AQ also went to the doctor for aggressive treatment, and Bethany did not pay for this even though he was a full Medicaid patient.  Ms. Best also

discharged patients once they ran out of their Medicare payments.  If they were on Medicaid, she would keep them because they do not have a monetary limit.

63.     There are also issues of neglect and failure to perform the services required by hospice.  A patient by the name of SB ended up dying unnecessarily due to negligence on Bethany's part of not treating a urinary tract infection.  TT is a patient who had passed away two days before any nurse went out to check on him.  The neighbors actually found him as they had not seen him out.  It was said he had been dead for days, but because the nurse said he would not answer the phone, she did not go by and check on him.

64.     During their investigation of Medicare and Medicaid fraud at Bethany Hospice and Bethany Coastal, Relators gained intimate knowledge of Bethany Hospice's and Bethany Coastal's billing protocols and operations.  This familiarity apprised them to the types of patients Bethany Hospice and Bethany Coastal endeavored to put under service, who the primary referral sources for each entity were, and the specific entities that reimbursed Bethany for hospice services.

65.     One of the key protocols at Bethany Hospice and Bethany Coastal was to immediately check all potential patients for Medicare coverage.  Ava Best insisted that Bethany Hospice and Bethany Coastal patients have either Medicare or Medicaid coverage. This is one of the ways Relators found out about the issues concerning Presbyterian Hospice.

66.     As a marketer, part of Relator Johnson's job duties entailed visiting patients in their homes and collecting their social security numbers to see if these patients had any Medicare eligibility left.  In doing so, Relator Johnson interacted with administration at every Bethany Hospice and Bethany Coastal branch.  Billing personnel would take the information from the marketers and run it through the system to assure coverage before a patient could be admitted. This protocol was heavily emphasized in Relator Johnson's mandatory marketer training.  Her

trainer was Bethany Hospice employee Robert Clements in Douglas, Georgia.

67.     During this training, Mr. Clements and Relator Johnson also visited the offices of the "Bethany doctors" for Bethany Hospice in Douglas, which is where she picked up a great deal of information about the kickback/referral process.  Mr. Clements explained to Relator Johnson that Bethany Hospice had doctors with financial ties to Bethany Hospice who would refer all their patients to Bethany Hospice.  During these visits, Mr. Clements would ask the "Bethany doctors" if they had any patients that needed to be referred to Bethany Hospice and whether these patients were covered by Medicare or Medicaid.  Drs. Arnett, Sinclair, and Harrell would provide Mr. Clements with names of patients eligible for Medicare and Medicaid coverage.

68.     Afterwards, Mr. Clements and Relator Johnson would visit those patients referred by the "Bethany doctors" in the patients' homes.  Mr. Clements explained to Relator Johnson that she needed to collect each patient's social security number.  This allowed Ms. Best to see whether a patient had previously been under hospice, how long they had been under hospice, and their certification period.  Mr. Clements told Relator Johnson that Bethany Hospice and Bethany Coastal collected this information to determine if patients were eligible for Medicare and Medicaid coverage.  He further explained that Bethany Hospice and Bethany Coastal's unwritten policy was to acquire more Medicare patients because "Medicare paid more."  Relator also found out about the percentage of the census that came from referrals tainted by kickbacks and that all the patients were billed to the Government until their benefits ran out.

69.     Relator Johnson had access to the census reports documenting each site's patients and which payor paid for the patients' care.  These reports revealed that federal health care programs covered the hospice expenses for a substantial majority of patients (100% or nearly 100%).  Relator Johnson also had the opportunity to meet with billers at the Bethany Hospice

Valdosta office.  These individuals informed her that they too entered patient's social security information into the billing system to make sure the patient was eligible for Medicare coverage before putting the patient under service.  From all of her contacts with billers, Relator Johnson was able to find out about the billing and collection from Medicare of the illicit referrals and the submission of bills for other inappropriate patients.

70.     As the administrator at Bethany Coastal, Relator Helmly had access to all of the billing information and census reports for every Bethany site.  In fact, Relator Helmly had full access to all billing and referral data for all patients at Bethany Hospice and Bethany Coastal.  She also attended meetings with Ms. Best where Bethany Hospice and Bethany Coastal management discussed site productivity and census numbers for all Bethany Hospice's and Bethany Coastal's sites.  Through these sources, Relator Helmly learned that all or nearly all of Bethany patients put under service received coverage from Medicare and Medicaid.  She shared this knowledge with Relator Johnson.  In investigating this case, Relators found that all (or nearly all) the hospice patients referred by Drs. Arnett, Sinclair, Wheeler, and Harrell, were Medicare or Medicaid patients and that Bethany Hospice submitted claims to the Government for the per diem payments for those patients knowing that they were false.  The patients that were illegally referred (that Relators found) were not only billed to the Government, but paid for by the Government.

71.     All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" meaning with reckless disregard, as that is defined in the False Claims Act, 31 U.S.C. § 3729 and related case law.  Each of the owners, officers, and directors (Defendants Best, Mackey, Arnett, Sinclair, Wheeler, and Harrell) are responsible for the actions of the companies they own, direct, and oversee as they have (at least) failed to make simple inquiries (buried their heads in the sand) and neglected to oversee and prevent kickbacks and the resulting submissions of false claims.

If a defendant company submits a false claim to the government, each of the owners, officers, and directors of that company are responsible for that submission as long as they meet the "knowingly" definition of the statute.  In the legislative history of the amendments, Congress clarified that it intended the FCA "[t]o reach what has become known as the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted.  S. Rep. No. 345, 99th Cong., 2d Sess. 21 (1986), reprinted in U.S.C.C.A.N. 5266, 5286.  "Indeed, Congress clarified the 'knowing' standard in 1986 to emphasize that the government need not prove that the defendant had actual knowledge or a specific intent to submit a false claim, reasoning that this high standard was 'inappropriate in a civil remedy' and 'prohibited the filing of many civil actions to recover taxpayer funds lost to fraud.' S. Rep. 99-345, at 7, reprinted at 1986 U.S.C.C.A.N. 5266, 5272. The Committee Report further noted that the 'actual knowledge' standard precluded the government from 'holding responsible those corporate officers who insulate themselves from knowledge of false claims submitted by lower-level subordinates. This "ostrich-like" conduct which can occur in large corporations poses insurmountable difficulties for civil false claims recoveries.' Id. at 6-7, 1996 U.S.C.C.A.N. at 5272." *U.S. ex rel. Bledsoe v. Community Health Sys.*, 342 F.3d 634, 642 (6th Cir. 2003) (emphasis added).

72.     All the actions of the Defendants alleged herein meet the statutory definition of "knowledge."   "If the reckless disregard standard of section 3729(b)(3) served merely as a substitute for willful misconduct—to prevent the defendant from "deliberately blind[ing] himself to the consequences of his tortious action"—section (b)(3) would be redundant since section (b)(2) already covers such struthious [ostrich-like] conduct. . . .  Moreover, as the statute explicitly states that specific intent is not required, it is logical to conclude that reckless disregard in this context is

not a 'lesser form of intent,' but an extreme version of ordinary negligence." *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997) (emphasis added) (an owner is responsible for the false billing of an employee of the company).  Accordingly, each of the owners, officers, and directors of the company are liable for the submissions of false claims by the company or the improper remuneration provided by the company in violation of the AKS.  Likewise, each of the doctors receiving remuneration for referrals in violation of the AKS are liable for the submission of claims for those referrals.  Moreover, each of the defendants is a party to a kickback and that is obviously wrong.  "Indeed, the **giving or taking of kickbacks for medical referrals is hardly the sort of activity a person might expect to be legal**." *U.S. v. Starks*, 157 F.3d 833, 838 (11th Cir. 1998) (emphasis added).

## FIRST CAUSE OF ACTION

### (False or Fraudulent Claims)
(False Claims Act 31 U.S.C. § 3729(a)(1)(A))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1))

73.     Relators hereby incorporate and re-allege paragraphs 15-23, 26-27, 30-49, 56, 58-72 as if fully set forth herein.

74.     As set forth above, Defendants Bethany Hospice and Palliative Care, LLC; Ava Best; Justin Harrell, M.D.; David Arnett, M.D.; Stan Sinclair, M.D.; Richard W. Wheeler, M.D.; and Berkley M. "Mac" Mackey by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government and the State of Georgia numerous false or fraudulent claims for payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and/or the Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1).

75.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

76.     The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

77.     The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

78.     Relators are also entitled to their attorney's fees and litigation expenses.

**SECOND CAUSE OF ACTION**
**(False Statements)**
(False Claims Act 31 U.S.C. § 3729(a)(1)(B))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(2))

79.     Relators hereby incorporate and re-allege paragraphs 15-23, 26-27, 30-49, 56, 58-72 as if fully set forth herein.

80.     As set forth above, Defendants Bethany Hospice and Palliative Care, LLC; Ava Best; Justin Harrell; M.D., David Arnett, M.D.; Stan Sinclair, M.D.; Richard E. Wheeler, M.D.; and Berkley M. "Mac" Mackey, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(2).

81.     Due to Defendants' conduct, the United States and the State of Georgia have suffered substantial damages.

82.     The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

83.     The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

84.     Relators are also entitled to their attorney's fees and litigation expenses.

## THIRD CAUSE OF ACTION
### (Retaliation Against Relators)
(False Claims Act-31 U.S.C. § 3730(h))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.4)

85.     Relators hereby incorporate and re-allege paragraphs 15-58, 61-72 as if fully set forth herein.

86.     Defendant Bethany Coastal directly violated Relators' rights pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4 by retaliating against them for lawful acts done by them in furtherance of efforts to stop one or more violations alleged in this action and other protected activities.

87.     As a result of Defendants' actions, Relators have suffered damages in an amount to be shown at trial.

88.     Relators are entitled to two times back pay, interest, (Relator Johnson) reinstatement, and make whole damages as well as all attorney's fees and litigation expenses.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators Jolie Johnson and Estate of Debbie Helmly pray for judgment:

a.      awarding the United States and the State of Georgia damages sustained by them for each of the false claims;

b.      awarding the United States and the State of Georgia treble damages sustained by them for each of the false claims;

c.      awarding the United States and the State of Georgia the largest civil penalty allowed by law for each of the false claims;

d.      awarding Relators 30% of the proceeds of this action and any alternate remedy or the settlement of any such claim;

e.      awarding Relators two times back pay, interest, (Relator Johnson) reinstatement,

and make whole damages resulting from retaliation;

f.      awarding Relators their litigation costs and reasonable attorney's fees; and

g.      granting such other relief as the Court may deem just and proper.


Respectfully submitted,

 /s/  Mike Bothwell
Mike Bothwell
Ga Bar No. 069920
Mike@WhistleblowerLaw.com
Attorney for Relators

**BOTHWELL**
LAW GROUP
304 Macy Drive
Roswell, Georgia 30076
Ph: 770-643-1606
Fax: 770-643-1442

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day, the foregoing was filed electronically with the Court via the CM/ECF system, which will automatically send electronic notification of such to counsel of record.

This 31st day of January, 2019.


/s/   Mike Bothwell