**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel. JOLIE JOHNSON and ESTATE OF DEBBIE HELMLY** <br> **and** <br> **STATE OF GEORGIA ex rel. JOLIE JOHNSON and ESTATE OF DEBBIE HELMLY,** <br><br>     **Relators,** <br><br>        **v.** <br><br> **BETHANY HOSPICE AND PALLIATIVE CARE OF COASTAL GEORGIA, LLC (f/k/a BETHANY HOSPICE OF COASTAL GEORGIA, LLC), BETHANY HOSPICE AND PALLIATIVE CARE, LLC (f/k/a BETHANY HOSPICE, LLC), BETHANY BENEVOLENCE FUND, INC.,** <br><br>     **Defendants.** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | **Civil Action No. 4:16-CV-290** |

<u>**BETHANY HOSPICE AND PALLIATIVE CARE OF COASTAL GEORGIA, LLC'S (f/k/a BETHANY HOSPICE OF COASTAL GEORGIA, LLC) ANSWER TO THIRD AMENDED COMPLAINT**</u>

COMES NOW Defendant Bethany Hospice and Palliative Care of Coastal Georgia, LLC (f/k/a Bethany Hospice of Coastal Georgia, LLC) ("Bethany Coastal"), by its counsel, and submits the following Answer and Affirmative Defenses to the Third Amended Complaint filed by United States of America and the State of Georgia, by and through Relators Jolie Johnson and the Estate of Debbie Helmly ("Relators"):

## FIRST AFFIRMATIVE DEFENSE

Relators' Complaint, in whole or in part, fails to state a claim against this Defendant upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

This Defendant states that some or all of Plaintiffs' claims against it may be barred by the applicable statute of limitation.

## THIRD AFFIRMATIVE DEFENSE

This Defendant admits that certain duties may arise under applicable law but denies that any such duties were breached.

## FOURTH AFFIRMATIVE DEFENSE

This Defendant's activities were at all times conducted in substantial compliance with all applicable laws.

## FIFTH AFFIRMATIVE DEFENSE

By their own actions and omissions, Relators are estopped from asserting any claims or recovering any damages against the Defendant in this case.

## SIXTH AFFIRMATIVE DEFENSE

Relators' have failed to mitigate their alleged damages.

## SEVENTH AFFIRMATIVE DEFENSE

Relators' claims are barred by the doctrine of unclean hands.

## EIGHTH AFFIRMATIVE DEFENSE

Relators' claims are barred by the doctrine of laches.

## NINTH AFFIRMATIVE DEFENSE

The occurrences referred to in Relators' Complaint and all damages, if any, resulting therefrom were caused by the acts or omissions by third parties over whom this answering Defendant had no control.

## TENTH AFFIRMATIVE DEFENSE

Relators' alleged losses, injuries, damage or detriment were directly and proximately caused and contributed to by Relators' own conduct, acts, omissions, activities, carelessness, recklessness, negligence, and/or intentional misconduct thereby completely or partially barring Relators' recovery herein.

## ELEVENTH AFFIRMATIVE DEFENSE

The damages and injuries, if any, incurred by Relators, are not attributable to any act, conduct or omission on the part of this answering Defendant.

## TWELFTH AFFIRMATIVE DEFENSE

The Relators have failed to plead with specificity any factual allegations to establish the requisite statutory elements.  The Relators have failed to set forth adequate or ultimate facts necessary to show or establish that the Relators are entitled to Relief under the False Claims Act.

## THIRTEENTH AFFIRMATIVE DEFENSE

The Complaint is barred because this Defendant never knowingly presented a false or fraudulent claim for payment or approval.

## FOURTEENTH AFFIRMATIVE DEFENSE

The Complaint is barred because this Defendant never knowingly made, used or caused to be made or used, a false record or statement material to a false or fraudulent claim.

## FIFTEENTH AFFIRMATIVE DEFENSE

This Defendant hereby incorporates by reference those affirmative defenses enumerated under Rule 8 of the Federal Rules of Civil Procedure as fully set forth herein.  In the event further investigation or discovery reveals the applicability of any such defenses, this answering Defendant reserves the right to seek leave of this Court to amend his answer to specifically assert the same.  Such defenses are herein incorporated by reference for the specific purpose of not waiving the same.

## SIXTEENTH AFFIRMATIVE DEFENSE

Relators' claims against Defendants are barred by the provisions of 42 C.F.R. § 1001.952(a).

## SEVENTEENTH AFFIRMATIVE DEFENSE

Responding specifically to the numbered Paragraphs, Defendant Bethany Coastal responds as follows:

## I.   JURISDICTION AND VENUE

1.      This action arises under the False Claims Act, 31 U.S.C. § 3729, *et seq*. and Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1, *et seq*.

ANSWER:      Bethany Coastal admits that Relators assert claims under the False Claims Act and Georgia False Medicaid Claims Act but denies that the facts or allegations supports such claims.

2.      This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants do or transact business in this jurisdiction, and portions of the violations of the False Claims Act described herein were carried out in this district.

ANSWER:      Bethany Coastal admits that it transacts business in this jurisdiction, but denies that any violations of the False Claims Act were carried out in this district, as alleged.

3.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

ANSWER:      The allegations of Paragraph 3 constitute legal conclusions or arguments of counsel to which no response is necessary or required.  To the extent a response is required, Bethany Coastal admits that this Court has subject matter jurisdiction over this action.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a) and O.C.G.A. § 49-4-168.6.

ANSWER:      The allegations of Paragraph 4 constitute legal conclusions or arguments of counsel, to which no response is necessary or required.  To the extent a response is required, Bethany Coastal admits that venue is proper in this district.

## II.    THE PARTIES

5.     Defendant Bethany Hospice and Palliative Care of Coastal, LLC (f/k/a Bethany Hospice of Coastal, LLC) ("Bethany Coastal") is a for profit provider of hospice care. Bethany Coastal has one office in Claxton, Georgia, which is located at 109 South Duval Street, Claxton, Georgia. Bethany Coastal exclusively (or nearly exclusively) funds its operations through receipt of Medicare/Medicaid dollars. Bethany Coastal's Medicare National Program Identifier ("NPI") is 1548501000. Bethany Coastal has retaliated against Relators in violation of the law.

ANSWER:     Bethany Coastal admits that it provides hospice care through a facility located at 109 South Duval Street, Claxton, Georgia, and that it accepts Medicare and Medicaid patients.  Bethany Coastal denies the remaining allegations of Paragraph 5 of the Third Amended Complaint.

6.     Bethany Hospice and Palliative Care, LLC (f/k/a/ Bethany Hospice, LLC) ("Bethany Hospice") is a for profit provider of hospice care. Bethany Hospice has four locations in Georgia with offices in Douglas, Thomasville, Waycross and Valdosta. At various times, Bethany Hospice and Palliative Care, LLC also maintained an office in Quitman, Georgia. The Douglas office is located at 1400 Peterson Avenue North, Suite 12, Douglas, Georgia. The Thomasville office is located at 2012 East Pinetree Boulevard, Suite A, Thomasville, Georgia. The Waycross office is located at 411 Lister Street, Waycross, Georgia. The Valdosta office is located at 2700 North Oak Street, Building B, Valdosta, Georgia. Bethany Hospice exclusively (or nearly exclusively) funds its operations through receipt of Medicare/Medicaid dollars. Its Medicare NPI is 1972709160. Bethany Hospice is responsible for submitting and causing false claims to be submitted to the Government for the per diem reimbursement for patients whose referrals were

tainted by kickbacks. It is also responsible for making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim tainted by kickbacks.

ANSWER:    Bethany Coastal admits that Bethany Hospice provides hospice care through facilities located in Douglas, GA, Thomasville, GA, Valdosta, GA and Waycross, GA and that Bethany Hospice accepts Medicare and Medicaid patients. Bethany Coastal denies the remaining allegations of Paragraph 6.

7.    Relator Jolie Johnson began working for Bethany Coastal in December 2014 as a marketer and was terminated July 2015.

ANSWER:    Defendant Bethany Coastal admits that Relator Jolie Johnson began working for Bethany Coastal as a marketer in December 2014 and that Relator Johnson's employment at Bethany Coastal ended in July 2015. Defendant Bethany Coastal denies the remaining allegations of Paragraph 7.

8.    Relator Debbie Helmly began working for Bethany Coastal in December 2014 as an administrator and was terminated July 2015. Relator Helmly passed away on March 27, 2018. Her estate has substituted as a party to this litigation.

ANSWER:    Defendant Bethany Coastal admits that Debbie Helmly began working for Bethany Coastal as a Clinical Director/Administrator in December 2014 and that Helmly's employment ended in July 2015, but denies that Helmly was terminated. Bethany Coastal further denies that Helmly worked for or was employed by Bethany Hospice at any time. Bethany Coastal admits upon information and belief that Helmly passed away on or about March 27, 2018 and further admits that Helmly's Estate seeks to pursue this litigation in Helmly's place. Defendant Bethany Coastal denies the remaining allegations of Paragraph 8.

### III.   FACTUAL ALLEGATIONS

9.    Hospices are paid a per diem rate based on the number of days and level of care provided for a hospice patient. Medicare Benefit Policy Manual, Chapter 9, §40; 42 C.F.R. §418.302. The United States reimburses Medicare providers with payments from the Medicare Trust Fund, through CMS, as supported by American taxpayers. Payments are typically made by Medicare directly to health care providers like Bethany Hospice and Bethany Coastal rather than to the patient. The Medicare provider submits its bill directly to Medicare for payment.

ANSWER:    The allegations of Paragraph 9 contain legal conclusions to which no responsive pleading is required.  Defendant Bethany Coastal states that the regulations referenced speak for themselves and Defendant Bethany Coastal denies the allegations of Paragraph 9 as stated.

10.    In particular because any hospice patient automatically generates daily payments from the Government, absolutely no reimbursement of any kind (kickbacks) can be exchanged for referrals of hospice patients. "The prohibition against kickbacks is a core requirement whose violation eviscerates the value of the service the Government has bargained for: an unbiased determination by a medical provider that a certain medical procedure, device, or drug is "reasonable and necessary' for the treatment of a patient." Statement of Interest of the United States of America in Response to Defendants' Motion to Dismiss, U.S. *ex rel. Wood v. Allergan, Inc.*, Civil Action No. 10-CV-5645, at 4 (Oct. 19, 2016).

ANSWER:    The allegations of Paragraph 10 contain legal conclusions to which no responsive pleading is required.  Defendant Bethany Coastal denies the allegations of Paragraph 10 as stated.

11.     The Medicare and Medicaid Fraud and Abuse Statute 42 U.S.C. § 1320a-7b(b) or Anti-Kickback Statue ("AKS") was enacted under the Social Security Act in 1977. The AKS arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care. The AKS also specifies that "a claim that items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCS]." 42 U.S.C. §1320a-7b (2013). This includes any claim submitted for a patient who was referred by someone receiving a kickback. The statute ascribes liability equally to both sides of an impermissible kickback relationship.

ANSWER:     The allegations of Paragraph 11 contain legal conclusions to which no responsive pleading is required.  Defendant Bethany Coastal denies the allegations of Paragraph 11 as stated.

12.     The AKS prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program. 42 U.S.C. §1320a-7b(b). Essentially, if just one purpose of the payment was to reward referrals or to induce future referrals, the AKS has been violated. This is true even if the doctor performs some medical service for the money. It is not even required that it be the primary purpose – just one purpose of the payment. In other words, a defendant can have 99 lawful reasons to enter a relationship, but if

one other reason is to expect referrals or reward referrals, it is illegal. It is irrelevant if the funds would have been spent anyway or that Medicare funds were not used to make the illegal payment.

ANSWER: The allegations of Paragraph 12 contain legal conclusions to which no responsive pleading is required. Defendant Bethany Coastal denies the allegations of Paragraph 12 as stated.

13.     Hospice providers are reimbursed based upon their submission of a single electronic or hard-copy form known as CMS Form 1500 to the appropriate fiscal intermediary or Medicare claims processor. Each time it submits a claim for payment by Medicare, a provider certifies that the claim is true, correct and complete, and complies with all Medicare laws and regulations.

ANSWER:     The allegations of Paragraph 13 contain legal conclusions to which no responsive pleading is required. Defendant Bethany Coastal denies the allegations of Paragraph 13 as stated.

14.     Bethany Hospice is a Medicare institutional service provider, and as such, certified compliance with the AKS prior to any claim submissions upon executing CMS Form 855A. Entities that execute CMS Form 855A make the following certification: "I agree to abide by the Medicare laws, regulations and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare." Bethany Hospice's Medicare certification date occurred on August 08, 2000. Its unique hospice identification number is 111587. Each of the billing forms echoed these certifications that Bethany

Hospice had violated the AKS in conjunction with the submission of the bills. These certifications (and the billing certifications) were false and Bethany Hospice knew they were false.

ANSWER:    Defendant Bethany Coastal lacks sufficient knowledge to admit the truth or falsity of any allegation contained in Paragraph 14 as to Bethany Hospice. Defendant Bethany Coastal denies all remaining allegations of Paragraph 14 as stated.

15.    Relators came to Bethany Coastal from another hospice – Spanish Oaks. From 2011 through October 2014, Relator Helmly ran the Claxton office of Spanish Oaks hospice and Relator Johnson worked for that office. By October 2014, Relators were looking for a different hospice to work for. Around that time, Ms. Best and Mr. Mackey were looking to open a Bethany Hospice location in the Claxton area.

ANSWER:    Bethany Coastal lacks knowledge or information as to the meaning of "around that time", but admits that Helmly and Johnson were previously employed at the Claxton office of Spanish Oaks Hospice. Bethany Coastal lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 15 and therefore denies the same.

16.    Ava Best is an owner and the president and CEO of both Bethany Hospice and Bethany Coastal.

ANSWER:  Admitted.

17.    Berkley M. "Mac" Mackey, III is an owner and officer in Bethany Hospice and Bethany Coastal.

ANSWER:  Admitted.

18.    Around October/November 2014, Ms. Best and Relator Helmly agreed that Relator Helmly would become the administrator of what would become Bethany Coastal and get a 2.5%

ownership.  During these negotiations, Ms. Best explained to Relator Helmly that since opening Bethany Hospice in 2007, she had offered each of her medical directors and administrators an ownership stake in Bethany Hospice and Bethany Coastal. Once they were owners, Ms. Best explained that Bethany Hospice or Bethany Coastal would issue dividends to each owner/investor based on how many patients were put under service at the owner/investor's site as reflected in the site's annual census report. Ms. Best further explained that if the owner/investor's site made the company enough money through patient enrollment, then the owner/investor stood to receive substantially more in annual dividends. According to Ms. Best, meeting revenue benchmarks also enabled part-owners to acquire additional ownership shares in subsequent years. Ms. Best also hired Relator Johnson as a marketer.

ANSWER:  Coastal admits that Ms. Helmly was hired by Bethany Coastal as the Clinical Director/Administrator, but denies that Ms. Helmly was to receive, or actually received, a 2.5% ownership in Bethany Coastal. Bethany Coastal further admits that Relator Johnson was hired by Bethany Coastal as a marketer. Defendant Bethany Coastal denies the remaining allegations of Paragraph 18.

19.     Relator Helmly had a prescheduled operation that would occupy her through December 2014, so she and Ms. Best agreed she would start to open Bethany Coastal after that. Mr. Mackey put both Relators under the insurance of his company starting December 1, 2014 and paid initial salaries to Relators for work at Bethany Coastal. Everyone worked to open Bethany Coastal in January 2015.

ANSWER:  Bethany Coastal lacks sufficient knowledge to admit or deny whether Relator Helmly had a prescheduled operation that would occupy her through December 2014

which is therefore denied. Defendant admits that Bethany Coastal opened in January 2105. Defendant Bethany Coastal denies all remaining allegations of Paragraph 19.

20.     Because of dissatisfaction with their time at Spanish Oaks and the way their employment was terminated, Relators Helmly and Johnson sought legal assistance to deal with Spanish Oaks. Because Ms. Best insisted that Relators approach her for permission to take any time off, in January 2015, Relators asked for one day off. Before she gave her permission, Ms. Best peppered them with questions as to why they needed the day off. For Relators, it was a very uncomfortable topic to discuss. Eventually, Ms. Best figured that it had something to do with their former employment and said yes. This was the first time Relators had encountered Ms. Best's paranoia and interrogative style of management. However, it was not out of character for Ms. Best as she was an extremely demanding boss who required immediate attention to whatever was on her mind at the time. A good example of her overbearing paranoia came a few years later when an employee was interrogated by Ms. Best about the fact that he had opened his door seven times on a particular day and asked whether he was seeing patients each of those seven times. Ms. Best had a practice of engaging in surveillance of the office and attached tracking devices on all the cars (which included tracking the number of times the door opened).

<u>ANSWER</u>:  With regard to Relators' allegations related to dissatisfaction with their time at Spanish Oaks, Bethany Coastal is without knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies those allegations. Defendant denies the remaining allegations contained in Paragraph 20.

21.     The first attorney Relators interviewed did not do the type of work they needed and referred them to another attorney. The second time they needed a day off to meet with an attorney, Ms. Best again peppered them with questions. Relators did not know enough about their putative

meeting at that time to provide any details. However, the day after they met with this attorney, Ms. Best became relentless with her questions and continued to pepper Ms. Helmly with questions through the end of January. Over this time, Relator Helmly shared with Ms. Best that they were meeting with an attorney in Atlanta and that this matter had to do with their prior employment and long-term hospice patients.

ANSWER:     Bethany Coastal admits that Relator Helmly requested time off to meet with Relators attorney.  Bethany Coastal lacks sufficient knowledge to admit or deny the truth of the remaining allegations of Paragraph 21 which are therefore denied by operation of law.  Bethany Coastal denies that Johnson and Helmly were "peppered with questions", as alleged.

22.     The Medicare identification number used for Bethany Coastal was one Ms. Best purchased from Alex Patterson who owned Presbyterian Hospice. Initially, she used this number for the Bethany Hospice office in Quitman, Georgia. Then, once Ms. Best decided to open the office in Claxton, she transferred the number over to Bethany Coastal. Once a number is purchased, the purchaser is required to do a CHOW (Change of Ownership). It is unclear whether or when Ms. Best did a CHOW for Bethany Coastal, which she opened on January 1, 2015, because it appears that she was operating as Presbyterian Hospice for some time after that.

ANSWER:     Bethany Coastal admits that its provider number was previously a provider number of Presbyterian Hospice and Bethany Hospice's office in Quitman, Georgia, but denies that Ms. Best merely "transferred the number over" to Bethany Coastal, as alleged. Bethany Coastal affirmatively asserts that it purchased the Quitman provider number from Bethany Hospice and that a Change of Ownership ("CHOW") was approved by the Georgia Department of Community Health on or about December 19, 2014.  Defendant Bethany Coastal denies the remaining allegations of Paragraph 22.

23.     Part of Relator Helmly's responsibilities entailed overseeing all the billing at Bethany Coastal.  When Relator Helmly or employees under her supervision would pull up any of the billing that was needed before signing up a new patient, it would still show up as the Presbyterian Hospice in Quitman. Bethany Coastal never had permission to work in Claxton, Georgia. The Presbyterian number issued continued for at least two months after Bethany Coastal was up and running. Relators contacted Ms. Best about this, but she just told them not to worry about it.

ANSWER:     Bethany Coastal admits that, among other things, Ms. Helmly was responsible for overseeing billing at Bethany Coastal during her employment there, but denies the remaining allegations contained in Paragraph 23.

24.     In February of 2015, Relators left work for a day to meet with their attorney in Atlanta. Relators had received information concerning their case from a former co-worker and kept it in a locked drawer in Relator Helmly's office. They also kept correspondence with their attorney, Mike Bothwell, in that locked drawer. While Relator Helmly was out of her office, Ava Best had an employee search Relator Helmly's office including the locked drawers in her desk. From this search, Ms. Best learned about their whistleblower attorney, Mike Bothwell, and much of the basis of their lawsuit. However, Ms.  Best did not confront Ms. Helmly about this information until the end of March 2015. At the end of March, Ava Best told Relator Helmly that she did not want "whistleblowers affiliated with [her] business." She mentioned the whistleblower attorney, Mike Bothwell, by name even though Relators had not told her that was the name of the attorney. Ms. Best insisted that Ms. Helmly not be a part of the whistleblower lawsuit because Ms. Best "did not want a whistleblower as [her] administrator." Relator Helmly relented and promised

Ms. Best that her name would not be on any pleadings, but told her Relator Johnson would still be a whistleblower against their former employer.

ANSWER:    Bethany Coastal admits that Relators in February of 2015, notified Ava Best that they were leaving "for a day to work with their attorney in Atlanta." Defendant Bethany Coastal denies the remaining allegations from Paragraph 24.

25.    Ms. Best never reprimanded either Relator for work-related issues or performance issues. Relators were never approached about any negative aspect of their work and were never written up or disciplined in any way. In fact, the time between the January 2015 opening and May 2015 was characterized as a time of high praise from both Ava Best and Mac Mackey. Some of the praise from Mac Mackey. Some of the praise from Mac Mackey was his delight that Relators had opened an office where Bethany Hospice was an unknown entity and had made it so profitable so quickly. Mr. Mackey would text Relator Helmly saying how much he liked the numbers he was seeing (and similar comments).

ANSWER:    With regard to Relators' allegations regarding alleged text conversations between Mr. Mackey and Ms. Helmly, Bethany Coastal is without knowledge or information sufficient to form a belief as to the truth of those allegations and therefore denies the same. Bethany Coastal denies the remaining allegations contained in Paragraph 25.

26.    However, as much as Ava Best and Mac Mackey were thrilled with Relators' performance, there were battles bubbling up with how Ava Best and Mac Mackey grew the rest of Bethany Hospice by providing remuneration to referral sources and potential referral sources in exchange for or as a reward for referrals. Ms. Best first provided insight into her practice of providing referral sources remuneration when she explained to Relator Helmly during salary negotiations that she issues her medical directors and administrators annual dividends that

fluctuated according to how many patients (including Medicare and Medicaid beneficiaries) were put under service at the owner/investor's site and how much money the site made for the company that year. This conversation, coupled with subsequent ones focused on owner/investor compensation and referral practices, led Relators to conclude that these were kickbacks, they violated the AKS, and were illegal. In fact, the impetus for this FCA lawsuit is that Ms. Best and Mr. Mackey determined to grow and maintain their business through kickbacks.

ANSWER:    The allegations in Paragraph 26 constitute legal conclusions or arguments of counsel, to which no response is required. To the extent that a response is required, Bethany Coastal denies the allegations in Paragraph 26.

27.    Prior to forming Bethany Hospice, Ms. Best worked for Odyssey Hospice ("Odyssey"). In fact, Bethany Hospice rose out of the local ashes of Odyssey. Odyssey asked a national hospice owner to buy some of the Georgia hospice locations Odyssey was seeking to divest from. He bought the Valdosta office and renamed it Bethany Hospice. He brought Ava Best on (from Odyssey Valdosta in Valdosta, Georgia) to work for Bethany Hospice, but disagreements with Ava Best and Mac Mackey over business practices prompted the original buyer to have them buy him out.

ANSWER:    Bethany Coastal admits that Ms. Best previously worked for Odyssey Healthcare but denies the remaining allegations in Paragraph 27.

28.    From conversations with Ms. Best, Relators knew Ms. Best was well aware that the way Odyssey was operated was illegal. At one point, she acknowledged to Relators that she knew Odyssey got referrals by giving medical directors kickbacks. She was aware that Odyssey was under local HHS-OIG scrutiny for providing illicit kickbacks to medical directors, and that Odyssey was hit with a $25 million settlement by DOJ for FCA violations. Relators also talked to

Ms. Best about her prior work for another company near Brunswick that was raided by DOJ. She told Relators they came into her office with guns and demanded billing records and charts. She said that the DOJ convicted the owner of the company for Medicare or Medicaid fraud. Ms. Best said she knew how these things went, having been a party to a DOJ Medicare fraud investigation.

ANSWER:   Denied.

29.   However, Ms. Best's experience with these companies provided her with conflicting conclusions. On the one hand, Ms. Best and Mrs. Mackey knew that paying for referrals was the most effective way to get referrals, but, on the other hand, they knew that the Government did not like remuneration for referrals. Ms. Best and Mr. Mackey tried to have the best of both worlds: paying the kickbacks to referring physicians, but hiding or masking them as compensation to medical directors and part owners of Bethany. From conversations Realtors had with Ms. Best, it was clear they were sure they would never get caught.

ANSWER:   Denied.

30.   Ms. Best revealed the terms of the kickbacks when negotiating ownership with Relator Helmly prior to December 2014. At the outset of the negotiation for employment, Ms. Best told Relator Helmly that she would follow the same protocol to add compensation for Relator Helmly that she used to pay referring doctors for their referrals. The offer concerned a below market investment for a percentage of the company and huge returns when referrals came pouring in. Focused on census and referrals as she was, Ms. Best indicated that she would determine the amount of return based on the number of patients put under service. Ms. Best informed Relator Helmly that her formulas for compensation always related to the number of referrals or the census because that is what Ms. Best wanted to incentivize. Ms. Best paid all the medical directors who owned shares in Bethany according to this same formula, and the payments varied depending on

the volume of referrals. Relators thought this discussion was odd, but Relators did not address this issue at the time because it required more investigation.

ANSWER:     Denied.

31.     In February of 2015, after Relators had opened Bethany Coastal from scratch and had started to see success (for which Ms. Best and Mr. Mackey complimented them), an issue came up with regard to needing a medical director for the Claxton office. Relators referred Ava Best and Mac Mackey the name of Dr. Thomas Miller, a family physician, as the potential medical director.

ANSWER:     Bethany Coastal denies that Johnson and Helmly opened Bethany Coastal from scratch, as alleged.   Bethany Coastal admits that it needed a Medical Director for the office and that Relators provided Dr. Thomas Miller's name to Ava Best and Mac Mackey.   As to any remaining allegations, Bethany Coastal lacks knowledge or information sufficient to form a belief as to the truth of such allegations and therefore denies the same.

32.     When informed that Ava Best would give an interest into the company to all her medical directors, and this interest would provide them with "a large amount of money" for maintaining a high census and a lot of referrals, Dr. Miller indicated that this arrangement was unethical and he would not participate. Dr. Miller said that he did not think it was ethical for him to have ownership in a business for which he was also the medical director. He said he felt that would be a conflict of interest. Relator Helmly was influenced by Dr. Miller's reaction and concluded that Bethany Hospice was giving illegal kickbacks to doctors for referrals.

ANSWER:     Denied. Bethany Coastal admits that Ms. Best met with Dr. Miller regarding a Medical Director position, and further admits that Ms. Helmly may have attended the meeting. Bethany Coastal Georgia denies the remaining allegations of Paragraph 32.

33.     Even after Dr. Miller pointed out the unethical nature of these payouts, Bethany Hospice continued to distribute investment income to referring physicians. Bethany Hospice's decision to proceed with these financial arrangements – even after a clinician with whom they vested medical director privileges voiced his concerns – demonstrates their continued intent to provide kickbacks.

ANSWER:     Denied.

34.     According to conversations Relators had with Ms. Best, Bethany Hospice had compensation arrangements with numerous medical directors and doctors that gave rise to kickbacks. These arrangements contained the following forms of payment: a monthly salary, an annual dividend, and/or monthly bonuses. The doctors would receive payments as inducement for or reward for referrals of patients, which constitute kickbacks. Even the payment of the salary was not done after a fair market value ("FMV") analysis and was made to doctors for referrals rather than for the obligation of an appropriate amount of actual work for the hospice. The schedule or interval of work is not written and not followed. The compensation is not consistent with FMV or an arms-length transaction and takes the volume or value of referrals into account. Bethany has more "medical directors" than is commercially reasonable for their census, in part because they are paying for referrals. For a period, while most hospices listed their medical directors, Bethany Hospice did not. It knew it had too many medical directors and that it needed to keep a low profile to avoid detection and ensure continued revenue streams.

ANSWER:     Denied.

35.     Ms. Best uses Bethany Hospice and Bethany Coastal's Electronic Medical Record ("EMR") system, Consolo, to track referrals from the various doctors so she can determine how much she is paying for each referral. Ms. Best requires staff to record every new admission, the

date, and the physician who referred the patient on a white board. This information is also added to the Consolo program. In Douglas, Tonya Smith, the admissions coordinator, inputs the referral source for each admission into Consolo. Once entered, Ms. Best generates weekly and monthly reports detailing how many referrals each physician has made. Jeneen Cliett (at various times, the Vice President of Bethany Hospice and the Clinical Director of Bethany Hospice's Douglas office) and Monica Jones (Head of Quality Assurance for both Bethany Hospice and Bethany Coastal) showed Relator Helmly how to run these reports and informed her that Ms. Best uses these reports to determine how much to pay referral sources. According to Ms. Cliett and Ms. Jones, Ms. Best and Mr. Mackey routinely reviewed the return on investment ("ROI") for their kickbacks. According to Ava Best, physicians who refered the most patients receive the largest payments.

   ANSWER:   Defendant Bethany Coastal admits that it uses Consolo for its EMR system, that Consolo is capable of tracking the referring physician, and that the date and referring physician for new admissions is recorded in Consolo.  Bethany Coastal further admits that Tonya Smith is the admissions coordinator in Douglas and inputs the referring physician into Consolo.  Defendant Bethany Coastal denies the remaining allegations of Paragraph 35.

   36.   As Ms. Best explained to Relators, Bethany Hospice clocks some payments to its medical directors as investment interest. Instead of providing these individuals with payments directly, Ms. Best first has them purchase an ownership stake in Bethany Hospice without obtaining proper valuation and without assessing a commercially viable buy-in. Once they are partial owners in Bethany Hospice, Ms. Best issues annual dividends to these individuals. According to Ms. Best, these amounts fluctuate according to how many patients are put under service at the owner/investor's site and are not proportional to the amount invested. The terms of the investment are related to the expected value of referrals or the amount of business that could

be generated by the owner/investor. Ms. Best said the "owner/investors" are required to make referrals to Bethany Hospice and only those who are in a position to make referrals are considered or offered an investment opportunity. This is a sham device to hide the payment for referrals.

ANSWER:    Denied.

37.    The Dr. Daly situation makes it clear that this was a kickback scheme and was never intended as a legitimate investment. Dr. Daly is a sleep medicine specialist based in Savannah, Georgia (with another office in Douglas). His practice focuses on performing sleep studies on patients to diagnose them with disorders such as obstructive sleep apnea. Early on in their tenure, Relators found out that Dr. Daly had been continuously approaching Ms. Best and Mr. Mackey about becoming an investor in Bethany Hospice or Bethany Coastal because Mr. Mackey asked Relators about him as a potential investor. Mr. Mackey discusses this with Relators because Relator Johnson knew Dr. Daly from when she worked at Hospice Advantage. Dr. Daly had been the medical director during Relator Johnson's tenure with Hospice Advantage. When Relators informed Mr. Mackey that Dr. Daly never referred patients to Hospice Advantage because of his niche practice, Mr. Mackey said, "Forget it. We do not need him if he does not and will not refer patients to Bethany [Hospice]." These remakes highlighted the fact that Bethany Hospice and Bethany Coastal's primary objective in obtaining investors was to lock up referral streams rather than investment streams. Mr. Mackey and Ms. Best wanted to look like they complied with the law, while intending to make payments based on the volume of referrals from these doctors.

ANSWER:    The allegations in Paragraph 37 constitute legal conclusions or arguments of counsel, to which no response in necessary or required. To the extent a response is required, Bethany Coastal admits that Dr. Daly is a sleep specialist based in Georgia but lacks sufficient

knowledge to admit or deny the remaining allegations contained in Paragraph 37, and therefore denies them.

38.    The value of Bethany Hospice's ownership interest is part of the remuneration. Referring physicians are allowed to pay below market value for their ownership, but, after their referrals grow the company, they can "cash out" for an unbelievably higher rate. Accordingly, there is remuneration in the initial value and the subsequent value that is inappropriate, and there is the fact that referrals make the business more profitable and the investing doctors profit by their referrals. For example, Dr. Marshall Tanner purchased a 5% share in Bethany Hospice for approximately $20,000 in 2007. Other doctors bought similar percentages later. In exchange for Dr. Tanner's contribution he along with Drs. Justin Harrell, David Arnett, Stan Sinclair, Conrad Harper, and Richard Wheeler received intermittent dividend distributions from Bethany Hospice (sometimes monthly and sometimes annually). These ranged from approximately $10,000 to $20,000 annually according to Dr. Tanner. By the time Dr. Tanner sold his shares in 2014 (then 10%), he was paid approximately $330,000 (the sale price) – an 825% increase value.

ANSWER:  The allegations in Paragraph 38 constitute legal conclusions or arguments of counsel, to which no response in necessary or required.  Further, these allegations are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 38, and therefore denies them.

39.    There are a number of medical directors for Bethany Hospice or other doctors who are "owner/investors" and get extra money from Bethany Hospice. Dr. Arnett has at various times served as Bethany Hospice's medical director for its Douglas site. He stepped down from his role to become Bethany Hospice's Chief Medical Office, and in his place, Drs. Justin Harrell and

Conrad Harper became Medical Directors for Bethany Hospice's Valdosta site. Notably, Dr. Sinclair serves in this capacity despite the fact his entire practice is located in Douglas, Georgia. Each of these physicians receive dividends based on how many patients their site puts under census. The vast majority of revenue for Bethany Hospice comes from "owner/investor" referral. In certain periods, around 95% of Bethany Hospice referrals came from doctors with financial interest in Bethany Hospice.

ANSWER:   The allegations contained in Paragraph 39 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 39, and therefore denies them.

40.   Bethany Hospice's Douglas location has a large concentration of these doctors, and they are linked with the county hospital. "Bethany doctors" include Drs. Arnett, Sinclair, Harrell and Harper. They work or have worked at Coffee Regional Medical Center ("CRMC"). In fact, these doctors sit on or have sat on the Coffee County Hospital Board. Each of these "Bethany Doctors" refers every single patient they control to Bethany Hospice. Other than outlier occasions, such as the family demanding another hospice, every single patient is referred to Bethany Hospice. Other than outlier occasions, such as the family demanding another hospice, or the patient being located outside of Bethany Hospice's geographical area, every single patient is referred to Bethany Hospice. "Bethany Doctors" (Arnett, Sinclair, Harrell and Harper) also bought out the company that provides hospitalists to CRMC and direct referrals from them as well. After they bought out the hospitalist company, Bethany Hospice became CRMC's number one referral of hospice patients (with around 90% of its referrals). This statistic is even more profound when the referrals to home health agencies that refer to Bethany Hospice are taken into account. It is as if payments

to these doctors alone have the power to direct 80-90% of the county's hospice patients to Bethany Hospice (and it does).

<u>ANSWER</u>:    The allegations in Paragraph 40 constitute legal conclusions or arguments of counsel, to which no response in necessary or required.  Further, the allegations relate solely to Bethany Hospice. To the extent a response is required, upon information and belief, Defendant Bethany Coastal admits that Drs. Arnett, Sinclair, Harrell and Harper have or previously had privileges at Coffee Regional Medical Center.  Defendant Bethany Coastal denies the remaining allegations of Paragraph 40.

41.    Bethany Hospice's kickbacks have worked as intended. Bethany Hospice's Medical Directors and part-owners did not refer any patients to Bethany Hospice prior to establishing a financial relationship. Once established, however those physicians with financial interest in Bethany Hospice began referring every Medicare and Medicaid patient they could to Bethany Hospice. Dr. Harper, for instance, only referred two such patients to Bethany Hospice prior to receiving kickbacks from Bethany Hospice. However, once his affiliation began all of Dr. Harper's referrals for hospice care that he could send to Bethany were sent to Bethany Hospice.

<u>ANSWER</u>:  The allegations in Paragraph 41 constitute legal conclusions or arguments of counsel, to which no response in necessary or required.  Further, the allegations relate solely to Bethany Hospice. To the extent a response is required, Defendant Bethany Coastal denies the remaining allegations of Paragraph 41.

42.    In fact, while nearly none of their referrals went to Bethany Hospice before their financial arrangements, afterwards, nearly all of the "Bethany Hospice doctors" referrals for hospice services have gone to Bethany Hospice. Coffee County is a perfect example of the effectiveness of these kickbacks. Using referral information housed in the Consolo program and

comparing it to the total deaths in the county, it is clear that Bethany has almost all the hospice business in Coffee County. In 2015, for example, 381 people died in Coffee County, and of those, 327 were patients of Bethany Hospice. Nearly all of these came from Drs. Arnett, Harrell, Harper, and Sinclair. Even assuming that all the deaths that year were preceded by hospice care, Bethany would have had at least 86% of all hospice patients that year. Making a reasonable adjustment to account for non-hospice deaths would push that percentage to almost 100%. Whether it is 86% or 99%, no one could argue the effectiveness of Bethany Hospice's kickbacks or the loyalty it has bought from the "Bethany Hospice doctors". During their investigation, Relators confirmed all the facts about the "Bethany Hospice doctors" with Bethany Hospice former employees who worked in Douglas and confirmed the referral patters from CRMC and the "Bethany Hospice doctors" from data obtained from Medicare claims. Therefore, the referral data mentioned in this complaint tracks Medicare patients that have been referred to Bethany Hospice by the "Bethany Hospice doctors" and Bethany Hospice has submitted claims to Medicare for these referred patients and been paid the hospice per diem by Medicare.

ANSWER:   Denied.

43.   In March 2015, Relator Johnson actually engaged Ms. Best in a conversation about doctor ownership in Bethany Hospice. Before the conversation, Relator Johnson had been looking into this matter and found that Odyssey had a similar scheme to pay directors through their retirement rather than directly. Relators knew that Ms. Best would know that because she worked there. She reminded Ms. Best that SouthCoast Medical in Savannah had an agreement with Odyssey Hospice like the Bethany Hospice agreement, but when Odyssey was bought out, the new company deemed the agreement to be "illegal" and dissolved the agreement. Ms. Best said she had "found a way around this issue." Ms. Best said that she had found a way to do it so she would not

get caught. She indicated that she could create a (sham) agreement that would mask the payment to doctors for referrals. She said that by making potential referral sources medical directors and medical directors "part owners" she would not get caught. Ms. Best mentioned several times that her medical directors were "part owners" in Bethany Hospice. These remarks not only illuminate the scheme employed but also demonstrate Ms. Best's clear intent to funnel kickbacks through a sham device. This conversation made it clear to Relators that they had to continue to investigate and continue conversations like this to persuade Ava Best and Mac Mackey to stop their illegal behavior.

      <u>ANSWER</u>:    Denied.

    44.    Continued investigations revealed that physicians receiving kickbacks from Bethany Hospice cut regulatory corners when referring Medicare and Medicaid beneficiaries to Bethany Hospice, ostensibly to maximize their bonuses and dividends. For instance, Relators learned through a contact with Atkinson Visiting Nurses Services, Inc. that a fellow employee in charge of receiving all physician orders for home health and hospice care had discovered that physicians with a financial interest in Bethany Hospice, including Drs. Arnett, Sinclair, and Harper referred patients to Bethany Hospice without informing the patient (including Medicare and Medicaid beneficiaries) of alternate facilities that could provide hospice care. While all other physician orders would denote that the physician had discussed treatment and facility options with the patient, orders from providers linked to Bethany Hospice lacked this information. Their orders, by contrast, would merely state "refer to hospice' with the understanding that the patient would be sent to Bethany Hospice. Similarly, Janeen Cliett instructed former Bethany Hospice nurse Tabitha Castillo to admit automatically any Medicare or Medicaid beneficiary referred by Dr. Sinclair for

General Inpatient ("GIP") care without evaluating whether the patient qualified for GIP (and the corollary increase in reimbursement).

ANSWER:     Denied.

45.     Ms. Best was already paranoid and concerned about the existence of "whistleblowers" in her employ. Unbeknownst to Relators, she had previously raided Ms. Helmly's personal, locked office areas to make sure Relators were not blowing the whistle on Bethany Hospice. The results of the raid showed that the whistleblowing was confined to Spanish Oaks, but Ms. Best remained uneasy.

ANSWER:     Denied.

46.     A few more related incidents played into Ms. Best's paranoia about Relators blowing the whistle on Bethany Hospice. One of these incidents involved a series of additional kickback offers to referring physicians (including Drs. Arnett, Harrell, Harper, Sinclair, and Wheeler) to take their wives on a paid vacation and having food, hotels and expenses and such paid by Bethany Hospice. The offers to doctors went out in May 2015 for a trip in August 2015. Bethany Hospice sent the top referring doctors and their wives on a trip, and paid airfare, hotel and food for both the doctors and their wives. Relators tried to persuade Ms. Best that this was inappropriate, but she didn't listen. The only physician to decline this offer was Dr. Thomas Miller, the same physician who declined Ms. Best's offer for an ownership stake in Bethany Coastal. Again, he stated that this type of remuneration represented a conflict of interest. Although Ms. Best felt this offer would ingratiate her referral sources to Bethany Hospice, her conversations about it with Realtors also increased Ms. Best's paranoia about Relators blowing the whistle on her kickback schemes.

ANSWER:     Denied.

28

47.     Unbeknownst to Relators, they played right into Ms. Best's whistleblower paranoia. In the same timeframe as the discussion about doctor trips, in May, Relators went on vacation to Florida. During the trip, Relator Helmly called Ava Best, and for the first time since their January agreement, broached the issue of putting Relator Helmly's name on the lawsuit to be filed against Spanish Oaks. Ms. Best agreed saying she was not going to ask Relator Helmly to forego the money she could possibly get from the case. However, after the Relators came back from Florida, Ava Best's attitude toward them markedly changed.

ANSWER:     Defendant Bethany Coastal admits that at some point during Relators employment Relator Helmly discussed putting Relator Helmly's name on the lawsuit to be filed against Spanish Oaks with Ava Best.  Defendant Bethany Coastal denies the remaining allegations of Paragraph 47.

48.     Apparently, the last whistleblower straw came when Relators had to take time off in June to meet with the Government. Ms. Best again peppered Relators with questions about this time off. However, this time was different and they responded that they could not tell her about it. At this time, contrary to prior discussions, a case had been filed and a federal judge had entered a sealed order gagging Relators from discussing the case.

ANSWER:     Denied.

49.     After the June meeting with the DOJ that Relators could not discuss, Ms. Best and all employees "loyal' to her started a harassment campaign against Relators trying to get them to quit so she would be "protected" from a retaliation claim. When Ms. Best realized that Relators were not so easily going to quit, the harassment got worse. Ms. Best and those "loyal" employees started fabricating things about Relators to "justify" the retaliatory discrimination and possible future termination if the harassment didn't work. Even though Ms. Best tried to create a pretext

for termination, she failed to create a contemporary record. Neither Relator was ever written up for anything nor officially disciplined in any way – just harassed. In creating this fake pretext, Bethany Coastal did not even follow its own policy manual.

ANSWER:   Denied.

50.   Part of the escalation of harassment and discrimination resulted in an unmerited demotion. Shortly after the visit with the Government that Relators could not discuss, Ava Best and Mac Mackey demoted Relator Helmly to field nurse without explanation or reason. A few weeks later, Ava Best escalated things again by threatening to tell Relator Helmly's old boss (at Spanish Oaks) "everything" including telling him about the lawsuit Ms. Best had assumed had been filed. She also threatened to out the Spanish Oaks employee who had helped Relators with their lawsuit. This was the same week Relator Helmly finally found out that Ava Best and Ms. Best's "loyal" employees had been going through Relator Helmly's personal information in her locked room and her locked desk on a regular basis. Whenever Relator Helmly was gone, she locked her door and only she and Ava Best had a key to her office. Yet, on a regular basis, someone who had a key had been in Relator's office and gone through her personal things.

ANSWER:   Denied.

51.   Relators were stressed and mortified by this conduct and these threats. Then on July 28, 2015, Ms. Best called Relator Helmly and told her to come into the office. Relator Helmly called Relator Johnson to tell her she was worried about possible retaliation at the proposed meeting – especially in light of Ava Best's most recent threats. Relator Johnson was very concerned Ava Best was going to do something to retaliate for their standing up to her for her illegal activities. To protect against possible whistleblower retaliation, Relator Johnson texted Relator Helmly at around noon on July 28, 2015 to tell her to have their whistleblower attorney on

the line during the conversation (or to at least record the conversation). However Relator Johnson accidentally sent the text to the Bethany Coastal group text, which included Ava Best herself. Within minutes of finding out that Relators were trying to protect themselves against whistleblower discrimination by including their whistleblower attorney (about whom Ms. Best learned by ransacking Relator Helmly's desk), Ava Best had called both of them and told them they could claim to resign to save face or they could be fired, but, either way, she was firing them that day.

ANSWER:   Bethany Coastal lacks knowledge or information regarding the truth of any allegations concerning alleged private conversations between Ms. Helmly and Ms. Johnson, or allegations concerning their state of mind or feelings, and for that reason denies such allegations. Bethany Coastal denies that Ms. Best or anyone at Bethany Coastal or Bethany Hospice made any threats to Ms. Helmly or Ms. Johnson, as alleged. Bethany Coastal admits that Ms. Best informed Ms. Johnson on July 28, 2018 of the decision to terminate her employment at Bethany Coastal due to inappropriate behavior and workplace misconduct, but affirmatively asserts that Ms. Helmly resigned her employment instead. Bethany Coastal denies that any decisions regarding Ms. Helmly or Ms. Johnson's employment were related in any way to actual or perceived whistleblower activities, including at Bethany Coastal. As to any remaining allegations of Paragraph 51, Bethany Coastal lacks knowledge or information sufficient to form a belief as to the truth of such allegations and therefore denies the same.

52.   Ms. Best and other Bethany Hospice and Bethany Coastal managers told Bethany Coastal employees that Relator Helmly resigned because of her health. They also told others that Relator Helmly resigned to pursue her education. Ms. Best never told anyone (including Relator Helmly) that she was being fired for any lack of productivity or for any improper behavior. Ms.

Best never told Relator Johnson that she was being fired for any lack of productivity or for any improper behavior. Ms. Best also never indicated that to anyone else at Bethany Hospice or Bethany Coastal. Ironically, Relator Johnson had three referrals for Bethany in her hand at the time Ms. Best fired her. In fact, she had averaged about 14 patients a month for the several months prior to July 28th. That did not matter to Ava Best, as she wanted their investigation of illegal activities to stop, she wanted their questioning of her illegal policies to stop, she did not want a whistleblower as her administrator or at her companies, and she was concerned that Relators had or might blow the whistle on Bethany Hospice. Over time, Ms. Best has tried to fabricate excuses and pretexts for Relators sudden disappearance from Bethany Coastal after they started and built the entire office from scratch. However, Bethany Coastal's history undermines this revisionist history as other employees who actually engaged in the type of behaviors Ms. Best later ascribed to Relators were never disciplined.

ANSWER:   Denied.

53.    The harassment and discrimination continued after the termination. Additional discrimination for protected activity included not allowing Relators to clean out their offices. Ms. Best went through their things and gave them back what she wanted to give back to them. In addition, knowing that Relators had used information from then current employees of their former employer in their reporting to the Government, Ms. Best forbade anyone working for Bethany Hospice and Bethany Coastal from having any contact with Relators for any reason. Bethany Coastal also blackballed Relators and did what it could to prevent them from obtaining subsequent employment in the area and the industry. Ms. Best, the head of Bethany Coastal's HR department, and others, would give bad references and badmouth Relators to potential employers.

ANSWER:   Denied.

54.     After the termination, in an effort to undermine any potential whistleblower case against Bethany Hospice and Bethany Coastal, Ava Best and Monica Jones tried to ferret out any employees who might help Relators or provide them with information. They would call employees in to talk to them and accuse employees of "talking to Debbie" or "talking to Jolie" and then tell them they needed to "resign". If they did not chose to "resign," Bethany Coastal management would cut their hours and harass them until they quit. Ms. Best fired at least one Bethany Coastal employee for the false accusation that she had contact with Relators.

ANSWER:     Denied.

55.     Then, in a final act of harassment and discrimination and to scare Relators from talking to the Government about Bethany Hospice, Ms. Best actually provided information to Relators' former boss at Spanish Oaks about who was helping them report that company to the Government for FCA violations. That person was immediately fired from Spanish Oaks – sending the message that Ms. Best would retaliate against anyone involved in reporting FCA violations to the Government and warning Relators not to do it to Bethany Hospice.

ANSWER:     Denied.

56.     Undermining the façade and the plethora of made up excuses, the termination of Relators' employment was not well planned because Bethany Coastal management wanted to get Relators away from Bethany Hospice and Bethany Coastal before they could gather evidence of false claims to give to the Government. After Relator Helmly, Bethany Coastal's administrator on file with the state, was terminated, the Claxton office went off the rails.

ANSWER:     Denied.

57.     Ms. Best started with what she called an "interim clinical director," who was an employee of Bethany Hospice Valdosta office. Of course, the interim clinical director from

Bethany Hospice in Valdosta did not actually come to the Claxton office every day. Even when the "interim director" did come to the site, Even when the "interim director" did come to the site, she would arrive between 10:00-10:30 a.m. and then leave by 1:00 or 2:00 p.m. Ms. Best later made the clinical director of the Bethany Hospice Douglas location, Jeneen Cliett, the administrator for Bethany Coastal (which is 1.5 hours away). After Ms. Cliett "became" the administrator of Bethany Coastal, she remained the director of the Douglas location and she never visited Claxton. She would merely "call in." Both of these actions are illegal. There must be an administrator on site all day every day.

ANSWER:    Bethany Coastal admits that Jeneen Cliett was named the Administrator of the Claxton site with the approval of the State of Georgia Department of Health Services, but denies that Ms. Cliett never visited the site and would merely "call in." The remaining allegations of Paragraph 57 constitute legal conclusions or arguments of counsel, to which no response is necessary or required. To the extent a response is required, Bethany Coastal denies the remaining allegations in Paragraph 57.

58.    Ms. Best also made Bridget Thornton the clinical director of Bethany Coastal, even though she was the only RN working there, and she did not meet the qualifications to be a clinical director. There are also two LPNs that were being used in place of RNs, so there was a chain reaction of regulatory violations simply because Ms. Best was unprepared to fire her administrator for protected activity.

ANSWER:    Defendant admits that Bridget Thornton became the Clinical Director of the Claxton office, but denies the remaining allegations contained in paragraph 58.

59.    While Relators were at Bethany Coastal, kickbacks were not the only thing they were investigating. Ms. Best did not have a social worker with a master's degree in social work

seeing patients. This is a prerequisite to billing for the visit. Relator Johnson was told about this by the very person seeing the patients who did not have her masters.

ANSWER:   Bethany Coastal lacks knowledge as to what, if anything, Ms. Johnson and Ms. Helmly were allegedly investigating during their employment at Bethany Coastal, but Bethany Coastal denies that there was a basis for any such investigation.  Bethany Coastal denies the remaining allegations of Paragraph 59.

60.   In addition, Ms. Best would discharge patients if they were going into the hospital (also against regulations). An example is patient P in Savannah, Georgia. Relator Johnson was told this in person by the nurse that had to meet patient P at the hospital to have him sign revocation papers. Some of the patients that went directly into the hospital and were also picked up that very same day include IC, JP, HK, and ST. Patient AQ also went to the doctor for aggressive treatment, and Bethany did not pay for this even though he was a full Medicaid patient. Ms. Best also discharged patients once they ran out of their Medicare payments. If they are on Medicaid, she would keep them because they do not have a monetary limit.

ANSWER:   Denied.

61.   There are also issues of neglect and failure to perform the services required by hospice. A patient by the name of SB ended up dying unnecessarily due to negligence on Bethany Coastal's part of not treating a urinary tract infection. TT is a patient who had passed away two days before any nurse went out to check on him. The neighbors actually found him as they had not seen him out. It was said he had been dead for days, but because the nurse said he would not answer the phone, she did not go by and check on him.

ANSWER:   Denied.

62.     During their investigation of Medicare and Medicaid fraud at Bethany Hospice and Bethany Coastal, Relators gained intimate knowledge of Bethany Hospice's and Bethany Coastal's billing protocols and operations. This familiarity apprised them to the types of patients Bethany Hospice and Bethany Coastal endeavored to put under service, who the primary referral sources for each entity were, and the specific entities that reimbursed Bethany for hospice services.

ANSWER:     Denied.

63.     During their investigation, Realtors confirmed several facts with the former Clinical Director of Bethany Hospice (Douglas), Ms. Shanda Jowers including that referrals from the "Bethany Hospice doctors" were Medicare and Medicaid and that Bethany Hospice billed the government for these patients. In her capacity as Clinical Director, Ms. Jowers oversaw the patient care operations of the Douglas office and acted as liaison with management staff, particularity Ms. Ava Best and Ms. Jeneen Cliett. Ms. Jower's position necessarily apprised her Bethany Hospice's patient and payor mix, and she shared this knowledge with Relators. She confirmed for Relators that Bethany Hospice's Douglas facility received the vast majority of its patient referrals from the "Bethany Hospice doctors." She confirmed that Bethany Hospice's policy was to admit patients only if they had Medicare or Medicaid coverage. She confirmed that she knew about the fact that the patients referred by the "Bethany Hospice doctors" were Medicare and Medicaid and that Bethany billed (and collected) for them from conversations with Ms. Best and Ms. Cliett both in management meetings and during day-to-day operations that Bethany Hospice. They also made it clear to her that employees needed to ensure patients had Medicare and Medicaid eligibility so that Bethany Hospice could continue to receive money from these government programs. If a patient did not have eligibility from a government program, Bethany Hospice employee Robby Carr would work with the patient to try and get them either Medicare or Medicaid coverage. Ms. Jowers

confirmed for Relators that if that did not work, the patients were not admitted, because Bethany Hospice only admitted and billed for Medicare or Medicaid patients with eligibility.

ANSWER:    Denied.

64.    During their investigation, Relators confirmed several facts with the former Bethany Hospice community education representative, Robert Clements. As a community education representative for Bethany Hospice, Mr. Clements had access to all of Bethany Hospice's referral data, including information housed in the Consolo program. In this capacity, he also received referrals for Medicare and Medicaid beneficiaries from the Bethany Hospice doctors Arnett, Sinclair, Harrell, and Harper. Mr. Clements confirmed that every single referral from these physicians was for a Medicare or Medicaid beneficiary. Mr. Clements knew this because each time he retrieved referrals from these physicians, the physician orders and patient paperwork would denote the payor. During his employment with Bethany Hospice (2014 through March 30, 2018), Mr. Clements would tender his referrals from the "Bethany Hospice doctors" to Ms. Tonya Smith (Bethany Hopice's admissions coordinator) so that she could process them in Consolo which would bill their per diem on a CMS Form 1500. No patient was admitted to Bethany Hospice in Douglas until Ms. Smith certified that they had Medicare eligibility and she logged the referral source into Consolo. Mr. Clements confirmed with Ms. Smith as well as Bethany Hospice's Clinical Director and Vice President, Ms. Jeneen Cliett, that Bethany Hospice billed and received payment from the government for the "Bethany Hospice doctor" referrals. Ms.Smith, Ms. Cliett, and Ms. Best were a core of the Bethany Hospice billing apparatus. Ms. Best made and the others executed the Bethany Hospice policy of confirming a patient's Medicare eligibility for hospice care prior to admitting the patient and billing Medicare. Mr. Clements confirmed that he learned all this information about billing and collecting from conversations with Ms. Smith, Ms. Cliett,

and Bethany Hospice's accountant, Elnita Ginn, who worked in Valdosta. Ms. Ginn also confirmed that Bethany Hospice received payments from Medicare for referrals made by Dr. Wheeler. Through conversations with Ms. Ginn, Ms. Cliett, and Ms. Smith, Mr.Clements learned that Bethany Hospice submitted and received payments for hospice care claims for those patients referred by the "Bethany Hospice doctors," throughout his tenure with Bethany Hospice. Mr. Clements has confirmed many of Relators' allegations regarding Bethany Hospice's kickback scheme, including that Bethany Hospice receives nearly all of its referrals from area physicians with a financial interest in Bethany Hospice, that these physicians always referred every Medicare and Medicaid patient to Bethany Hospice that they controlled, and that Bethany Hospice billed government health programs for the services rendered to Medicare and Medicaid patients referred by these physicians.

ANSWER:  Denied.

65.    As part of their investigation, Relators have accessed Bethany Hospice's and its physician-owners' aggregate billing and referral data for Medicare beneficiaries. This information only tracks Medicare patients for which Bethany Hospice has billed Medicare and received payment. The only patients tracked from doctor referrals to Bethany Hospice are Medicare patients that have been billed and collected. The data details how many Medicare referrals a particular physician makes to a particular hospice facility, as well as how many total patient days the hospice received Medicare reimbursement for as a result of that physician's referrals.

ANSWER:  Bethany Coastal lacks knowledge as to Ms. Johnson and Ms. Helmly alleged investigation during their employment at Bethany Coastal, but Bethany Coastal denies that there was a basis for any such investigation.  Bethany Coastal denies the remaining allegations of Paragraph 65.

66.     As stated, Bethany Hospice is a for-profit hospice enrolled in the Medicare program. Bethany Hospice derives nearly all of its revenue from the Medicare program monies. In 2014, Bethany Hospice provided hospice services to 312 Medicare beneficiaries for a total of 24,791 patient days. In exchange for providing these services, Medicare reimbursed Bethany Hospice $3,318,134. In 2015, Bethany Hospice received $4,529,028.23 for Medicare services rendered to 422 Medicare beneficiaries for a total of 33,077 total patient days. In 2016, Bethany Hospice provided hospice services for 510 Medicare beneficiaries for which it received a total Medicare payment amount of $6,483,714 for 47,126 total patient days.

ANSWER:   The allegations contained in Paragraph 66 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 66.

67.     All of Bethany Hospice's Medical Directors and part-owner physicians referred the vast majority of their Medicare patients to Bethany Hospice. In fact, from Medicare claims data, Bethany Hospice's top three referral sources from the 4th Quarter of 2016 through the 3rd quarter of 2018 are Dr. Sinclair (97 total Medicare patients referred to Bethany Hospice), Dr. Harper (91 total Medicare patients referred to Bethany Hospice), and Dr. Harrell (68 total Medicare patients referred to Bethany Hospice). Dr. Arnett—who is preceded only by the other "Bethany Hospice doctors", the head of the hospitalist program at CRMC, and a cardiologist affiliated with CRMC—ranked sixth highest in referral sources with 40 total Medicare patient referrals to Bethany Hospice over the same period.

ANSWER:   The allegations contained in Paragraph 67 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 67.

68.     From the 3rd Quarter of 2016 through the 2nd quarter of 2018, Dr. Harrell treated at least 76 Medicare hospice patients. Of these 76 patients, Dr. Harrell referred 62 to Bethany Hospice, making his referral rate to Bethany Hospice (i.e., the percentage of referrals to a specific provider out of total referrals made) 81.6%. Bethany Hospice received reimbursement for Medicare for 6,513 patient days as a result of these referrals. Notably, Dr. Harrell referred at least eight of the remaining fourteen patients to providers in counties where Bethany Hospice does not operate. Thus, by adjusting for patients that Dr. Harrell could not have referred to a Bethany Hospice facility and unenumerated referrals, his referral rate to Bethany Hospice is 100%.

ANSWER: The allegations contained in Paragraph 68 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 68, and therefore denies them.

69.     Similarly, Dr. Arnett referred at least 63 Medicare beneficiaries for hospice services from the 3rd Quarter of 2016 through the 2nd Quarter of 2018. Of these 63 patients, 38 were referred to Bethany Hospice for a total of 4,155 patient days billed to Medicare. Dr. Arnett referred the vast majority of his remaining patients to providers operating in counties where Bethany Hospice does not own a facility. When adjusting for these patients and unenumerated referrals, Dr. Arnett's referral rate to Bethany Hospice is 100%.

ANSWER: The allegations contained in Paragraph 69 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 69, and therefore denies them.

70.     From the 3rd Quarter of 2016 through the 2nd Quarter of 2018, Dr. Harper referred at least 112 Medicare hospice patients to various providers. Of these 112 patients, 57 were referred to Bethany Hospice for a total of 2,763 patient days billed to Medicare. When adjusting for patients

referred to counties lacking a Bethany Hospice presence and unenumerated referrals, Dr. Harper's referral rate to Bethany Hospice is 100%.

ANSWER: The allegations contained in Paragraph 70 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 70, and therefore denies them.

71.     From the 3rd Quarter of 2016 through the 2nd quarter of 2018, Dr. Sinclair referred at least 159 Medicare beneficiaries to various hospice destinations for a total of 5,779 patient days billed to Medicare. Over this period of time, Dr. Sinclair referred 96 patients to Bethany Hospice. When adjusting for referrals made to providers operating in counties where Bethany Hospice does not and unenumerated referrals, Dr. Sinclair's referral rate to Bethany Hospice is 100%.

ANSWER: The allegations contained in Paragraph 71 are related solely to Bethany Hospice. To the extent a response is required, Bethany Coastal lacks sufficient knowledge to admit or deny the remaining allegations contained in Paragraph 71, and therefore denies them.

72.     One of the key protocols at Bethany Hospice and Bethany Coastal was to immediately check all potential patients for Medicare coverage. Ava Best insisted that Bethany Hospice and Bethany Coastal patients have either Medicare or Medicaid coverage. This is one of the ways Relators found out about the issues concerning Presbyterian Hospice.

ANSWER: Denied.

73. As a marketer, part of Relator Johnson's job duties entailed visiting patients in their homes and collecting their social security numbers to see if these patients had any Medicare eligibility left. In doing so, Relator Johnson interacted with administration at every Bethany Hospice and Bethany Coastal location. Billing personnel would take the information from the marketers and run it through the system to assure coverage before a patient could be admitted.

This protocol was heavily emphasized in Relator Johnson's mandatory marketer training. Her trainer was Bethany Hospice employee Robert Clements in Douglas, Georgia.

ANSWER:   Defendant Bethany Coastal admits that Robert Clements was a trainer of Relator Johnson.  Bethany Coastal denies the remaining allegations of Paragraph 73.

74.     During this training, Mr. Clements and Relator Johnson also visited the offices of the "Bethany doctors" for Bethany Hospice in Douglas, which is where she picked up a great deal of information about the kickback/referral process. Mr. Clements explained to Relator Johnson that Bethany Hospice had doctors with financial tie to Bethany Hospice who would refer all their patients to Bethany Hospice. During these visits, Mr. Clements would ask the "Bethany Doctors" if they had any patients that needed to be referred to Bethany Hospice and whether these patients were covered by Medicare or Medicaid. Drs. Arnett, Sinclair, and Harrell would provide Mr. Clements with names of patients eligible for Medicare and Medicaid coverage.

ANSWER:   Defendant Bethany Coastal admits that Robert Clements was a trainer of Relator Johnson.  Bethany Coastal denies the remaining allegations of Paragraph 74.

75.     Afterwards, Mr. Clements and Relator Johnson would visit those patients referred by the "Bethany Hospice doctors" in the patients' homes. Mr. Clements explained to Relator Johnson that she needed to collect each patients' social security number. This allowed Ms. Best to see whether a patient had previously been under hospice, how long they had been under hospice, and their certification period. Mr. Clements told Relator Johnson that Bethany Hospice and Bethany Coastal collected this information to determine if patients are eligible for Medicare and Medicaid coverage. He further explained that Bethany Hospice and Bethany Coastal's unwritten policy was to acquire more Medicare patients because "Medicare paid more." Relator also found

out about the percentage of the census that came from referrals tainted by kickbacks and that all the patients were billed to the Government until their benefits ran out.

ANSWER:     Denied.

76.     Relator Johnson had access to the census reports documenting each site's patients and which payor paid for the patients' care. These reports revealed that federal health care programs covered the hospice expenses for a substantial majority of patients (100% or nearly 100%). Relator Johnson also had the opportunity to meet with billers at the Bethany Hospice Valdosta office. These individuals informed her that they too entered patient's social security information into the billing system to make sure the patient was eligible for Medicare coverage before putting the patient under service. From all of her contacts with billers, Relator Johnson was able to find out about the billing and collection from Medicare of the illicit referrals and the submission of bills for other inappropriate patients.

ANSWER:     Bethany Coastal denies that federal health care programs covered expenses for a substantial majority of patients at Bethany Coastal or Bethany Hospice.  Defendant denies that there are billers at any office, including Bethany Hospice's Valdosta location, and therefore denies that Relator Johnson "had the opportunity" to meet with billers at Bethany Hospice's Valdosta location, as alleged.  Bethany Coastal denies all remaining allegations contained in Paragraph 76.

77.     As the Administrator at Bethany Coastal, Relator Helmly had access to all of the billing information and census reports for every Bethany site. In fact, Relator Helmly had full access to all billing and referral data for all patients at Bethany Hospice and Bethany Coastal. She also attended meetings with Ms. Best where Bethany Hospice and Bethany Coastal management discussed site productivity and census numbers for all Bethany Hospice's and Bethany Coastal's

sites. Through these sources, Relator Helmly learned that all or nearly all of Bethany Hospice's patients put under service received coverage from Medicare and Medicaid. She shared this knowledge with Relator Johnson. In investigating this case, Relators found that all (or nearly all) the hospice patients referred by Drs. Arnett, Sinclair, Wheeler, Harper and Harrell were Medicare or Medicaid patients and that Bethany Hospice submitted claims to the Government for the per diem payments for those patients knowing that they were false. The patients that were illegally referred (that Relators found) were not only billed to the Government, but paid for by the Government.

ANSWER:   Bethany Coastal admits that Ms. Helmly had access to all of the billing information and census reports of Bethany Coastal during her employment there, but denies that Ms. Helmly had access to such information for Bethany Hospice.  Bethany Coastal admits that Ms. Helmly may have attended one meeting with Ms. Best where management discussed site productivity and census numbers for Bethany Hospice and Bethany Coastal's various locations were discussed.  Bethany Coastal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations contained in Paragraph 77 and therefore denies those allegations.

78.     Instead of treating Bethany Coastal as a separate corporate entity, Ms. Best and Mr. Mackey ran it as if it were another facility office of Bethany Hospice. Thus, while Bethany Hospice did not officially employ Relators, the significant overlap in personnel, resources, and operations between Bethany Hospice and Bethany Coastal effectively made Relators corporate insiders of Bethany Hospice.

ANSWER:  Denied.

79.     As a preliminary matter, Bethany Hospice and Bethany Coastal do not even attempt to differentiate between themselves when advertising hospice services to the general public. The two corporate entities advertise their services from the same website, "bethany-hospice.com." The website informs visitors that "[Bethany Hospice] has five locations throughout South Georgia." Similarly, Bethany Hospice's non-discrimination policy and notice of privacy practices fail to draw a distinction between Bethany Hospice and Bethany Coastal. Instead, both policies refer to the provider as "Bethany Hospice."

ANSWER:  Denied.  Bethany Coastal is a distinct corporate entity.

80.     The same cadre of individuals shared control and ownership over both Bethany Hospice and Bethany Coastal. At various times, Ava Best has served as the President and CEO of both Bethany Hospice and Bethany Coastal. Similarly, Mac Mackey has served as CFO of both Bethany Hospice and Bethany Coastal. Ms. Best and Mr. Mackey (individually and through his holding company ECM Coastal, LLC) both own substantial investment interests in Bethany Hospice and Bethany Coastal, as do Drs. Richard Wheeler and John Arnett. Dr. Arnett serves as the only other manager of Bethany Coastal, and Dr. Wheeler is the only other manager for Bethany Hospice. Relator Helmly attended joint leadership meetings where Bethany Hospice and Bethany Coastal site productivity and census numbers were discussed.

ANSWER: Defendant Bethany Coastal admits that Ava Best is an owner and President of Bethany Coastal and Bethany Hospice.  Mr. Mackey is an owner and CFO of Bethany Coastal and Bethany Hospice.  The remainder of the allegations in Paragraph 80 are denied.

81.     Bethany Hospice and Bethany Coastal commingled funds and assets without properly accounting for each corporate entity's separate use. For instance, all of the offices across both Bethany Hospice and Bethany Coastal used the same product license for its hospice practice

management software, Consolo. Employees from Bethany Coastal could access information on patients receiving hospice care at any of the Bethany Hospice offices, and vice versa. For instance, marketers at Bethany Coastal could access all of the physician notes entered by other marketing representatives employed by Bethany Hospice. For the first four months that Relator Johnson worked at Bethany Coastal, she had to enter Bethany Coastal's information manually into the Consolo program when uploading her marketing pieces because the program did not have presets or Bethany Coastal. It only had presets for Bethany Hospice.

ANSWER: Denied.

82.     Two company cars owned by Bethany Hospice were driven up from Valdosta to Claxton to be used by the Bethany Coastal marketers. Relator Johnson drove one such car. Ms. Best had outfitted the car with GPS so a Bethany Hospice employee in Valdosta could track the movements of the Bethany Coastal employees.

ANSWER:  Denied.

83.     Ms. Best also sent extra office equipment owned by Bethany Hospice to Bethany Coastal without charging Bethany Coastal. This office equipment included filing cabinets, desks, and office supplies.

ANSWER:  Denied.

84.     Marketers like Relator Johnson received prepaid company cards to subsidize their gas and meal expenses incurred while in the field. The card issued to Relator Johnson read "Bethany Hospice," suggesting that the card connected to a Bethany Hospice account rather than a Bethany Coastal account.

ANSWER:  Denied.

85.     Bethany Hospice issued Bethany Coastal employees company cell phones. These phones had a 223 area code because Bethany Hospice's operations were centrally located in Valdosta, Georgia. Of note, the area code for Claxton, Georgia is 912. Bethany Hospice and Bethany Coastal also shared the same email server. All employees' email address features the same domain "@bethanyhospice.com".

ANSWER:  Denied.

86.     Ms. Best routinely sent Bethany Hospice employees to work at Bethany Coastal without contracting out their services so that she could avoid hiring staff to work at Bethany Coastal. Starting in May 2015 and continuing on and off throughout Relators' tenure at Bethany Coastal, Ms. Best sent a nurse, several social workers, and the office chaplain from Bethany Hospice's Douglas office to work at Bethany Coastal despite the fact that these individuals were employed and paid by Bethany Hospice.

ANSWER:  Denied.

87. In the wake of Ms. Best's decision to terminate Relators' employment for engaging in protected activity, Ms. Best named a Bethany Hospice employee at the Valdosta office the "Interim Clinical Director" of Bethany Coastal. Later, Ms. Best named Jeneen Cliett, an employee of Bethany Hospice and the Clinical Director of its Valdosta office, the Administrator of Bethany Coastal.

ANSWER:  Denied.  Further, if Bethany employees are used in Claxton, Bethany is reimbursed for their time and mileage by Bethany Coastal.

88. Bethany Hospice and Bethany Coastal shared common business departments. Despite only being employed by Bethany Hospice, Monica Jones served as the Head of Quality Assurance

for both Bethany Hospice and Bethany Coastal. Only one human resources department existed for the two companies.

ANSWER:  Denied.  Further, if Bethany employees are used in Claxton, Bethany is reimbursed for their time and mileage by Bethany Coastal.

89.     Ms. Best operated both Bethany Hospice and Bethany Coastal from a singular location in Valdosta, Georgia. When Relator Johnson needed to have her company card reloaded (it had a $200 limit), she would call Ms. Best in Valdosta, and Ms. Best would place another $200 on the card. Bills submitted by third parties to Bethany Coastal often fell into delinquency in part because the third parties sent the bill to Bethany Coastal's office instead of Bethany Hospice's headquarters in Valdosta. For instance, after Ms. Best terminated Relators' employment with Bethany Coastal, Joe Lucky, the Administrator for Eagle Health and Rehabilitation of Statesboro, Georgia, called Relator Johnson regarding a patient bill for room and board that had not been paid by Bethany Coastal despite having been sent to its physical address. Relator Johnson informed Ms. Lucky that she would need to submit the bill to Bethany Hospice's Valdosta office because Ms. Best worked from there.

ANSWER:  Defendant Bethany Coastal admits that Relator Johnson was given a company card for her expenses during marketing with an amount on the card that was standard for the industry.  Defendant Bethany Coastal denies the remaining allegations contained in Paragraph 89.

90.     Bethany Hospice and Bethany Coastal also share the same principal office address at P.O. Box 4720, Valdosta, Georgia, 31604, USA.

ANSWER:  Denied as stated.

91.      Bethany Hospice did not promulgate policies and/or protocols to its staff. To the extent it did, the same policies and/or protocols applied universally across Bethany Hospice and

Bethany Coastal. However, employees at Bethany Coastal received and were beholden to the Bethany Hospice Employee Handbook. Additionally, all marketing forms given to Relator Johnson during the first half of her tenure with Bethany Coastal referred to the hospice provider as Bethany Hospice and only displayed contact information for the Valdosta office. Because Bethany Hospice and Bethany Coastal were essentially the same company and shared all resources and management, Relators knew as much about Bethany Hospice as any other "insider."

ANSWER:  Denied.

92.    All of the conduct alleged in this Complaint is alleged to have occurred "knowingly" meaning with reckless disregard, as that is defined in the False Claims Act, 31 U.S.C.§ 3729 and related case law.

ANSWER: The allegations of Paragraph 92 constitute legal conclusions or arguments of counsel, to which no response is necessary or required. To the extent a response is required, Defendant denies the allegations contained in Paragraph 92.

## FIRST CAUSE OF ACTION
(**False or Fraudulent Claims**)
(False Claims Act 31 U.S.C. § 3729(a)(1)(A))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1))

93.    Relators hereby incorporate and re-allege all other paragraphs 9-19, 22-23, 26-46, 54, and 56-92 as if fully set forth herein.

ANSWER:   Defendant Bethany Coastal realleges and incorporates its responses to Paragraphs 1-92 above as if fully set forth herein.

94.    As set forth above, Defendant Bethany Hospice and Palliative Care, LLC, by and through its agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government and the State of Georgia numerous false or fraudulent claims for

payment or approval, in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and/or the

Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(1).

ANSWER:    Denied.

95.    Due to Defendant Bethany Hospice's conduct, the United States and the State of

Georgia have suffered substantial damages.

ANSWER:    Denied.

96.    The United States and the State of Georgia are entitled to treble damages based

upon the amount of damage sustained by them in an amount that will be proven at trial.

ANSWER:    Denied.

97.    The United States and the State of Georgia are entitled to the largest civil penalty

allowed by law for each of the false claims.

ANSWER:    Denied.

98.    Relators are also entitled to their attorney's fees and litigation expenses.

ANSWER:    Denied.

## SECOND CAUSE OF ACTION
### (**False Statements**)
(False Claims Act 31 U.S.C. § 3729(a)(1)(B))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.1(a)(2))

99.    Relators hereby incorporate and re-allege all paragraphs 19, 22-23, 26-46, 54, and

56-92 as if fully set forth herein.

ANSWER:    Defendant realleges and incorporates its responses to Paragraphs 1- 98 as if

fully set forth herein.

100.    As set forth above, Defendant Bethany Hospice and Palliative Care, LLC, by and

through its agents, officers, and employees, knowingly made, used, or caused to be made or used, a

false record or statement material to a false or fraudulent claim, in violation of the False Claims

Act, 31 U.S.C. § 3729(a)(1)(B) and or the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1(a)(2).

> ANSWER:     Denied.

101.    Due to Bethany Hospice's conduct, the United States and the State of Georgia have suffered substantial damages.

> ANSWER:     Denied.

102.    The United States and the State of Georgia are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

> ANSWER:     Denied.

103.    The United States and the State of Georgia are entitled to the largest civil penalty allowed by law for each of the false claims.

> ANSWER:     Denied.

104.    Relators are also entitled to their attorney's fees and litigation expenses.

> ANSWER:     Denied.

**THIRD CAUSE OF ACTION**
(**Retaliation Against Relators**)
(False Claims Act-31 U.S.C. § 3730(h))
(Georgia False Medicaid Claims Act O.C.G.A. § 49-4-168.4)

105.    Relators hereby incorporate and re-allege paragraphs 9-104 as if fully set forth herein.

> ANSWER:     Defendant realleges and incorporates its responses to Paragraphs 1-104 above as if fully set forth herein.

106.    Defendant Bethany Coastal directly violated Relators' rights pursuant to 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4 by retaliating against them for lawful acts done by them in

furtherance of efforts to stop one or more violations alleged in this action and other protected activities.

ANSWER: Denied.

107. As a result of Defendant's actions, Relators have suffered damages in an amount to be shown at trial.

ANSWER:     Denied.

108. Relators are entitled to two times back pay, interest, (Relator Johnson) reinstatement, and make whole damages as well as all attorney's fees and litigation expenses.

ANSWER:     Denied.

**WHEREFORE,** Bethany Coastal respectfully requests the following relief:

A.  Dismissal of Relators' Third Amended Complaint with prejudice;

B.  An award of Defendant's costs and attorneys' fees incurred in this action; and

C.  Such other relief as the Court deems just and equitable.

## **JURY DEMAND**

Bethany Coastal demands a trial by jury on all issues triable by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

RESPECTFULLY SUBMITTED this 28th day of May, 2019.

ROBERTS TATE, LLC

*/s/ James L. Roberts, IV*
James L. Roberts, IV
State Bar No. 608580
jroberts@robertstate.com
Theresa D. Beaton
State Bar No. 708198
tbeaton@robertstate.com
BETHANY HOSPICE AND PALLIATIVE CARE
OF COASTAL, LLC, et al.

Post Office Box 21828
St. Simons Island, Georgia 31522
(912) 638-5200 | (912) 638-5300- Fax

and

Bryan Nowicki (*admitted pro hac vice*)
WI State Bar ID No. 1029857
bnowicki@reinhartlaw.com
Thomas M. Burnett (*admitted pro hac vice*)
WI State Bar ID No. 1076010
tburnett@reinhartlaw.com
Reinhart Boerner Van Deuren s.c.
1000 North Water Street, Suite 1700
Milwaukee, WI 53202
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of May, 2019, I electronically filed the foregoing

**BETHANY HOSPICE AND PALLIATIVE CARE OF COASTAL GEORGIA, LLC'S**

**(f/k/a BETHANY HOSPICE OF COASTAL GEORGIA, LLC) ANSWER TO THIRD**

**AMENDED COMPLAINT** with the Clerk of Court using the CM/ECF system which will send

notification of such filing to the following attorneys of record:

Mike Bothwell
The Bothwell Law Group, P.C.
304 Macy Drive
Roswell, Georgia 30076
mike@whistleblowerlaw.com

This the 28th day of May, 2019.

/s/ James L. Roberts, IV
James L. Roberts, IV