IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

UNITED STATES OF AMERICA ex ) 
rel. JOLIE JOHNSON and DEBBIE )
HELMLY, and STATE OF GEORGIA )
ex rel. JOLIE JOHNSON and )
DEBBIE HELMLY, )
                               )
     Plaintiffs-Relators,      )
                               )
v.                             )       CASE NO. CV416-290
                               )
BETHANY HOSPICE AND PALLIATIVE )
CARE, LLC;                     )
                               )
     Defendant.                )
_____ )

## O R D E R

Before the Court is Defendant Bethany Hospice and Palliative Care, LLC's Motion to Dismiss Relators' Third Amended Complaint. (Doc. 100.) For the following reasons, Defendant Bethany Hospice and Palliative Care, LLC's Motion to Dismiss (Doc. 100) is **GRANTED**. Accordingly, Relators' claims against Defendant Bethany Hospice and Palliative Care, LLC are **DISMISSED WITH PREJUDICE**. The Clerk is **DIRECTED** to close this case.

**BACKGROUND**[1]

Relators Debbie Helmly and Jolie Johnson bring this case on behalf of the United States and the State of Georgia.[2] (Doc. 98.)

---

[1] For the purposes of this Order, the Court will accept all factual allegations in the Third Amended Complaint as true and construe all allegations in the light most favorable to Plaintiff. Timson v. Sampson, 518 F.3d 870, 872 (11th Cir. 2008).

[2] In their Third Amended Complaint, Relators state that after Debbie Helmly's death on March 27, 2018, her estate was substituted

Relators claim that Bethany Hospice and Palliative Care, LLC ("Bethany Hospice") violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, and the Georgia False Medicaid Claims Act ("GFMCA"), O.C.G.A. § 49-4-168.1. (Id. at 35-36.) As the basis of their FCA claims, Relators allege that Bethany Hospice violated the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b, by providing physicians remuneration in exchange for referrals—"kickbacks." (Id. at 5.) Relators' contend that because Bethany Hospice allegedly violated the AKS, any claims filed with Medicare or Medicaid for reimbursement for hospice services rendered by Bethany Hospice were in violation of the FCA and GFMCA.[3] (Id. at 26.)

Relators filed this case under seal on November 4, 2016. (Doc. 1.) Their original complaint named forty-nine (49) defendants. (Id.) On June 5, 2017, the United States notified the Court that it was declining to intervene in this matter. (Doc. 10.) Subsequently, on March 12, 2018, the State of Georgia also notified the Court that it was also declining to intervene in this matter. (Doc. 14.) After these declinations, the Court ordered the

as a party in this action. (Doc. 98 at 3.) The Clerk is **DIRECTED** to amend the caption of this case accordingly. For purposes of this Order, the Court will refer to the Estate of Debbie Helmly as "Relator Helmly."

[3] For purposes of this Order, there is no meaningful distinction between Medicare and Medicaid; thus, the Court will use Medicare as a reference to both federal healthcare programs.

2

complaint unsealed and that Defendants be served with copies of the complaint. (Doc. 17.)

Relators have amended their complaint three times since filing this case. (Doc. 18; Doc. 45; Doc. 98.) Relators filed their Third Amended Complaint ("complaint") on May 13, 2019 and it forms the basis of this Order. (Doc. 98.) After numerous dismissals, only two defendants are named in the complaint: Bethany Hospice and Bethany Hospice and Palliative Care of Coastal Georgia, LLC ("Bethany Coastal"). (Id.) However, after filing the complaint, Relators dismissed Bethany Coastal as a defendant. (Doc. 128.) As a result, Defendant Bethany Hospice is the only defendant remaining in this case.[4]

Bethany Hospice is a for-profit provider of hospice care in Georgia. (Id. at 2.) Bethany Hospice operates offices in four cities—Douglas, Thomasville, Waycross, and Valdosta. (Id.) In October 2014, Bethany Hospice opened Bethany Coastal in Claxton, Georgia. (Id. at 5.) Unlike Bethany Hospice's other locations, Bethany Coastal was organized as a separate company and obtained a different hospice license number. (Id. at 7.)

Relators are former employees of Bethany Coastal. (Id. at 3.) Relator Johnson worked as a marketer for Bethany Coastal from December 2014 until July 2015, and Relator Helmly worked as an

---

[4] Relators brought their retaliation claim against Bethany Coastal. (Doc. 98 at 36.) Because Relators dismissed Bethany Coastal from this action, Relators' retaliation claim is **DISMISSED**.

administrator for Bethany Coastal from December 2014 until July 2015. (Id.) Relators allege that during their brief employment with Bethany Coastal, they discovered evidence that Bethany Hospice was operating an illegal referral scheme in violation of the FCA and GFMCA. (Id.)

According to Relators, although Bethany Hospice and Bethany Coastal are licensed as separate entities, Bethany Coastal operated "as if it were another [] office of Bethany Hospice." (Id. at 31.) Specifically, the two entities used the same hospice management software—Consolo—to organize patient information, site productivity, and patient census. (Id. at 32.) Additionally, Relators allege that the two entities were owned and operated by the same individuals—Ava Best and Mac Mackey. (Id. at 31.) Ms. Best served as the President and Chief Executive Officer ("CEO") of Bethany Hospice and Bethany Coastal, and Mr. Mackey served as Chief Financial Officer ("CFO") of Bethany Hospice and Bethany Coastal. (Id.) Relators also allege that Ms. Best and Mr. Mackey both owned "substantial investment interests in Bethany Hospice and Bethany Coastal . . . ." (Id. at 32.) Because of Bethany Hospice and Bethany Coastal's "significant overlap in personnel, resources, and operations," Relators allege that they were "effectively . . . corporate insiders of Bethany Hospice." (Id. at 31.)

Relators' claim that their status as "corporate insiders" allowed them to acquire personal knowledge of Bethany Hospice's allegedly fraudulent activity. Specifically, Relators allege that Bethany Hospice operated an illegal referral scheme in which Bethany Hospice paid doctors in exchange for patient referrals. (Id. at 10.) Once Bethany Hospice rendered services to these illegally referred patients, Bethany Hospice allegedly submitted claims for reimbursement for those services to Medicare.[5] (Id. at 10.) Relators identify several pieces of evidence in their complaint they claim support their allegation that Bethany Hospice operated an illegal kickback scheme. (Id.)

To begin, Relators claim that Ms. Best admitted to operating an illegal kickback scheme. (Id. at 10.) According to Relators, Ms. Best sold ownership interest in Bethany Hospice to doctors and hired doctors as medical directors of several of the Bethany Hospice locations. (Id. at 10-11.) After a doctor became a

_____

[5] Although Relators allege various other FCA violations in their complaint, such as "failure to perform the services required by hospice . . .," failure to employ a social worker with a master's degree, and "discharging patients if they were going to the hospital . . . ," the Court will not address these allegations. (Doc. 98 at 23-24.) Relators very briefly discuss these circumstances in reference to other things they investigated at Bethany Hospice. (Id. at 23.) Without more than a couple of sentences, the Court cannot address these allegations as violations of the FCA. See United States v. Cross Garden Care Cntr., LLC, No. 8:16-cv-961-T-27AEP, 2019 WL 6493972, at *6 (M.D. Fla. Dec. 3, 2019). Therefore, only the illegal referral scheme will be discussed as the basis for Bethany Hospice's alleged FCA violations.

part-owner or medical director, Ms. Best paid the doctor for each patient he referred to Bethany Hospice. (Id.) Bethany Hospice allegedly disguised these kickbacks as monthly dividends, bonuses, or salaries. (Id. at 12.) According to Dr. Marshall Tanner, his payments ranged from "approximately $10,000 to $20,000 annually . . . ." (Id. at 14.)

Relators also allege that Bethany Hospice paid doctors kickbacks by allowing the doctors to purchase ownership interest at a below fair-market-value price and then, after the doctors referred patients to Bethany Hospice, "[the doctors] can 'cash out' for an unbelievably higher rate." (Id.) Relators identify Dr. Tanner as an example of this type of remuneration. (Id.) According to Relators, in 2007, Dr. Tanner purchased a 5% share in Bethany Hospice for $20,000. (Id.) Seven years later, Dr. Tanner allegedly sold his shares for $330,000. (Id.)

Another form of remuneration allegedly paid by Bethany Hospice to doctors was an all-expense paid vacation in exchange for patient referrals. (Id. at 18.) Relators allege that, in May 2015, Ms. Best offered several doctors a trip in exchange for patient referrals. (Id.) The trip was to occur in August 2015, but Relators do not indicate whether the doctors actually went on the trip. (Id.)

The complaint also identifies the four doctors that Relators allege are primarily involved in the illegal kickback scheme: (1)

Dr. David Arnett; (2) Dr. Justin Harrell; (3) Dr. Stan Sinclair; and (4) Dr. Conrad Harper. (Id. at 15.) Relators refer to these doctors as the "Bethany Hospice doctors." (Id.) Each of the Bethany Hospice doctors served as medical directors for various Bethany Hospice offices, however, none of the doctors served as medical directors for Bethany Coastal. (Id.)

In addition, Relators allege that, based on mathematical probability, Bethany Hospice must be operating an illegal kickback scheme. Specifically, Realtors allege that, at various times, "around 95% of Bethany Hospice's" patients were referred from Bethany Hospice doctors and that those doctors referred "nearly all" of their hospice patients to Bethany Hospice.[6] (Id. at 15-16.)

In conjunction with the suspected kickback scheme, Relators also allege that Bethany Hospice submitted claims for reimbursement from Federal Health Care Programs—such as, Medicare and Medicaid—for services rendered to the unlawfully referred patients. (Id.) Relators allege that they know claims tainted by the kickback scheme were actually submitted because, during their employment with Bethany Coastal, Relators "gained intimate knowledge of Bethany Hospice's and Bethany Coastal's billing protocols and operations." (Id. at 24.) Relators point to several

---

[6] Relators do not specify whether this percentage includes the patients referred to Bethany Coastal, however, because the Court must construe all facts in the light most favorable to Relators, the Court will consider that the patients referred to Bethany Coastal were included in the calculations.

pieces of evidence that they claim support their contention that Bethany Hospice submitted claims to Medicare for reimbursement.

First, Relators describe several conversations they had with Bethany Hospice employees about Medicare patients being unlawfully referred by doctors. (Id. at 24-25.) One such conversation was with Shonda Jowers, Clinical Director of Bethany Hospice's Douglas office. (Id. at 24.) Ms. Jowers allegedly told Relators that Medicare patients were referred to Bethany Hospice from Bethany Hospice doctors and, in turn, Bethany Hospice billed the government for the services provided to the patients. (Id.) Relators also claim that Robert Clements, the former Bethany Hospice Community Education Representative, told them that "every single referral from [the Bethany Hospice doctors] was for a Medicare . . . beneficiary." (Id. at 25.) Mr. Clements allegedly learned this information from other Bethany Hospice employees. (Id. at 26.)

Second, Relators claim that they had personal access to Bethany Hospice's "aggregate billing and referral data for Medicare beneficiaries." (Id. at 27.) In fact, Relator Johnson and Relator Helmly claim that they each had individual access to information about Bethany Hospice's Medicare claims. Relator Johnson "interacted with administration at every Bethany Hospice and Bethany Coastal location" and "had access to the census reports documenting each [hospice] site's patients and [who paid] for the patients' care." (Id. at 30.) Relator Helmly "had access to all of

the billing information and census reports for every Bethany office" and "attended meetings with Ms. Best where Bethany Hospice and Bethany Coastal management discussed site productivity . . . ." (Id.) Relator Helmly also claims that the former Vice President of Bethany Hospice, Jeneen Cliett, taught her how to create reports documenting the number of patients referred to Bethany Hospice by each doctor. (Id. at 12-13.) According to Ms. Cliett, Ms. Best used "these reports to determine how much to pay referral sources." (Id. at 13.)

Lastly, Relators allege that, based on "Medicare claims data," Bethany Hospice doctors referred "the vast majority of their Medicare patients to Bethany Hospice." (Id. at 27.) Using this data, Relators contend that from the third quarter of 2016 to the second quarter of 2018 the Bethany Hospice doctors referred 100% of their eligible Medicare patients to Bethany Hospice. (Id. at 28-29.) Relators insist that "Bethany Hospice derives nearly all of its revenue from" Medicare reimbursement. (Id. at 27.)

Based on these allegations, Relators brought two claims pursuant to the FCA against Bethany Hospice: (1) false or fraudulent claims, under 31 U.S.C. § 3729(a)(1)(A); and (2) false statements material to a false or fraudulent claim, under 31 U.S.C. § 3729(a)(1)(B).[7]  (Id. at 35-36.) In the first claim, Relators

---

[7] In the complaint, Relators assert two claims under the GFMCA that are based on the same allegations as Relators' FCA claims. (Doc. 98 at 35-36.) In its motion to dismiss, Bethany Hospice cites

allege that Bethany Hospice's kickback scheme led to the submission of false claims tainted by illegal remuneration. (Id. at 35.) In the second claim, Relators allege that Bethany Hospice knowingly created false statements certifying compliance with the AKS and the FCA in order to receive reimbursement from Medicare, and, in fact, did receive reimbursement. (Id. at 35-36.)

Bethany Hospice has now moved to dismiss Relators' complaint. (Doc. 100.) Bethany Hospice contends that Relators have failed to plead facts in the complaint with the particularity required by Federal Rule of Civil Procedure 9(b), and therefore, the entire complaint should be dismissed. (Id. at 9.) Relators have responded in opposition to this motion. (Doc. 121.) Bethany Hospice filed a Reply in Support of its Motion to Dismiss (Doc. 130), to which Relators filed a Sur-Reply in Opposition (Doc. 134). Bethany Hospice's Motion to Dismiss Relators' Third Amended Complaint is now ripe for review.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." "[T]he pleading standard Rule

---

authority for the proposition that a relator who fails to state a claim under the FCA necessarily fails to state a claim under the GFMCA. See Cade v. Progressive Cmty. Healthcare, Inc., No. 1:09-cv-3522-WSD, 2011 WL 2837648, at *3 (N.D. Ga. July 14, 2011). Relators do not challenge this proposition. As a result, the Court's analysis applies to Relators' claims brought under the FCA and the GFMCA.

8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964, 167 L. Ed. 2d 929 (2007)). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.' " Id. (quoting Twombly, 550 U.S. at 555, 127 S. Ct. at 1965). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966) (alteration in original).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " Id. (quoting Twombly, 550 U.S. at 570, 127 S. Ct. at 1974). For a claim to have facial plausibility, the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1261 (11th Cir. 2009) (quotations omitted). Plausibility does not require probability, "but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949. "Where a complaint pleads facts that are 'merely consistent with' a

11

defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.' " Id. (quoting Twombly, 550 U.S. at 557, 127 S. Ct. at 1966). Additionally, a complaint is sufficient only if it gives "fair notice of what the . . . claim is and the grounds upon which it rests." Sinaltrainal, 578 F.3d at 1268 (quotations omitted).

When the Court considers a motion to dismiss, it accepts the well-pleaded facts in the complaint as true. Id. at 1260. However, this Court is "not bound to accept as true a legal conclusion couched as a factual allegation." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1950. Moreover, "unwarranted deductions of fact in a complaint are not admitted as true for the purpose of testing the sufficiency of [plaintiff's] allegations." Sinaltrainal, 578 F.3d at 1268 (citing Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248 (11th Cir. 2005)). That is, "[t]he rule 'does not impose a probability requirement at the pleading stage,' but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295-96 (11th Cir. 2007) (quoting Twombly, 550 U.S. at 545, 127 S. Ct. at 1959).

In addition to Rule 8(a)(2), the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies to causes of actions brought under the FCA. Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1324 (11th Cir. 2009). Rule 9(b) states that "in

alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Id.

Despite the heightened standard, the purpose of Rule 9(b) remains that a complaint must provide the defendant with "enough information to formulate a defense to the charges." United States ex rel. Clausen v. Lab. Corp. of Am., Inc., 290 F.3d 1301, 1313 n.24 (11th Cir. 2002). The Eleventh Circuit has emphasized that "[t]he application of Rule 9(b) . . . 'must not abrogate the concept of notice pleading.' " Tello v. Dean Witter Reynolds, Inc., 494 F.3d 956, 972 (11th Cir. 2007) (quoting Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001)). Furthermore, Rule 9(b)'s standard "should not be conflated with that used on a summary judgment motion." United States ex rel. Rogers v. Azmat, No. CV507-092, 2011 WL 10935176, at *3 (S.D. Ga. May 16, 2011).

Rule 9(b) serves to ensure that a FCA claim has "some indicia of reliability . . . to support the allegation of an actual false claim for payment being made to the Government." Clausen, 290 F.3d at 1311. This is because "[t]he [FCA] does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." Id. As a result, an FCA complaint must

13

plead not only the "who, what, where, when, and how of improper practices," but also the "who, what, where, when, and how of fraudulent submissions to the government." <u>Corsello v. Lincare, Inc.</u>, 428 F.3d 1008, 1014 (11th Cir. 2005). The question of whether a complaint satisfies Rule 9(b) is decided on a case-by-case basis, but even detailed portrayals of fraudulent schemes followed by conclusions that false claims must have been submitted is insufficient. <u>See</u> <u>United States ex rel. Atkins v. McInteer</u>, 470 F.3d 1350, 1358 (11th Cir. 2006). In other words, the complaint must allege with particularity both "the details of the defendant['s] allegedly fraudulent acts" and that claims tainted by the defendant's fraud were actually submitted to the government. <u>Clausen</u>, 290 F.3d at 1311.

## ANALYSIS

In its Motion to Dismiss, Bethany Hospice argues that Relators' complaint should be dismissed because Relators failed to allege FCA violations with the particularity required by Rule 9(b). (Doc. 100.) As an initial matter, Bethany Hospice argues that Relators failed to plead the facts surrounding Bethany Hospice's alleged kickback scheme with particularity. (<u>Id.</u> at 10.) Alternatively, Bethany Hospice argues that Relators do not plead with particularity their assertions that Bethany Hospice actually submitted false claims to the government. (<u>Id.</u> at 15.) Bethany Hospice contends that Relators' complaint could be dismissed on

14

either of these grounds. The Court will now consider Bethany Hospice's arguments in turn.

## I.   ANTI-KICKBACK STATUTE VIOLATIONS

"The [AKS] makes it a felony to offer kickbacks or other payments in exchange for referring patients 'for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.' " McNutt ex rel. v. Haleyville Med. Supplies, Inc., 423 F.3d 1256, 1259 (11th Cir. 2005) (quoting 42 U.S.C. § 1320a-7b(b)(2)(A)). "A violation of the [AKS] occurs when a defendant: (1) knowingly and willfully, (2) 'offers of pays any remuneration,' directly or indirectly, (3) to induce a person to refer individuals to the defendant[] for the furnishing of medical services, (4) paid for by Medicare."[8] United States v. Choudhry, No. 8:13-cv-2603-T-27AEP, 2017 WL 2604930, at *4 (M.D. Fla. June 14, 2017) (citing United States ex rel. Mastej v. Health Mgmt. Assocs., Inc., 591 F. App'x 693, 705 (11th Cir. 2014)).

The AKS provides that "a claim [to Medicare for reimbursement] that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b(g). In this case, Relators allege that

---

[8] The AKS does include statutory and regulatory exceptions to the prohibitions against payments for referrals, but Bethany Hospice does not argue that any of the exceptions apply. Therefore, the Court will not address the exceptions.

15

Bethany Hospice violated the AKS and, therefore, any claims resulting from Bethany Hospice's violations are fraudulent under the FCA. See United States ex rel. Schaengold v. Mem'l Health, Inc., No. 4:11-cv-58, 2014 WL 7272598, at *3 (S.D. Ga. Dec. 18, 2014) (finding that violations of the AKS "can provide the basis of FCA liability"). As the basis of Bethany Hospice's FCA liability, Relators must plead the circumstances constituting Bethany Hospice's alleged AKS violations with particularity. Mastej, 591 F. App'x at 705. Violations of the AKS are pled with particularity when the complaint provides "the names of the doctors who received the incentives, the names of the defendant['s] employees who negotiated the incentives with the doctors, precisely what the incentives were, when they were provided, why they were provided, and why they were illegal." Id. at 705; United States ex rel. Matheny v. Medco Health Sols., Inc., 671 F.3d 1217, 1222 (11th Cir. 2012) ("The particularity requirement of Rule 9(b) is satisfied if the complaint alleges facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendant['s] allegedly fraudulent acts, when they occurred, and who engaged in them.") (internal citations omitted).

In its Motion to Dismiss, Bethany Hospice argues that Relators have not sufficiently pled the existence of a compensation arrangement that violates the AKS. (Doc. 100 at 10.) Specifically, Defendant Bethany Hospice argues that Relators provide only

16

"conclusory assertions" and fail to "provide facts to support" allegations that doctors received payment from Bethany Hospice as inducement for patient referrals. (Id. at 13.) The Court agrees.

To their credit, Relators provide some facts to support their allegation of an illegal kickback scheme. For example, Relators named several doctors—the "Bethany Hospice doctors"—that they claim Bethany Hospice paid for referrals. (Doc. 98 at 15.) Relators also named one doctor that allegedly benefitted from an unfair investment in Bethany Hospice—Dr. Tanner. (Id. at 14-15.) Additionally, Relators named the individual who allegedly organized the illegal kickback scheme—Ms. Ava Best. (Id. at 13.) Relators' also allege that Ms. Best admitted that she "mask[ed] payments to doctors for referrals." (Id. at 17.)

Despite these factual allegations, Relators' do not allege enough facts with particularity to support their contention that Bethany Hospice violated the AKS. Specifically, Relators fail to allege with particularity "precisely what the incentives were, when they were provided . . .," and how they were provided to the doctors. Mastej, 591 F. App'x at 705. Although Relators claim that "Ms. Best told Relator Helmly that she would follow the same protocol to add compensation for Relator Helmly that she used to pay referring doctors for their referrals," Relators provide no details as to how much Ms. Best paid for referrals. (Doc. 98 at 10.) In fact, Relators provide contradictory factual allegations

17

about payments to doctors. Relators claim that Ms. Best admitted to paying doctors on a monthly basis (Doc. 98 at 12) and also claim that Dr. Tanner was paid annually (Doc. 98 at 14).

Moreover, Relators assert that they created reports for Ms. Best that tracked referrals, but, even with their alleged access to these reports, Relators cannot provide specific dates that Bethany Hospice paid doctors, the amounts doctors were paid, or any specific patient in the reports.[9] (Id. at 12.) Relators only state "[e]ach of these physicians receive dividends based on how many patients their site puts under census." (Id. at 15.) Relators' purported access to these reports should have afforded them more specific information. Without more specific facts supporting Relators' allegations about Bethany Hospice's alleged AKS violations, the complaint does not meet the particularity requirement of Rule 9(b). See Ga. ex rel. Hunter Labs., LLC v. Quest Diagnostics Inc., No. 1:13-cv-01838-SCJ, 2014 WL 12543888, at *4 (N.D. Ga. Mar. 17, 2014) (finding "the kickback scheme . . . obviously deficient" because plaintiffs failed "to articulate any specific kickback at issue" such as when the defendant offered inducements and what the specific rates were).

Relators also fail to plead their allegation that Bethany Hospice paid doctors illegal kickbacks by selling doctors shares

---

[9] In fact, Relators do not contend they actually made a report for Ms. Best, rather, that they learned how to make the reports.

in Bethany Hospice at below fair-market-value with particularity. In their complaint, Relators highlight Dr. Tanner as an example of this type of remuneration. (Doc. 98 at 14.) Relators allege the purchase and sale price of Dr. Tanner's ownership interest of Bethany Hospice; however, Relators overlook the fact that Dr. Tanner purchased additional shares before he sold his interest. (Id. at 14.) Therefore, it is reasonable to assume that Dr. Tanner's sale price would be higher than his purchase price. Moreover, "[w]ithout alleging a benchmark of fair market value, it is impossible for the Court to infer whether" Bethany Hospice's offer "falls sufficiently below the benchmark so as to constitute remuneration." United States ex rel. Osheroff v. Tenet Healthcare Corp., No. 09-22253-CIV, 2012 WL 2871264, at *7 (S.D. Fla. July 12, 2012); see also United States v. All Children's Health Sys., Inc., No. 8:11-cv-01687-T-27EAJ, 2013 WL 6054803, at *11 (M.D. Fla. Nov. 15, 2013) (finding relator satisfied Rule 9(b) because she alleged "a fair market value benchmark for" competitive salaries of doctors nationwide).

Lastly, Relators suggest that the high percentage of patients referred to Bethany Hospice indicates that Bethany Hospice was paying doctors for referrals. To support this suggestion, Relators allege that "[i]n certain periods, around 95% of Bethany Hospice's referrals came from doctors with a financial interest in Bethany Hospice." (Doc. 98 at 15.) In addition, Relators allege that "while

19

nearly none of their referrals went to Bethany Hospice before their
financial arrangements, afterwards, nearly all of the 'Bethany
Hospice doctors' referrals for hospice services have gone to
Bethany Hospice." (Id. at 16.) However, Relators do not support
these contentions with any evidence. Relators do not explain what
numbers were used to calculate the percentages and do not provide
the Court with the source of this data.

Because Relators have failed to plead the circumstances of an
illegal kickback scheme with particularity and this scheme forms
the basis of Relators' FCA claims, the Court finds that Relators'
claims should be dismissed.[10] Nevertheless, the Court will address
Relators' allegations regarding the submission of false claims to
Medicare.

## II.  SUBMISSION OF FALSE CLAIMS TO THE GOVERNMENT

Even if Relators had pled the circumstances of Bethany
Hospice's AKS violations with particularity, "[m]erely alleging a
violation of the [AKS] does not sufficiently state a claim under
the FCA." Mastej, 591 F. App'x at 706. "[T]he Eleventh Circuit has
clearly articulated a complaint that simply alleges an illegal
scheme is insufficient to satisfy the pleading standard of Rule

---

[10] Relators' also alleged that Bethany Hospice offered the Bethany
Hospice doctors a free trip. (Doc. 98 at 18.) However, Relators do
not allege that the doctors actually went on this trip and Relators
were not employed by Bethany Coastal at the time the trip was
supposed to occur. (Id.) Therefore, this allegation also does not
plead enough facts with particularity to satisfy Rule 9(b).

9(b) if said complaint fails to particularize the existence of a single actual false claim in relation to the fraudulent scheme." Hunter Labs., LLC, 2014 WL 12543888, at *4. "It is the submission and payment of a false Medicare claim and false certification of compliance with the law that creates FCA liability." Mastej, 591 F. App'x at 706. In other words, Relators cannot simply describe an illegal kickback scheme and then state that claims "must have been submitted, were likely submitted[,] or should have been submitted." Carrel v. AIDS Healthcare Found., Inc., 898 F.3d 1267, 1275 (11th Cir. 2018) (internal citation omitted).

In their complaint, Relators allege that Bethany Hospice violated the "false claim" and "make or use" provisions of the FCA by submitting claims to Medicare for services rendered as a result of an illegal referral scheme and accepting payment from the government for those claims. The "false claim" provision imposes liability on anyone who "knowingly presents or causes to be presented a false or fraudulent claim for payment or approval[.]" 31 U.S.C. § 3729(a)(1)(A). Similarly, the "make or use" provision imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" 31 U.S.C. § 3729(a)(1)(B). To successfully plead a claim under either provision, Relators must provide particularized allegations "that [Bethany Hospice] actually submitted a false claim, and by extension, that the government

21

actually paid" Bethany Hospice for the claim. <u>United States ex</u> <u>rel. Aquino v. Univ. of Miami</u>, 250 F. Supp. 3d 1319, 1329 (S.D. Fla. 2017). Because, under either provision, Relators must first establish that Bethany Hospice submitted a false or fraudulent claim, the Court will address Relators' claims under the "false claim" and "make or use" provisions together.[11] <u>See, e.g.,</u> <u>United</u> <u>States ex rel. Klusmeier v. Bell Constructors, Inc.</u>, 469 F. App'x 718, 721 n.5 (11th Cir. 2015) (addressing claims under the false claim and make or use provisions together).

---

[11] Relators contend that Bethany Hospice violated 31 U.S.C. § 3729(a)(1)(B) by certifying compliance with the AKS on claims submitted to the government for reimbursement. (Doc. 98 at 5.) Notwithstanding that the Court found that Relators' did not particularly allege the facts surrounding an alleged kickback scheme, the Court notes that Relators only mention false statements in violation of 31 U.S.C. § 3729(a)(1)(B) once in their complaint. (<u>Id.</u> at 5.) Specifically, Relators state that "[e]ach of the billing forms [certified] that Bethany Hospice had not violated the AKS in conjunction with the submission of the bills" and "[t]hese certifications (and the billing certifications) were false, and Bethany Hospice knew they were false." (<u>Id.</u> at 5.) Relators provide no facts to support when Bethany Hospice created false statements or if Bethany Hospice was paid in connection with any false statements. As a result, the Court finds that Relators have failed to plead this claim with the particularity required by Rule 9(b). <u>See</u> <u>Thornton v. Nat'l Compounding Co., Inc.</u>, No. 8:15-cv-2647-T-36JSS, 2019 WL 2744623, at *19 (M.D. Fla. July 1, 2019) (dismissing a claim under § 3729(a)(1)(B) because the relator provided "[n]o factual allegations support [the] conclusion" that false certifications were made where the relator only mentioned false certifications in one paragraph of the complaint); <u>Garden</u> <u>Care Cntr.</u>, 2019 WL 6493972, at *6 (dismissing a claim under § 3729(a)(1)(B) because "there [was] no indication of when the false narratives were provided or for which services or patients").

In its motion to dismiss, Bethany Hospice argues that "Relators . . . fail to allege any facts showing the actual presentment of a claim to the government." (Doc. 100 at 15.) Additionally, Bethany Hospice argues that Relators cannot support their conclusory allegations because, even without an example claim, Relators provide insufficient "indicia of reliability" that false claims were submitted to Medicare. (Id. at 17.) The Court agrees.

"Because it is the submission of a fraudulent claim that gives rise to liability under the [FCA], that submission must be pleaded with particularity and not inferred from the circumstances." Corsello, 428 F.3d at 1013. Generally, the submission of a false claim is pled with particularity by "attach[ing] a representative sample claim" that includes "exact billing data (name, date, amount, and services rendered) . . . ." Mastej, 591 F. App'x at 704; see also United States ex rel. Chase v. HPC Healthcare, Inc., 723 F. App'x 783, 789 (11th Cir. 2018) ("One way to satisfy this requirement is by alleging the details of false claims by providing specific billing information—such as dates, times, and amounts of actual false claims or copies of bills.").

Relators did not present specific details of false claims or example claims that were allegedly submitted to the government by Bethany Hospice. (Doc. 121 at 4.) Rather, Relators argue that their personal knowledge of Bethany Hospice's internal operations and

Medicare referral rates provide sufficient "indicia of reliability" to support their allegations that Bethany Hospice actually submitted false claims. (Id.)

Relators are correct that the Eleventh Circuit has "allowed FCA claims to proceed where clear 'indicia of reliability' support the actual submission of a false claim, even if the relator cannot offer particularized allegations about a specific false claim." Aquino, 250 F. Supp. 3d at 1332 (quoting Clausen, 290 F.3d at 1311). The Eleventh Circuit is "more tolerant towards complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." Matheny, 671 F.3d at 1230. "[A] relator's firsthand knowledge of a defendant's actual submission of false claims may, where supported by appropriate factual allegations, provide 'sufficient indicia of reliability' to substitute for the particularized allegations that Rule 9(b) generally requires." Aquino, 250 F. Supp. 3d at 1332 (quoting Clausen, 290 F.3d at 1311); see also Mastej, 591 F. App'x at 704 ("[R]elators with direct, first-hand knowledge of the defendant['s] submission of false claims gained through her employment with the defendant[] may have a sufficient basis for asserting that the defendant[] actually submitted false claims.").

Bethany Hospice argues that Relators have failed to "supply sufficient 'indicia of reliability' to support Relators'"

allegation that Bethany Hospice actually submitted claims *to the* government. (Doc. 100 at 20.) Specifically, Bethany Hospice argues that Relators cannot support their allegations with personal knowledge and rely only on mathematical probability that Bethany Hospice submitted claims to Medicare that were tainted by the alleged kickback scheme. (Id.) In response, Relators contend that they pled more reliable allegations, based on their personal knowledge, than the relators in Hill v. Morehouse Med. Assocs., Inc., No. 02-14429, 2003 WL 22019936 (11th Cir. 2003), United States ex rel. Walker v. R&F Props. Of Lake Cty., Inc., 433 F.3d 1349 (11th Cir. 2005), and Mastej, 591 F. A'ppx 693. (Doc. 121.) However, the Court finds that Relators do not meet the "relatively high bar for 'indicia of reliability' . . ." established by these cases. Aquino, 250 F. Supp. 3d at 1332. Specifically, Relators "cannot rely on their 'personal knowledge or participation' in the alleged fraud" to provide sufficient indicia of reliability. Carrel, 898 F.3d at 1277 (citing Matheny, 671 F.3d at 1227).

As a starting point, Relators' did not describe Bethany Hospice's billing operations in as much detail as the relator in Hill. The relator in Hill, a former employee of the defendant's billing department, alleged that the defendant was submitting fraudulent bills to the government for reimbursement. 2003 WL 22019936, at *1-2. To support her allegations, the relator described in detail the defendant's billing process, who engaged

25

in the fraud, and the frequency fraudulent bills were submitted to the government. Id. Additionally, the relator described three specific instances in which she personally observed employees change codes on bills to fraudulently secure reimbursement from Medicare. Id. Although the relator could not identify specific patients associated with false claims, the Eleventh Circuit found that the relator's "factual allegations provide[d] the indicia of reliability" necessary because the relator pled that she "was an employee within the billing and coding department and witnessed firsthand the alleged fraudulent submissions . . . ." Id. at *4. Moreover, the relator "supported her legal theory with facts describing [the defendant's] billing process, the specific . . . codes that were altered for each of the five billing schemes, and the frequency of submission of each type of claim." Id.

The details alleged in Hill highlight the relator's personal knowledge that the defendant submitted false claims and exceed the factual allegations offered by Relators in this case. Realtors conclusively state that they "gained intimate knowledge of Bethany Hospice's and Bethany Coastal's billing protocols and operations" without providing any details of these operations. (Doc. 98 at 24.) Although Relator Helmly claims that she "had full access to all billing and referral data for all patients . . ." and "she attended meetings with Ms. Best where . . . management discussed site productivity . . .," Relators do not describe even one

specific instance they observed a Bethany Hospice employee submit a false claim. (Id. at 30.) "It is not enough for the [relators] to state baldly that [they were] aware of the defendants' billing practices . . . ." Mastej, 591 F. App'x at 704-705.

Relators case is also distinguishable from Walker. In Walker, the relator, a former nurse practitioner for the defendant, claimed that the defendant "filed false claims for Medicare reimbursement by billing Medicare for services rendered by nurse practitioners . . . as if those services were rendered 'incident to the service of a physician' . . . ." 433 F.3d at 1353. Specifically, the relator alleged that she personally participated in the fraudulent billing because she was instructed to bill her time as a physician. Id. Additionally, the relator had a conversation with an administrator of the defendant where the administrator admitted that "[the defendant] billed all nurse practitioner and physician assistant services as rendered 'incident to the services of a physician.' " Id. at 1360. Because of the relator's participation in the fraudulent billing, the Eleventh Circuit found that her "allegations [were] sufficient to explain why [she] believed [the defendant] submitted false or fraudulent claims." Id. at 1360.

In contrast, Relators in this case do not allege that they participated in the submission of fraudulent claims to the government. Although Relators do allege that they had conversations about fraudulent claims with Bethany Hospice

27

employees, including Ms. Jowers and Ms. Cliett, these conversations were not had in conjunction with Relators' participation in the fraud. Relators' vague and conclusory details about their conversations with Bethany Hospice employees do not amount to the participation and detailed conversation alleged in Walker.

Lastly, Relators' argument that their allegations are "nearly identical" to those in Mastej is misplaced. The relator in Mastej was the vice president of the defendants' company and, at one time, the CEO of a hospital operated by the defendants. 591 F. App'x at 708-09. While the relator was CEO, another CEO asked him to split the cost of "on-call coverage in exchange for Medicare/Medicaid referrals." Id. at 707. Additionally, the relator frequently attended case management meetings in which every patient was discussed, "including how the services were being billed to each patient." Id. Because the relator was "actively and heavily engaged in the [d]efendants' business and revenue operations . . . " and because the relator had "first-hand knowledge of the [d]efendants' submission of false interim claims to the government," the Eleventh Circuit determined that the relator provided the necessary indicia of reliability to support his allegations that false claims were submitted. Id.

In contrast to the relator in Mastej, Relators in this case do not allege facts indicating that they were "actively and heavily

engaged" in Bethany Hospice's billing operations. Although Relator Helmly allegedly attended meetings where "site productivity" was discussed, she does not assert that she gained knowledge of how "services were billed to each patient." Mastej, 591 F. App'x at 707. Additionally, Relators' status as former employees of Bethany Coastal, not Bethany Hospice, further indicates that they were not actively engaged in Bethany Hospice's billing operations. Even if the Court accepts Relators' argument that Bethany Coastal operated as merely another office of Bethany Hospice (Doc. 98 at 31), Relators did not work in the other Bethany Hospice offices and cannot rely on their personal knowledge of those offices' billing operation.

As a final attempt to provide some indicia of reliability to support Relators' contention that Bethany Hospice submitted false claims to the government, Relators highlight the number of Medicare patients that doctors have allegedly referred to Bethany Hospice. (Doc. 98 at 27.) Specifically, Relators allege that "[f]rom the [third] quarter of 2016 through the [second] quarter of 2018," the Bethany Hospice doctors referred 100% of their Medicare patients to Bethany Hospice. (Id. at 28-29.) From this "Medicare claims data," Bethany Hospice infers that "Bethany Hospice billed government health programs for the services rendered to Medicare . . . patients referred by [the Bethany Hospice doctors]." (Id. at 26.) In response, Bethany Hospice argues that "[a]lthough

29

Relators' . . . alleged 'Medicare claims data' may be more specific" than Relators' other allegations, Relators still fail to plead that a false claim was submitted with particularity. (Doc. 100 at 8.) The Court agrees.

As an initial matter, the Court cannot "make assumptions about a . . . defendant's submission of actual claims to the Government . . . ." <u>Clausen</u>, 290 F.3d at 1312 n.21. By claiming that, based on the number of Medicare referrals from doctors, Bethany Hospice must have submitted a false claim to the government, Relators are asking the Court to assume claims were submitted. However, the Court cannot rely on "mathematical probability to conclude that" Bethany Hospice "surely must have submitted a false claim at some point." <u>Carrel</u>, 898 F.3d at 1277.

Moreover, Relators have provided no facts as to how they acquired this "Medicare claims data." Relators did not offer public filings to support the data. <u>See</u> <u>Osheroff</u>, 2012 WL 2871264, at *5-6 (finding a relator's allegation that the defendant actually submitted false claims based on the defendant's number of Medicare patients was sufficient indicia of reliability because the relator attached public filings that showed "thousands of sample claims that [the defendant] presented to Medicaid for reimbursement"). Again, the Court cannot "make unwarranted inferences about the submission of claims." <u>Id.</u> Therefore, Relators have also failed to

provide the necessary indicia of reliability using alleged "Medicare claims data."

In summary, Relators cannot plead "a mosaic of circumstances that are perhaps consistent with their accusation[]" that Bethany Hospice submitted false claims without pleading any of those circumstances with particularity. Carrel, 898 F.3d at 1277. Accordingly, the Court finds that Relators have failed to plead their allegations that Bethany Hospice submitted false claims to the government for reimbursement with the particularity required by Rule 9(b). As a result, Relators' claims pursuant to the FCA are **DISMISSED**.

CONCLUSION

For the foregoing reasons, the Court finds that Relators' have failed to plead their claims under the FCA and the GFMCA with the particularity required by Rule 9(b). Relators have had numerous opportunities to correct the deficiencies in their complaint and have failed to do so. As a result, Relators' Third Amended Complaint (Doc. 98) is **DISMISSED WITH PREJUDICE.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this *31ST* day of March 2020.


_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA