[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-11624
Non-Argument Calendar
_____

D.C. Docket No. 4:16-cv-00290-WTM-BKE

ESTATE OF DEBBIE HELMLY, et al.,

                                                            Plaintiffs-Appellants,

versus

BETHANY HOSPICE AND PALLIATIVE CARE OF
COASTAL GEORGIA, LLC,
f.k.a. Bethany Hospice of Coastal Georgia, LLC
(Bethany Coastal),
BETHANY HOSPICE AND PALLIATIVE CARE, LLC,
f.k.a. Bethany Hospice, LLC (Bethany Hospice),
BETHANY BENEVOLENCE FUND, INC.,
AVA BEST, et al.,

                                                            Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(April 26, 2021)

Before MARTIN, NEWSOM, and BRANCH, Circuit Judges.

PER CURIAM:

In this *qui tam* action, Debbie Helmly and Jolie Johnson (the "Relators") appeal the dismissal of their complaint. Relators sued Bethany Hospice and Palliative Care, LLC ("Bethany Hospice") on behalf of the United States and the State of Georgia,[1] alleging that Bethany Hospice violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733, and the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168.1. In particular, Relators alleged that Bethany Hospice violated the so-called Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b),[2] by paying physicians remuneration for Medicare and Medicaid patient referrals. According to Relators, Bethany Hospice submitted false claims when it billed the government for services provided to illegally-referred patients. Relators further

---

[1] *See* 31 U.S.C. § 3730(b)(1) ("A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government."); *id*. § 3732(b) ("The district courts shall have jurisdiction over any action brought under the laws of any State for the recovery of funds paid by a State or local government if the action arises from the same transaction or occurrence as an action brought under section 3730.").

[2] An entity violates the AKS when it:

> knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.

42 U.S.C. § 1320a-7b(b)(2).

allege that Bethany Hospice falsely certified compliance with the AKS. Under Rule 9 of the Federal Rules of Civil Procedure, Relators were required to plead with particularity the submission of an actual false claim to the government. Because Relators failed to do so, the district court properly dismissed their complaint. Accordingly, we affirm.

I.   Background[3]

Bethany Hospice provides for-profit hospice care in Georgia. It operates care facilities in four cities: Douglas, Thomasville, Waycross, and Valdosta. In 2014, Bethany Hospice opened Bethany Hospice and Palliative Care of Coastal Georgia, LLC ("Bethany Coastal"). Relators are former employees of Bethany Coastal. Helmly was employed as the administrator of Bethany Coastal from December 2014 until July 2015. Johnson was employed as a marketer during the same period.

Although Bethany Coastal was organized as a separate company from Bethany Hospice and obtained a different business license number, the two entities are both owned and operated by Ava Best and Mac Mackey and share personnel, resources, and management software. According to Relators, Best and Mackey operated Bethany Coastal "as if it were another facility office of Bethany

---

[3] Relators' original complaint was filed under seal. After the United States and the State of Georgia declined to intervene, the complaint was unsealed. The following facts are taken from Relators' third amended complaint (the "operative complaint").

Hospice." For that reason, Relators allege that they were "effectively . . . corporate insiders of Bethany Hospice."

Relators allege that, as corporate insiders, they learned that Bethany Hospice operated an illegal kickback referral scheme in which Bethany Hospice paid doctors in exchange for referring Medicare beneficiaries[4] to Bethany Hospice. Relators further allege that, after rendering services to the illegally referred patients, Bethany Hospice submitted claims to Medicare for reimbursement.

In particular, Helmly alleged that when she and Best were negotiating the terms of Helmly's employment as administrator of Bethany Coastal, Best offered her compensation based on the kickback scheme. During those negotiations, Best allegedly told Helmly that Best "would follow the same protocol to add compensation for . . . Helmly that [Best] used to pay referring doctors for their referrals." Under that "protocol," Helmly could make a below-market ownership investment in Bethany Coastal that would provide "huge returns" based on the number of referred patients. Helmly further alleged that Best said that she "paid all the medical directors who owned shares in Bethany Hospice according to this same formula, and the payments varied depending on the volume of referrals."

---

[4] Relators allege that the referral scheme involved Medicare and Medicaid beneficiaries. For simplicity, we will refer only to Medicare.

Relators also alleged that, on other occasions, Best acknowledged to them that the compensation structure was designed to avoid getting caught for FCA violations. Best was formerly employed by Odyssey Hospice—a predecessor to Bethany Hospice. Relators alleged that Odyssey also employed a kickback compensation scheme, Odyssey's owner was eventually convicted of Medicare Fraud, and Odyssey agreed to a $25 million settlement with the U.S. Department of Justice. According to Relators, Best acknowledged that kickbacks were improper but, because they were "the most effective way to get referrals," Best "tried to have the best of both worlds: paying the kickbacks to referring physicians but hiding or masking them as compensation to medical directors and part owners of Bethany Hospice."

Relators alleged that several doctors purchased ownership interests in Bethany Hospice and were paid kickbacks for referrals through "a monthly salary, dividends, and/or monthly bonuses."[5] According to Relators, that compensation was not paid for the fair market value of their work but, rather, "as inducement for or reward for referrals of patients, which constitute kickbacks." Relators' complaint points to Dr. Tanner as an example: In 2007, he purchased a 5% interest in Bethany Hospice for $20,000 and, seven years later, he sold that interest for

---

[5] Relators also allege that, on at least one occasion, Bethany Hospice offered its doctors a paid family vacation as a kickback.

$300,000.  Relators' complaint identifies at least four other doctors (the "Bethany Hospice doctors") who are allegedly the primary participants in this compensation scheme.

Relators point to other facts to show that the scheme was operational and successful.  They allege that, after purchasing an investment in Bethany Hospice, the Bethany Hospice doctors made "nearly all" or "around 95%" of their patient referrals to Bethany Hospice.  Realtors also allege that they were able to access Bethany Hospice's internal billing software, Consolo, to confirm that Bethany Hospice tracked each patient admission and the doctor who referred that patient for the purpose of paying those doctors kickbacks.  Relators claim that other Bethany Hospice employees confirmed that Bethany Hospice ran "weekly and monthly reports" tracking referrals and that "Best use[d] these reports to determine how much to pay referral sources."

Relators further alleged that, as a result of the kickback scheme, Bethany Hospice submitted false claims for Medicare reimbursement to the government.  Relators alleged that "all or nearly all of Bethany Hospice's patients put under service received coverage from Medicare."  Johnson "had access to the census reports documenting each site's patients and which payor paid for the patients' care."  By accessing these records, and speaking to some of Bethany Hospice's billing employees, Johnson allegedly "was able to find out about the billing and

6

collection from Medicare of the illicit referrals and the submission of bills for other inappropriate patients." For her part, Helmly alleged that she also had access to all billing information and "attended meetings with Ms. Best where Bethany Hospice and Bethany Coastal management discussed site productivity and census numbers for all Bethany Hospice's and Bethany Coastal's sites." And, relevant here, Relators claim to have discovered that "all (or nearly all) the hospice patients referred by [the Bethany Hospice doctors] were Medicare or Medicaid patients and that Bethany Hospice submitted claims to the Government for per diem payments for those patients knowing that they were false."

  Relators' complaint included government Medicare claims data that showed that "Bethany Hospice derive[d] nearly all of its revenue from the Medicare program monies," and it provided a breakdown of Medicare referrals from the Bethany Hospice doctors.

  Finally, Relators alleged that five other Bethany Hospice employees confirmed that Bethany Hospice submitted Medicare reimbursement claims for patients referred by the Bethany Hospice doctors. At bottom, Relators alleged that "all or nearly all" of Bethany Hospice's business was derived from Medicare beneficiaries and that Bethany Hospice submitted claims for Medicare reimbursement for those patients. Combined with Relators' access to the billing systems and confirmation from other employees that Bethany Hospice submitted

7

Medicare reimbursement claims, Relators alleged that Bethany Hospice submitted false claims to the government.

As noted, Relators' operative complaint alleged two causes of action. Relators alleged that Bethany Hospice made false or fraudulent claims for reimbursement based on illegal kickbacks, in violation of 31 U.S.C. § 3729(a)(1)(A) and O.C.G.A. § 49-4-168.1(a)(1). Relators also alleged that Bethany Hospice made false statements by certifying compliance with the AKS, in violation of 31 U.S.C. § 3729(a)(1)(B) and O.C.G.A. § 49-4-168.1(a)(2).[6]

Bethany Hospice eventually moved to dismiss the operative complaint. Bethany Hospice argued that Relators' complaint contained primarily conclusory assertions and failed to plead its claims with sufficient particularity, as required by Fed. R. Civ. P. 9(b). The Relators opposed the motion, arguing that the operative complaint satisfied the requirements of Rule 9(b).

The district court granted Bethany Hospice's motion to dismiss with prejudice. First, the district court concluded that Relators did not plead sufficiently particular facts to allege that Bethany Hospice violated the AKS. Although it acknowledged that the Relators had put forth some facts to support their allegations about a kickback scheme, the district court determined that Relators

---

[6] Relators also alleged that Best and Bethany Hospice retaliated against them for their investigations into the alleged FCA violations, in violation of 31 U.S.C. § 3730(h) and O.C.G.A. § 49-4-168.4. The parties agreed to settle that claim.

failed to allege particular facts about the precise nature of the kickback incentives and how much Best paid for referrals.  The district court then noted that, despite Relators' access to billing reports, they failed to "provide specific dates that Bethany Hospice paid doctors, the amounts doctors were paid, or any specific patient in the reports."  The district court added that Relators failed to provide enough background for the district court to infer that Dr. Tanner's ownership shares were so inflated as to constitute remuneration.  Finally, the district court concluded that Relators' claim that 95% of Bethany Hospice's referrals came from the Bethany Hospice doctors lacked factual support.

     Second, the district court concluded that the Relators failed to plead the submission of a false claim with particularity.  The district court began by observing that Relators' complaint did not present an example of a Medicare reimbursement claim that Bethany Hospice submitted to the government on behalf of an illegally referred patient.  Next, the district court addressed the Relators' argument that their inside knowledge and Bethany Hospice's Medicare referral rates were sufficient indicia of reliability to meet Rule 9(b)'s pleading standard.  Relying on our FCA precedent, the district court concluded that Relators' complaint lacked sufficient indicia of reliability because Relators: (1) failed to describe Bethany Hospice's billing operations in sufficient detail, (2) failed to describe a single example of when Relators observed a false claim being

submitted, (3) did not themselves participate in the submission of false claims. Lastly, the district court explained that, under our precedent, courts may not rely on mathematical probability to conclude that a defendant submitted a false claim.

Finally, the district court dismissed Relators' false statements claim. The district court noted that Relators' complaint contained only one paragraph describing the allegedly false statements. In the district court's view, that lone paragraph lacked the factual support necessary to plead the claim with sufficient particularity.

Relators timely appealed.

## II.  Standard of Review

"We review a dismissal with prejudice for failure to state a claim under the False Claims Act *de novo*." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015). We take the allegations in the complaint as true and draw all reasonable inferences in Relators' favor. *Id.*

## III.  Discussion

Relators argue that the district court erred when it concluded that their complaint failed to plead with particularity Bethany Hospice's kickback scheme, submission of a false claim, and certification of a false statement. We agree with the district court that Relators failed to plead with particularity the submission of

an actual false claim, and that shortcoming is fatal to Relators' case. Accordingly, we affirm the district court's dismissal of Relators' complaint.

"The FCA imposes liability on any person who 'knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or] knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.'" *United States ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1154 (11th Cir. 2017) (quoting 31 U.S.C. § 3729(a)(1)(A)–(B)). The AKS "makes it a felony to offer kickbacks or other payments in exchange for referring patients 'for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program.'" *McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005) (quoting 42 U.S.C. § 1320a-b7(b)(1)). And, relevant here, "a claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [§ 3729(a)(1)]." 42 U.S.C. § 1320a-7b(g).

Nevertheless, the FCA "does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe." *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002). A violation of the AKS is a separate criminal

11

offense. *See United States v. Sosa*, 777 F.3d 1279, 1293 (11th Cir. 2015). But a relator in a *qui tam* action must plead that a defendant "both violated the [AKS] when it unlawfully recruited a patient and then billed the government for the services provided to that patient." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1277 (11th Cir. 2018). Thus, the "act of submitting a fraudulent claim to the government is the '*sine qua non* of a False Claims Act violation.'" *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (quoting *Clausen*, 290 F.3d at 1311). Put differently, "[l]iability under the False Claims Act arises from the submission of a fraudulent claim to the government, not the disregard of government regulations or failure to maintain proper internal policies." *Id.*

Furthermore, complaints alleging violations of the FCA must meet the heightened pleading standard of Rule 9(b). *Id.*; *United States ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006). Under Rule 9(b), a party "alleging fraud or mistake . . . must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet this standard, we have explained that a complaint "must allege actual 'submission of a false claim,'" and that it must do so with "some indicia of reliability." *Carrel*, 898 F.3d at 1275 (quoting *Clausen*, 290 F.3d at 1311) (alteration adopted). It is not enough to "point to 'improper practices of the defendant' to support 'the inference that fraudulent claims were submitted' because 'submission . . . cannot be inferred from the

12

circumstances.'" *Id.* (quoting *Corsello*, 428 F.3d at 1013) (alterations adopted). In short, a relator must "allege the 'who,' 'what,' 'where,' 'when,' and 'how' of fraudulent submissions to the government." *Corsello*, 428 F.3d at 1014.

Although Relators concede that their complaint did not include any details about specific claims submitted to the government, they argue that they have met Rule 9(b)'s pleading threshold because their complaint contains sufficient indicia of reliability to support their claim that Bethany Hospice submitted false claims to the government. First, Relators rely on their complaint's allegations that they had access to and knowledge of Bethany Hospice's billing practices. For example, Relators alleged that they attended meetings in which Best "discussed site productivity and census numbers for all Bethany Hospice's and Bethany Coastal's sites." Relators further alleged that they reviewed billing data that showed that Bethany Hospice submitted Medicare reimbursement claims for patients referred by the Bethany Hospice doctors. And Relators alleged that five other Bethany Hospice employees confirmed that such claims were submitted. Second, Relators draw our attention to the numbers. They alleged that the Bethany Hospice doctors referred significant numbers of Medicare recipients to Bethany Hospice and that "all or nearly all" of Bethany Hospice's patients received coverage from Medicare. In short, Relators argue that their knowledge and access, coupled with data about

13

Bethany Hospice's Medicare claims submissions, lends sufficient indicia of reliability to survive Bethany Hospice's motion to dismiss. We disagree.

To begin, Relators have failed to allege any specifics about actual claims submitted to the government. Despite alleging intimate familiarity with and access to Bethany Hospice's billing practices, Relators' complaint fails to identify even a single, concrete example of a false claim submitted to the government. *See Clausen*, 290 F.3d at 1306 ("[N]o copies of a single actual bill or claim or payment were provided. No amounts of any charges by LabCorp were identified. No actual dates of claims were alleged. Not a single completed Form 1500 was provided."); *Carrel*, 898 F.3d at 1277 (noting that the plaintiff failed to allege facts about a specific claim submitted for reimbursement).

To be sure, we do not always require a sample fraudulent claim because "we are more tolerant toward complaints that leave out some particularities of the submissions of a false claim if the complaint also alleges personal knowledge or participation in the fraudulent conduct." *United States ex rel. Matheny v. Medco Health Sols., Inc.*, 671 F.3d 1217, 1230 (11th Cir. 2012). But Relators do not even attempt to provide any particular facts about a representative false claim. Moreover, Relators do not have the personal knowledge or level of participation that can give rise to some indicia of reliability. In *Carrel*, the relators "highlighted their managerial positions" at the defendant company and their attendance "at

14

monthly financial review meetings." 898 F.3d at 1277. But we found this kind of senior insider knowledge insufficient because "the relators failed to explain how their access to possibly relevant information translated to knowledge of actual tainted claims presented to the government." *Id.* at 1278. Relators' complaint suffers from the same flaw. The complaint alleged that at least one Relator (Helmly) attended meetings that discussed the productivity of various Bethany Hospice sites and that both Relators had access to Bethany Hospice's billing systems and confirmed from their review of those systems and conversations with other employees that Bethany Hospice submitted false claims. Those allegations are insufficient to satisfy Rule 9(b)'s particularity requirement because even with "direct knowledge of the defendants' billing and patient records," Relators have "failed to provide any specific details regarding either the dates on or the frequency with which the defendants submitted false claims, the amounts of those claims, or the patients whose treatment served as the basis for the claims." *United States ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1302 (11th Cir. 2010). Additionally, Relators did not claim to have observed the submission of an actual false claim; nor did they personally participate in the submission of false claims. *See Matheny*, 671 F.3d at 1230 (crediting the complaint's allegations when one of the relators was intimately involved in a department of the defendant company that was responsible for creating the alleged false claims.); *United States v. R&F Props.*

*of Lake Cnty., Inc.*, 433 F.3d 1349, 1356–58 (11th Cir. 2005) (crediting a complaint's allegations because one of the relators was a nurse practitioner who personally used incorrect billing codes). In sum, Relators' access and knowledge are not sufficient indicia of reliability.

Relators' reliance on Bethany Hospice's business model and Medicare claims data lends no credence to their allegation that Bethany Hospice submitted a false claim. Relators alleged that Bethany Hospice doctors referred significant numbers of Medicare recipients, that "all or nearly all" of Bethany Hospice's patients were Medicare recipients, and that Medicare claims data shows that Bethany Hospice billed the government for their patients. Therefore, Relators contend, their complaint contains sufficient indicia of reliability to allege plausibly that Bethany Hospice submitted a false claim. But we have explained that relators cannot "rely on mathematical probability to conclude that [a defendant] surely must have submitted a false claim at some point." *Carrel*, 898 F.3d at 1277; *see also Corsello*, 428 F.3d at 1012–13 (explaining that it is insufficient to "describe[] in detail a private scheme to defraud" and then speculate that claims "must have been submitted, were likely submitted or should have been submitted to the Government"). Thus, numerical probability is not an indicium of reliability. Relators attempt to distinguish *Clausen* and *Carrel* by pointing out that neither defendant in those cases billed the government for almost all its business. That

16

distinction is unpersuasive.  Under the FCA and Rule 9(b), a false claim cannot be "inferred from the circumstances." *Corsello*, 428 F.3d at 1013.  Whether a defendant bills the government for some or most of its services, the burden remains on a relator alleging the submission of a false claim to "allege 'specific details' about false claims to establish 'the indicia of reliability necessary under Rule 9(b).'"  *Carrel*, 898 F.3d at 1276 (quoting *Sanchez*, 596 F.3d at 1302).  Here, Relators have failed to allege any specific details about the submission of an actual false claim.[7]

In sum, Relators' complaint fails to contain some indicia of reliability to meet Rule 9(b)'s particularity requirement.  Although we construe all facts in favor of Relators, we "decline to make inferences about the submission of fraudulent claims because such an assumption would 'strip[] all meaning from Rule 9(b)'s requirements of specificity.'"  *Corsello*, 428 F.3d at 1013 (quoting *Clausen*, 290 F.3d at 1312 n.21); *Atkins*, 470 F.3d at 1359 ("The particularity requirement of Rule 9 is a nullity if Plaintiff gets a ticket to the discovery process without identifying a single claim." (quotation omitted)); *id.* at 1360 ("Requiring relators to

---

[7] Relators also rely on two other decisions that they argue support their case. *See United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 695 (11th Cir. 2014); *Hill v. Morehouse Med. Assocs.*, 2003 WL 22019936, at *3–4 (11th Cir. Aug. 15, 2003) (per curiam). We do not read those nonprecedential decisions to be contrary to our analysis.

17

plead FCA claims with particularity is especially important in light of the quasi-criminal nature of FCA violations (i.e., a violator is liable for treble damages).").

Because Relators have failed to plead the submission of an actual false claim with particularity, their false statement claim also fails. The "submission of a [false] claim is . . . the *sine qua non* of a False Claims Act violation." *Clausen*, 290 F.3d at 1311. And as Relators acknowledge, "[i]f Bethany Hospice's claims were false or fraudulent, it follows that when Bethany Hospice certified its compliance with the AKS" it made false statements under § 3729(a)(1)(B). But Relators have failed to plead a false claim with particularity, so their false statement claim must also be dismissed. *See, e.g.*, *United States ex rel. Grant v. United Airlines Inc.*, 912 F.3d 190, 199–200 (4th Cir. 2018) (dismissing a false statement claim because relators' complaint failed to allege a false claim); *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1166 (8th Cir. 2019) (rejecting a false statement claim because the complaint "fail[ed] to connect the false records or statements to any claim made to the government").

IV.  Conclusion

Because Relators failed to allege the submission of an actual false claim with particularity, the district court properly dismissed their complaint. Accordingly, we affirm.

**AFFIRMED**.

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

April 26, 2021

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 20-11624-AA
Case Style: Estate of Debbie Helmly, et al v. Bethany Hospice and Palliative, et al
District Court Docket No: 4:16-cv-00290-WTM-BKE

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing, are available at www.ca11.uscourts.gov.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call T. L. Searcy, AA at (404) 335-6180.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs